William R. Jones, Jr., Bar #001481
John T. Masterson, Bar #007447
Joseph J. Popolizio, Bar #017434
Lori L. Voepel, Bar #015342
JONES, SKELTON & HOCHULI, P.L.C.
2901 North Central Avenue, Suite 800
Phoenix, Arizona  85012
Telephone:  (602) 263-1700
Fax:  (602) 200-7801
wjones@jshfirm.com
jmasterson@jshfirm.com
jpopolizio@jshfirm.com
lvoepel@jshfirm.com

Attorneys for Defendants Maricopa County
Sheriff's Office and Joseph M. Arpaio

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | NO. CV12-00981-PHX-ROS |
| Plaintiff, | **DEFENDANTS' RULE 12(b)(6) MOTION TO DISMISS** |
| v. | |
| Maricopa County, Arizona; Maricopa County Sheriff's Office; and Joseph M. Arpaio, in his official capacity as Sheriff of Maricopa County, Arizona, | |
| Defendants. | |

Defendants   Maricopa   County   Sheriff's   Office   and   Joseph   Arpaio
(Defendants),  through  undersigned  counsel,  respectfully  request  the  Court  to  dismiss
Maricopa County Sheriff's Office (MCSO) as a Defendant because it is a nonjural entity
incapable  of  suing  or  being  sued.    Defendants  also  request  dismissal  of  Plaintiff's
disparate impact claims in Counts III, IV and V because the Complaint fails to set forth a
sufficient statistical basis for those claims.  Dismissal of the Title VI claims in Counts IV
and V is also required to the extent they allege discrimination based upon language, which
is not a "proxy" for national origin.  Count VI (alleged retaliation against "critics") should
also  be  dismissed,  as  it  fails  to  state  a  claim  under  42  U.S.C.  §  14141  and  the  First

Amendment.  Lastly, the request for injunctive relief relating to jail operations, posse operations, supervision, oversight and MCSO's "response to crimes of sexual violence" must be dismissed because such remedies are unavailable as a matter of law.  This Motion is supported by the attached Memorandum of Points and Authorities and the Complaint.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    PLAINTIFF'S ALLEGATIONS.

The Complaint alleges that Defendants have engaged in three categories of unlawful conduct: (1) a pattern or practice of discriminatory and otherwise unconstitutional law enforcement actions against Latinos in Maricopa County; (2) discriminatory jail practices against Latino prisoners with limited English language skills; and (3) a pattern or practice of retaliatory actions against perceived critics of MCSO activities.  (Complaint ¶6).  Plaintiff alleges that this conduct violates the First Amendment, Fourth Amendment and Fourteenth Amendment to the United States Constitution; the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141 (§ 14141); Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d to 2000d-7 (Title VI); the Title VI implementing regulations issued by the United States Department of Justice, 28 C.F.R. §§ 42.101 to 42.112 (Title VI Regulations); and Title VI contractual assurances. (Complaint ¶7).  Plaintiff seeks declaratory and injunctive relief "to remedy Defendants' violations of the law and to ensure that MCSO implements sustainable reforms establishing police and jail practices that are constitutional."  (Id. ¶8).

## II.   THE MARICOPA COUNTY SHERIFF'S OFFICE MUST BE DISMISSED BECAUSE IT IS A NONJURAL ENTITY WITHOUT THE CAPACITY TO SUE OR BE SUED.

### A.    Controlling Federal and State Authority Establishes That MCSO Lacks Capacity to Sue or Be Sued.

The capacity of a municipal entity such as the MCSO to sue or be sued is determined "by the law of the state where the court is located …."  Fed. R. Civ. P. 17(b)(3).  Governmental entities such as MCSO have no inherent power and possess only those powers and duties delegated to them by their enabling statutes.  *See Schwartz v.*

1    *Superior Court*, 186 Ariz. 617, 619, 925 P.2d 1068, 1070 (App. 1996).   Thus, a

2    governmental entity may be sued only if the state legislature has so provided.  *See Kimball*

3    *v. Shofstall*, 17 Ariz. App. 11, 13, 494 P.2d 1357, 1359 (1972).

4           It is well established that MCSO is a nonjural entity without the capacity to

5    sue or be sued.  *Braillard v. Maricopa County*, 224 Ariz. 481, 487, 232 P.3d 1263, 1269

6    (App. 2010); *Wilson v. Maricopa County*, 2005 U.S. Dist. LEXIS 28021, 2005 WL

7    3054051, at *2 (D. Ariz. 2005) (dismissing MCSO because it is not a jural entity separate

8    from Maricopa County); *see also Gotbaum v. City of Phoenix*, 617 F. Supp. 2d 878, 886

9    (D. Ariz. 2008) (because neither the Arizona legislature nor the City has stated that the

10    Phoenix Police Department is a separate jural entity, it is merely a subpart of the City of

11    Phoenix, which cannot sue or be sued).  In *Braillard*, the Arizona Court of Appeals stated

12    that its holding is consistent with the "consensus among Arizona federal decisions that

13    city police departments generally are nonjural entities."  *Id.*  As *Braillard* further noted,

14    "[a]lthough A.R.S. § 11-201(A)(1) provides that counties have the power to sue and be

15    sued through their boards of supervisors, no Arizona statute confers such power on MCSO

16    as a separate legal entity." *Id*.

17           No entity other than the legislature can confer jural status on MCSO.

18    Indeed, MCSO cannot even convey jural status upon itself by admitting such capacity in

19    court proceedings.  *Id.* (citing *Payne v. Arpaio*, 2009 U.S. Dist. LEXIS 110553, 2009 WL

20    3756679, 4 (D. Ariz. 2009)).  As a matter of law, MCSO must be dismissed.

21        **B.**     **Title VI Does Not Create A Capacity To Sue Or Be Sued.**

22          The Complaint seemingly alleges that MCSO has the capacity to be sued

23    because it "receives financial assistance from the United States Department of Justice

24    (DOJ), both directly and as a subrecipient of Maricopa County."  (Complaint ¶¶10, 152-

25    159).  The Complaint fails, however, to specifically identify any law that would create

26    capacity on the part of a nonjural entity simply because that entity receives federal funds.

27    To the extent Plaintiff believes otherwise, it is likely confusing jurisdiction and capacity.

28    Even if a court would otherwise have jurisdiction over an entity, that entity cannot be sued

if it lacks capacity to be sued under state law.  Capacity measures the ability of a party to participate in a lawsuit.

Nothing in Title VI or any other applicable federal law creates capacity to be sued simply because an entity receives federal financial assistance.  Recipients of federal financial assistance explicitly waive any claim to Eleventh Amendment immunity.  *See* 42 U.S.C. § 2000d-7(a)(1).  But there is no applicable federal law creating a capacity to sue or be sued when such capacity does not otherwise exist.  Even the Federal Rules of Civil Procedure make clear that the capacity to sue or be sued is determined *solely* by state law. Fed. R. Civ. P. 17(b)(3).  Both state and federal courts routinely dismiss charges against nonjural entities without any reference to an exception for those that receive federal financial assistance, and Defendants have found no case identifying such an exception.

## III. THE DISPARATE IMPACT CLAIMS CONTAINED IN COUNTS III, IV AND V MUST BE DISMISSED FOR FAILURE TO ALLEGE SUFFICIENT STATISTICAL EVIDENCE OF DISCRIMINATORY EFFECT.

The Complaint's Third, Fourth and Fifth Claims for Relief (Counts III, IV, V), allege that Defendants' law enforcement practices, treatment of limited English proficiency prisoners, and policing and jail practices have "an adverse disparate impact" on Latinos.  (Complaint ¶¶173, 179, 184).  The Complaint fails, however, to allege sufficiently specific statistical data to state any claim based upon a disparate impact theory.  These theories of liability must therefore be dismissed.[1]

### A. Specific Statistics Are Required To Support a Disparate Impact Claim.

A prima facie case of disparate impact requires the plaintiff to: (1) identify the specific practices or policies being challenged; (2) show disparate impact; and (3)

---

[1] Moreover, a showing of disparate impact is insufficient to state a Title VI claim under Section 601; intentional discrimination is required.  *Alexander v. Sandoval*, 532 U.S. 275, 280-81 (2001).  Section 601 of Title VI provides that no person shall, "on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity" covered by Title VI. 42 U.S.C. § 2000d.  Plaintiff has alleged intentional discrimination under Title VI in Counts III, IV and V in addition to alleging disparate impact, so to the extent those claims are based on Section 601 of Title VI, dismissal of the disparate impact portions of those claims would not fully dispose of those counts.

prove causation. *Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1424 (9th Cir. 1990). The second two factors are generally shown with statistics. *Rose*, 902 F.2d at 1424. The prima facie elements for a disparate impact theory were first set forth for Title VII claims under the Civil Rights Act of 1964. *See Griggs v. Duke Power Co.*, 401 U.S. 424 (1971). To sufficiently set forth the element of causation, a plaintiff must offer "statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of [a particular group] because of their membership in a protected group." *Rose*, 902 F.2d at 1424 (citing *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 108 S.Ct. 2777, 2788-89 (1988)). "The statistical disparities 'must be sufficiently substantial that they raise such an inference of causation.'" *Id.* (quoting *Watson,* 108 S.Ct. at 2798). Absent sufficient statistics, factual allegations are not "enough to raise a right of relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955, 1965 (2007).

In *Rose,* an employment case involving the dismissal of certain managers during the reorganization/consolidation of a newly acquired bank, the Ninth Circuit upheld dismissal of the plaintiff's claim because his statistics showed only that persons over 50 were "terminated at a higher rate than younger … employees." *Rose,* 902 F.2d at 1425. Because these statistical disparities could be explained by non-discriminatory factors (ie: older persons tended to hold the duplicative managerial positions eliminated during the reorganization), the court found the statistics were not sufficient to sustain plaintiff's disparate impact claim. *Id.*

**B.**     **Disparate Impact Claims Under Title VI Are Subject to the Same Criteria as Employment Discrimination Claims Under Title VII.**

Disparate impact claims under the ADEA are analyzed the same way as employment discrimination claims are evaluated under Title VII. *Rose,* 902 F.2d at 1420; *Palmer v. United States,* 794 F.2d 534, 537 (9th Cir. 1986). Likewise, disparate impact claims under Title VI, 42 U.S.C. § 2000d, are analyzed using the same criteria as that used for Title VII employment discrimination claims. *Darensburg v. Metropolitan Transp. Com'n,* 636 F.3d 511, 519 (9th Cir. 2011) ("We look to Title VII disparate impact

analysis in analyzing Title VI claims."); *Rashdan v. Geissberger*, 2012 U.S. Dist. LEXIS 75802 (N.D. Cal. 2012) ("Title VI claims are analyzed under the same test as Title VII employment discrimination claims."); *see also Greater New Orleans Fair Housing Action Center v. U.S. Dept. of Housing and Urban Dev*., 639 F.3d 1078 (D.C. Cir. 2011) ("When presenting a disparate impact claim, a plaintiff must generally 'demonstrate with statistical evidence that the practice or policy has an adverse effect on the protected group.'").

## C.     These Requirements Apply at the Pleading Stage.

Although *Rose* reviewed a grant of summary judgment, a plaintiff cannot wait until after discovery to allege facts sufficient to raise a disparate impact claim above the speculative level.  Numerous courts have dismissed disparate impact claims pursuant to Rule 12(b)(6) for failure to provide specific statistics in the Complaint itself.  In *Fanaka v. Warner Bros.*, 2000 U.S. Dist. LEXIS 19078 (C.D. Cal. 2000), the plaintiff claimed that movie studios used a subjective hiring system that disparately impacts African American directors.  The district court dismissed the claim under Rule 12(b)(6) for failure to provide specific statistics showing the approximate number of qualified African American directors and the approximate number of directors actually employed from different racial groups in the movie industry, which the Ninth Circuit had required plaintiff to provide on remand.  *Id.*  On remand, the statistics plaintiff provided were found to be insufficient to state a claim.  The Ninth Circuit affirmed the district court's dismissal of the disparate impact claim. *Fanaka v. Warner Bros*, 22 Fed.Appx. 915 (9th Cir. 2001).

In *Brown v. Coach Stores, Inc*., 30 F.Supp.2d 611 (S.D.N.Y. 1997), a receptionist filed suit against Coach for repeatedly passing her over for promotion, arguing that the system Coach uses for promoting and hiring disparately impacts minorities.  Dismissing both her disparate treatment and disparate impact claims under Rule 12(b)(6), the district court first noted that the statistics she provided from the EEOC regarding minority compensation of the overall Coach workforce were not sufficiently specific to support a disparate impact claim.  Similarly, in *United States v. Nara Bank*, 2010 U.S. Dist. LEXIS 78918 (C.D. Cal. 2010), the United States filed a disparate impact

claim alleging that the Bank discriminated against "non-Asians" by giving better loan rates to Asians.  The district court held that the amended complaint did not contain sufficient facts to make a disparate impact claim "plausible" within the meaning of *Twombly* even though the Bank supported its factual allegations with statistics showing that half of the studied non-Asian applicants got higher loan rates than the Asians.

In *Bennett v. Schmidt*, 1997 U.S. Dis. LEXIS 19034 (N.D. Ill. 1997), an African American plaintiff alleged that a school district screening committee interviewed only white applicants when she applied for a teaching position. The district court dismissed the plaintiff's disparate impact claim because statistical evidence showing the number of African American teachers out of a total staff of full time teachers showed only an "imbalance" in the work force and did not substantiate an inference of causation because it showed no comparison between African Americans who were qualified and interviewed, and whose who were actually hired.

In contrast, the cases denying Rule 12(b)(6) motions to dismiss did so because sufficient statistics were included with the plaintiff's factual allegations, which adequately stated plausible disparate impact claims under *Twombly.  See, e.g., Hogan & Rosen*, 167 F.Supp.2d 593 (S.D.N.Y. 2001) (statistics adequately suggested that a disproportionate number of employees within a protected age group were affected by the challenged employment practice); *Albright v. City of New Orleans,* 1997 U.S. Dist. LEXIS 7385  (E.D. La. 1997) (statistics revealing the domicile requirement's racially disparate impact were sufficient evidence of causation to withstand 12(b)(6) dismissal); *Garcia v. Country Wide Fin. Corp*., 2008 U.S. Dist. LEXIS 106675 (C.D. Cal. 2008) (statistical evidence sufficiently raised above the speculative level allegation that defendant's minority buyers pay disproportionately high fees).

**D.**     **The Complaint Fails To Allege Specific Statistics in Support of the Disparate Impact Claims.**

The Complaint fails to state claims for disparate impact.  First, it relies in significant part on anecdotal allegations rather than specific statistics.  For example, in its

allegations pertaining to stops conducted by the Human Smuggling Unit (HSU), the Complaint states that "in one instance, HSU officers stopped and detained a Latino driver and Latino passengers for a human smuggling investigation" based on their appearance as "disheveled" and "dirty." (Complaint ¶45). It alleges that "in another instance, MCSO officers stopped a car carrying four Latino men, although the car was not violating any traffic laws." (Id. ¶46). And it claims that "reports by MCSO officers reveal the routine absence of probable cause to arrest passengers." (Id. ¶49). In the section of allegations dealing with the treatment of Latinos in the course of traffic enforcement, it cites an "example" in which a pregnant Latina woman was allegedly stopped and mistreated after refusing to sit on the hood of her car. (Id. ¶62). And, it cites "another instance" in which a Latina woman was followed and subsequently arrested by officers for disorderly conduct, which was ultimately dismissed. (Id. ¶63). In the section of the Complaint alleging "targeting" of Latinos for immigration enforcement, it cites an "example" involving the officers' supposed search of an adjacent house during their raid of a house suspected of containing human smugglers and their victims. (Id. ¶67). And, it cites another example where a Latina was allegedly taken into custody for four hours to determine whether she was lawfully in the United States. (Id. ¶73). It also gives an "example" of an alleged worksite raid in which officers "demanded" to see the identification of a Latino man who was parked in an adjacent lot. (Id. ¶75). In the section addressing alleged public statements and endorsement of anti-Latino statements, the Complaint includes anecdotes of public statements allegedly made by Sheriff Arpaio in various contexts, and in response to letters he received from citizens, as well as alleged e-mails by MCSO staff about Latinos. (Id. ¶¶102-104, 107-108, 113-114). Finally, in the section addressing alleged constitutional violations by MCSO of Spanish speaking prisoners, the Complaint includes various examples of mistreatment of Latino prisoners resulting from their purported inability to communicate in English. (Id. ¶¶124-134).

Moreover, where purported studies and statistics are referenced, they are insufficiently identified and/or are not "statistical evidence of a kind and degree sufficient

to show that the practice in question has caused" the disparate impact. *Rose*, 902 F.2d at 1424. In discussing the alleged targeting of Latinos on the roadway, the Complaint references an unidentified "2011 study that assessed the incidence of traffic violations by non-Latino and Latino drivers" compared with the "rates at which MCSO officers stopped non-Latino and Latino traffic violators." (Complaint ¶¶27-30). The Complaint also alleges, without citing any particular source, that "a high percentage of people who are stopped [during suppression sweeps] have committed no criminal offense." (Id. ¶59). And, in discussing the alleged targeting of Latinos for immigration enforcement, the Complaint claims that "according to MCSO, CES has conducted 60 raids resulting in 627 arrests since 2006, with the most recent in May 2012." (Id. ¶69). It does not reference the specific statistics and/or any statistical basis for its subsequent claim that "During raids, CES typically seizes all Latinos present, whether they are listed on the warrant or not." (Id. ¶72). Rather, it gives another "example" to one raid in which 109 people were allegedly detained. (Id.). Finally, in discussing MCSO's alleged decision to prioritize immigration enforcement over violent crime investigations, the Complaint loosely references unnamed "statistical reports" which allegedly "show an increase in violent crime in Maricopa County … during the period of enhanced immigration enforcement." (Id. ¶84).

As a matter of law, such anecdotal allegations and unidentified, non-specific statistics are insufficient to state a claim for disparate impact under Title VI. Absent sufficient statistics to support its factual allegations and to raise its disparate impact claims beyond the speculative level, Plaintiff is precluded from maintaining its disparate impact claims under *Rose, Twombly*, and the other cases cited above. The disparate impact claims/theories under Counts III, IV and V must be dismissed.

**IV.  PLAINTIFF'S CLAIMS BASED ON LANGUAGE DISCRIMINATION MUST BE DISMISSED FOR FAILURE TO STATE A CLAIM OF NATIONAL ORIGIN DISCRIMINATION UNDER TITLE VI.**

Plaintiff's Fourth and Fifth Claims for Relief (Counts IV and V), allege that discrimination against limited English proficient Latino prisoners violates Title VI (Count

IV) and Title VI assurances (Count V, in part).  Plaintiff cannot maintain these claims because Title VI does not prohibit disparate treatment based on language proficiency.

Section 601 of Title VI prohibits intentional discrimination "on the ground of race, color, or national origin." 42 U.S.C. §§ 2000d.  But the Fourth Claim for Relief, and part of the Fifth Claim for Relief, do not rely on any of those prohibited grounds of discrimination.  Instead, the claims rely on allegations that Defendants violated Title VI by not providing adequate Spanish language-assistance to "limited English proficient (LEP) Latino prisoners."  (Complaint ¶¶117-137).  Plaintiff confuses the term "national origin" with language proficiency and, consequently, the claim must be dismissed.

Title VI and its implementing regulations prohibit intentional discrimination on the basis of "race, color, or national origin." 42 U.S.C. §§ 2000d; 28 C.F.R. § 42.104(b)(2).  Neither Title VI nor its implementing regulations prohibit, or even reference, disparate treatment of individuals with limited English proficiency.  Nor is there any reference in the legislative history of any intent to include language within the types of disparate treatment prohibited by Title VI.  *See* 1964 U.S.C.C.A.N. 2391, H. Rep. No. 914, 88th Cong., 2nd Sess. (1964) and S. Rep. No. 872, 88th Cong., 2nd Sess. (1964).  Whereas "national origin" refers to a person's birthplace or ancestry, language proficiency refers to the ability to understand and convey a specific set of words and phrases.

The distinction between language proficiency and national origin is not a novel concept.  Indeed, it was recently applied in the context of a Title VI claim.  In a 2010 Eighth Circuit case, the court held that disparate treatment of individuals with limited English proficiency does not equate to discrimination on the basis of national origin. *Mumid v. Abraham Lincoln High Sch.*, 618 F.3d 789 (8th Cir. 2010).  In *Mumid*, a group of 13 students filed a complaint, including a Title VI claim, against Abraham Lincoln High School, an alternative school for immigrant students.  *Id.* at 791.  Each of the *Mumid* plaintiffs were natives of either Somalia or Ethiopia and had lived in Kenyan refugee camps before coming to the United States when they were between the ages of 14-20.  *Id.* at 792.  The plaintiffs claimed that the high school provided fewer educational

1  and extracurricular opportunities than other schools and that it failed to test those students

2  learning English for learning disabilities or other special educational needs.  *Id.* at 793-94.

3  These shortcomings, they alleged, amounted to discrimination on the basis of national

4  origin because they occurred in a school that served only foreign-born students. *Id.*

5        The Eighth Circuit first noted that the district court "observed correctly that

6  Title VI prohibits only intentional discrimination [and that] proof of disparate impact is

7  not sufficient."  *Id.* at 794 (citing *Alexander*, 532 U.S. at 280-81).  [2]  In analyzing whether

8  the plaintiffs had adequately shown intentional discrimination, the Court turned to the

9  crux of the allegations – that the policies at issue discriminated against those students

10  categorized as "English language learners."  *Id.* at 795.  The Court rejected this argument,

11  noting that "[w]hile Title VI prohibits discrimination on the basis of national origin,

12  ***language and national origin are not interchangeable***." *Id.* (emphasis added).   The

13  Court then held that "[a] policy that treats students with limited English proficiency

14  differently than other students in the district does not facially discriminate based on

15  national origin." *Id.;  see also Castaneda v. Pickard*, 648 F.2d 989, 1007 (5th Cir. 1981)

16  ("we do not think it can seriously be asserted that [a] program [of allegedly inadequate

17  bilingual education in a Texas public school] was intended or designed to discriminate

18  against Mexican-American students" in violation of Title VI.).

19        This distinction has also been recognized in Title VI claims brought by

20  inmates.  In *Franklin v. District of Columbia*, a class of Hispanic prisoners alleged that the

21  District of Columbia violated their rights under Title VI by failing to offer religious,

22  vocational, and education programs in the Spanish language.  960 F. Supp. 394, 398

23  (D.D.C. 1997), *rev'd in part on other grounds*, 163 F.3d 625 (D.C. Cir. 1998).  The Court

24  held that the inmate plaintiffs were not entitled to Title VI relief because they were "not

25  being barred from participation in prison programs because of their race, color or national

26

27      [2] *Alexander* rejected the Title VI analysis used in earlier cases, including *Lau v. Nichols*, 414 U.S. 563 (1974), which Plaintiff had previously relied upon in support of its
28  discrimination claims.

origin." *Id.* at 432. The Court recognized the fundamental distinction between language proficiency and national origin: "While the programs are open to all inmates, limited-English proficient inmates' participation is limited only by their English fluency.  Simply put, LEP inmates are differently situated than inmates who are fluent in English." *Id*.

Applying the analysis from *Mumid* and *Franklin* requires a similar result here. Plaintiff's Fourth Claim for Relief must be dismissed because it is based on allegations that Defendants' policies discriminate against LEP inmates.   Although Plaintiff goes to great lengths to categorize the prisoners as "Latino Limited English Proficient" prisoners, its allegations clearly and unequivocally focus on providing language assistance to Spanish-speaking prisoners, not simply to those Spanish-speaking prisoners who also happen to be Latinos.  To the extent that Plaintiff's Fifth Claim for Relief is also based upon allegations that Defendants' policies discriminate against limited English proficient inmates, it must also be dismissed.

The plain language of Title VI and its implementing regulations expressly state a prohibition of conduct that discriminates on the basis of ***race, color, or national origin only*** – not language proficiency.  Language proficiency is simply not a proxy for national origin and, as such, any Title VI claim based on language proficiency is beyond the scope of Title VI.  Accordingly, this Court should dismiss Plaintiff's Fourth Claim for Relief, as well as the portion of Plaintiff's Fifth Claim for Relief that alleges discrimination on the basis of language proficiency.

## V.     COUNT VI (RETALIATION AGAINST CRITICS) FAILS TO STATE A CLAIM UNDER EITHER 42 USC § 14141 OR THE FIRST AMENDMENT.

In its Sixth Claim for Relief, Plaintiff claims that Defendants "retaliated" against "critics" of its immigration policies in violation of 42 U.S.C. § 14141 and the First Amendment.  This claim must be dismissed because: (1) it is outside the scope of conduct for which § 14141 relief is authorized, and (2) Plaintiff has no standing to sue for violations of individuals' First Amendment rights.

A.      **Congress Enacted § 14141 To Eradicate Systematic Police Brutality.**

Congress enacted 42 U.S.C. § 14141 as part of the Violent Crime Control and Law Enforcement Act of 1994 (Omnibus Violent Crime Act).   Section 14141 empowers the Attorney General to file a civil action for injunctive or declaratory relief if the Attorney General has "reasonable cause to believe" that law enforcement officers have engaged in "a pattern or practice of conduct ... that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States."

Legislative history demonstrates that that the driving force behind this Act was the Rodney King beating and other incidents of police brutality, both within the Los Angeles Police Department and elsewhere.  *See* Armacost, B., Organizational Culture and Police Misconduct, 72 Geo. Wash. L. Rev. 453 (2004).  Section 14141 was, in large part, a response to the Christopher Commission's finding that a significant number of officers in the LAPD "repetitively use excessive force against the public." H.R. Rep. No. 102-242, at 135 (1991) (quoting Christopher Commission Report, at 40).[3]  In enacting § 14141, Congress concluded that police brutality was not only a problem in Los Angeles, but was characteristic of many police departments, which often involved "particular policies or practices that [are] reflected in a pattern of misconduct." *Id.* at 136.  Legislators concluded that only injunctive relief could adequately address the problem of systemic police brutality, and § 14141 was the means by which Congress sought to eradicate such misconduct in police departments where police brutality was pervasive. *Id.* at 138.

The expanded authority granted to the Justice Department pursuant to § 14141 was intended only to "close the gap in the law" as it had developed in litigation under 42 U.S.C. § 1983 by providing the remedy of broad injunctive relief **where "appropriate."**  *United States v. City of Columbus*, 2000 U.S. Dist. LEXIS 11327 at 27 (S.D. Ohio 2000) (finding that the law is a valid and proper exercise of Congressional

---

[3] The Christopher Commission was created to investigate the LAPD following the 1991 beating of Rodney King. *See* H.R. Rep. No. 242 (discussing a predecessor bill to Pub. L. No. 103-322, which ultimately enacted 42 U.S.C. § 14141).

authority because "the remedy authorized by § 14141 is ***clearly responsive to the constitutional harm identified in the House Committee report and is no more expansive than is necessary to address that harm***."). In keeping with the spirit and purpose of Congress in enacting § 14141, virtually every lawsuit initiated by the Justice Department in the years following adoption of § 14141 focused on systematic police brutality. Lawsuits were brought in Pittsburgh, Pennsylvania; Steubenville, Ohio; the State of New Jersey; Los Angeles, California; Columbus, Ohio; Nassau County, New York, and elsewhere. Many of these resulted in consent decrees to improve police training in the proper use of force.[4]   Although lawsuits by the Justice Department pursuant to § 14141 occasionally have targeted racially discriminatory traffic stops and searches, efforts have focused primarily on policies and practices involving police brutality. *See Grand Lodge of the Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 12-13 (D D.C. 2001).

**B.   The Alleged Retaliation Contained in Count VI Is Plainly Outside the Scope of Conduct For which Injunctive Relief is Authorized By § 14141.**

Given the legislative history and purpose behind § 14141 and the Omnibus Violent Crime Act, this lawsuit against Defendants is questionable at best. But at least with regard to the racial profiling aspect of the § 14141 claims, there is some, albeit limited, precedent. There is absolutely no precedent, however, for using the authority under § 14141 to target the kind of conduct alleged in Plaintiff's Sixth Claim for Relief.

The conduct Plaintiff alleges in support of this claim involves purported "retaliation" by Defendants "against critics of MCSO practices, and particularly MCSO's immigration practices, in an effort to punish these persons for their criticism and to prevent future criticism." (Complaint ¶138). Even if this were a valid ground for

---

[4] *See, e.g.,* Consent Decree P 2, United States v. City of Los Angeles (C.D. Cal. June 15, 2001) (No. 00-11769), http://www.usdoj.gov/crt/split/documents/laconsent.htm (last visited Feb. 9, 2004); Consent Decree P 2, United States v. New Jersey (D.N.J. Dec. 30, 1999) (No. 99-5970), http://www.usdoj.gov/crt/split/documents/jerseysa.htm (last visited Feb. 9, 2004); Consent Decree PP 1, 4, United States v. City of Pittsburgh (W.D. Pa. Feb. 26, 1997) (No. 97-0354), http://www.us doj.gov/crt/split/documents/pittssa.htm (last visited Feb. 9, 2004); Consent Decree P 1, United States v. City of Steubenville (S.D. Ohio Sept. 3, 1997) (No. C2 97-966), http://www.usdoj.gov/ crt/split/documents/steubensa.htm (last visited Feb. 9, 2004).

obtaining injunctive relief under § 14141, which it is not, the factual allegation section of the Complaint purportedly supporting this Claim does not address retaliation against those who criticize MCSO's immigration practices. Rather, it cites alleged "unsubstantiated complaints and lawsuits" against certain attorneys, judges and Maricopa County officials, for which former Maricopa County Attorney Andrew Thomas and two of his assistant attorneys were subsequently disciplined by the Arizona State Bar. (Id. ¶¶140-145). None of the allegations claim that those incidents involved criticism of MCSO's "immigration practices," nor could they legitimately do so. At best, they allege supposed retaliation against individuals who criticize MCSO generally, which does not come close to forming the basis for a claim under § 14141.

Only three allegations (involving two anecdotes) in the Complaint even mention alleged retaliation against those who criticize MCSO's immigration policies or practices. (See Complaint §§ 147-149).[5] And those allegations cannot remotely support a claim that Defendants have engaged in "a pattern or practice of conduct ... that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States." § 14141. More importantly, the alleged conduct described in paragraphs 138 through 151 of the Complaint as a whole have nothing whatsoever to do with the purpose for which § 14141 was adopted – to eradicate systematic police brutality.

The United States Supreme Court has repeatedly emphasized the central tenant of federal statutory construction that: "if Congress intends to alter the usual constitutional balance between States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute." *Vermont Agency of Nat'l Resources v. United States*, 529 U.S. 765, 786 and n. 17 (2000); *see also United*

---

[5] Paragraphs 147-48 relate an alleged incident in which MCSO arrested a "peaceful protester for obstructing a thoroughfare during an act of civil disobedience." It notes that the protester "has a long history of publicly criticizing MCSO immigration operations." It also alleges that the protester was re-arrested, but that the charges were later dismissed. These allegations do not indicate that the "protester" was arrested while protesting MCSO immigration practices. Paragraph 149 alleges that MCSO officers arrested unnamed persons who "expressed their disagreement with MSCO immigration policies during the course of County Board meetings by applauding."

*States v. Univ. Hosp.*, 2001 U.S. Dist. LEXIS 25093, 7-8 (E.D.N.Y. 2001). This central tenant has been applied in strictly construing the bounds of § 14141. *See United States of America v. City of Columbus, Ohio*, 2000 U.S. Dist. LEXIS 11327 (S.D. Ohio 2000) (citing *Vermont Agency* and adding that in interpreting § 14141, "the Court will [also] be guided by the time-honored tenet of statutory interpretation which requires that a Court 'interpret the text of one statute in the light of text of surrounding statutes ....'").

Nothing in the language or legislative history of the Omnibus Violent Crime Act or § 14141 evidence an intent by Congress to permit the Attorney General to wield his authority under § 14141 to seek injunctive relief against a local county sheriff for filing complaints against individuals simply because the charges were ultimately dismissed, even if they allegedly involved retaliation against "critics." On its face, the Sixth Claim for Relief fails to state a claim for injunctive relief under § 14141 and must be dismissed.

**C.   <u>Plaintiff Lacks Standing to Bring a Third-Party First Amendment Claim on Behalf of the Unnamed Individuals Referenced in Count VI.</u>**

Setting aside whether the allegations in the Sixth Claim for Relief would support a First Amendment claim, the United States lacks standing to bring such a claim on behalf of the unnamed individuals referenced in this Count. When a person or entity seeks standing to advance the constitutional rights of others, courts consider two criteria. *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 623-24 n.3. (1989). First, the litigant must prove that he has suffered some injury-in-fact adequate to satisfy Article III's case or controversy requirement. *Id.* Second, the litigant must show that prudential considerations permit him to advance the claim. *Id.* In determining whether the litigant has shown the necessary prudential considerations, a court looks to three factors: (1) the relationship between the litigant and the person whose rights are being asserted; (2) the ability of the person to advance his or her own rights; and (3) the impact of the litigation on third-party interests. *Id.*

Plaintiff has not shown it has suffered some injury-in-fact related to the alleged violations of First Amendment rights set forth in Count VI. Nor has Plaintiff even

attempted to show that prudential considerations permit it to bring this type of claim. There is no apparent relationship between Plaintiff and the unnamed individuals referenced in Count VI that would support allowing Plaintiff to bring these claims. Nor is there any indication that the unnamed individuals are incapable of bringing First Amendment claims on their own, assuming they have such claims. Finally, the Complaint alleges no impact on third-party interests sufficient to support third-party standing. Even if standing to assert a claim under Title VI and/or § 14141 could potentially support third-party standing of the government to advance First Amendment claims, Title VI is not alleged as a basis for relief under Count VI, and as shown above, the allegations also do not support grounds for relief under § 14141. Thus, neither of these federal laws provide the basis for third-party standing to assert a First Amendment claim on behalf of these unnamed individuals. Count VI must therefore be dismissed on this basis as well.

## VI. PLAINTIFF CANNOT OBTAIN INJUNCTIVE RELIEF RELATING TO OVERSIGHT" AND "SUPERVISION" OF "JAIL OPERATIONS" OR TO MCSO'S "RESPONSE TO CRIMES OF SEXUAL VIOLENCE."

In paragraph 193 of its Prayer for Relief, Plaintiff seeks in pertinent part the following injunctive relief:

> Order the Defendants, their officers, agents, and employees to adopt and implement policies, procedures, and mechanisms to remedy the pattern or practice of unlawful conduct described herein, and by specifically addressing, inter alia, the following areas: policies and training; non-discriminatory policing **and jail operations**; stops, searches, and arrests; **response to crimes of sexual violence**; **posse operations**; **jail operations**; **supervision**; misconduct complaint intake, investigation and adjudication; retaliation; **oversight** and transparency; and community engagement[.]

(Complaint ¶193) (emphasis added). To the extent the relief sought by Plaintiff involves court or government monitoring of jail operations and/or court or government setting of law enforcement priorities, it is unavailable as a matter of law. Interference with prison (or jail) operations is prohibited by *Casey v. Lewis*, 518 U.S. 343, 362-63 (1996). And courts have no authority to issue an injunction "overriding" the setting of law enforcement priorities. *Sensing v. Harris*, 217 Ariz. 261, 265, 172 P.3d 856, 859 (App. 2007).

A.      **Injunctive Relief Is Not Available If It Interferes With Jail Operations.**

In *Casey*, the U.S. Supreme Court invalidated the appointment of a special master to oversee what changes in prison policy were necessary to ensure that prisoners received their right to access the courts. The special master's appointment was invalidated primarily due to the extreme deference due by the judiciary to the states regarding the internal operations of their prison systems. In *Casey*, Justice Scalia wrote:

> Finally, the order was developed through a process that failed to give adequate consideration to the views of state prison authorities. We have said that "the strong considerations of comity that require giving a state court system that has convicted a defendant the first opportunity to correct its own errors ... also require giving the States the first opportunity to correct the errors made in the internal administration of their prisons."

518 U.S. at 362 (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 492 (1973)).

*Casey* then compared and contrasted the procedural remedies used in that case with those employed in *Bounds v. Smith*, 430 U.S. 817 (1977). In the latter case, "after granting summary judgment for the inmates, the district court refrained from 'dictating precisely what course the State should follow.'" *Casey,* 518 U.S. at 362-63 (quoting *Bounds*, 430 U.S. at 818). Because the *Bounds* court recognized that "determining the appropriate relief to be ordered ... presents a difficult problem," it "charged the Department of Correction with the task of devising a Constitutionally sound program to assure inmate access to the courts." *Casey,* 518 U.S. at 363 (citing *Bounds* at 818-819). As *Casey* observed, the Supreme Court praised the procedure used in *Bounds*, "observing that the court had 'scrupulously respected the limits on [its] role,' by 'not . . . thrusting itself into prison administration' and instead permitting 'prison administrators [to] exercise wide discretion within the bounds of constitutional requirements.'" *Casey,* 518 U.S. at 363 (quoting *Bounds* at 832-833). In contrast, the district court in *Casey* totally disregarded the limits of its role by conferring upon its special master (a law professor from New York), rather than upon prison officials, the responsibility for devising a remedial plan. *Casey* also emphasized that "a prison regulation impinging on inmates' constitutional rights 'is valid if it is reasonably related to legitimate penological

interests" and that courts owe a high degree of deference to prison officials because "[s]ubjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration[.]" *Id.* at 363. The Supreme Court had previously expounded upon the need for this high degree of deference in *Bell v. Wolfish*, stating that:

> the problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. ***Such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters***.

441 U.S. 520, 547-548 (1979) (emphasis added).

Although *Casey* and *Wolfish* involved prison, rather than jail, administration, such deference appears to be even greater when dealing with a duly elected Sheriff's jail policies. The statutory powers and duties of our state's elected Sheriffs set forth in A.R.S. § 11-441 support the notion that Sheriff Arpaio is restrained from delegating or relinquishing the power to maintain and operate his county jail. In applying this provision, courts have held that they in turn have limited authority to interfere with a sheriff's duties to maintain and operate the county jails, and then only to determine whether specific constitutional violations exist and in ordering ***narrow*** remedies to correct violations. *Judd v. Bollman*, 166 Ariz. 417, 803 P.2d 138 (App. 1990).

The only apparent exception to the court's lack of authority to interfere with jail operations is where the issue involves the Sheriff's duties as an officer of the court, such as his duty to ensure that defendants are transported for court. In *Trombi v. Donahoe*, 223 Ariz. 261, 266-267, 222 P.3d 284 (App. 2009), the Arizona Court of Appeals held that although courts have limited authority to interfere with a sheriff's statutory duty under § 11-441(A)(5) to maintain and operate county jails, the sheriff acts

as an officer of the court when he performs his duty under § 11-441(A)(4) to attend court. Thus, the court order in *Trombi* was lawful where it merely directed the timely appearance of inmates.[6]   In contrast, because a sheriff was not acting as an officer of the court when regulating hours of jail visitation, he acted within the "ambit of his power," and the court had no authority to control the exercise of the sheriff's discretion within that ambit. *Arpaio v. Baca*, 217 Ariz. 570, 177 P.3d 312 (App. 2008).

Entering orders relating to jail operations, posse operations, supervision and oversight would unquestionably involve jail operations and prioritization of law enforcement efforts and resources.  These are statutory duties imposed on and reserved to the Sheriff in his capacity as an elected official.  Neither the court nor the government can properly interfere with Sheriff Arpaio's exercise of these duties under controlling federal and state caselaw.  These potential remedies are therefore unavailable as a matter of law.[7]

**B.**     **Injunctive Relief is Not Available If It "Overrides" the Setting of Law Enforcement Priorities.**

Moreover, courts have held that the decision of how to prioritize law enforcement goals and objectives based on resources and other considerations is within the discretion of a police chief or sheriff.  *Sensing v. Harris*, 217 Ariz. 261, 265, 172 P.3d 856, 859 (App. 2007).  Injunctive relief is simply not available to override the exercise of that discretion.  *Id.*  A police chief's or sheriff's discretion over law enforcement decisions also makes the issue of enforcing a particular statute a political question not appropriate for judicial resolution.  *Id.* (citing *Ahern v. Baker*, 366 P.2d 366, 369 (Colo. 1961)).  Thus, any order relating to MCSO's "response to crimes of sexual violence" would  improperly override Sheriff Arpaio's exercise of his discretion to set law enforcement priorities, and would involve non-justiciable political questions.

---

[6] *Trombi* observed that in § 11-441(A)(4), the Legislature granted to the judiciary the authority to require the sheriff to attend court, and required the sheriff to "obey lawful orders and directions issued by the judge."  Thus, the sheriff acts as an officer of the court in carrying out that duty. 223 Ariz. at 266-267 (citing *Baca*, 217 Ariz. at 579, 177 P.3d at 321 & *Clark v. Campbell*, 219 Ariz. 66, 72, 193 P.3d 320, 326 (App 2008)).

[7] In moving to dismiss these specific remedies, Defendants do not waive their ability to argue that none of the remedies should be ordered in this case.

**VII.** **CONCLUSION.**

For the above reasons, Defendants respectfully request the Court to: (1) dismiss MCSO as a Defendant; (2) dismiss the disparate impact claims/theories in Counts II, IV and V; (3) dismiss the Title VI claims in Counts IV and V alleging discrimination based upon limited English language proficiency; (4) dismiss Count VI; and (5) find that injunctive relief relating to "jail operations," "posse operations," "supervision," "oversight," and MCSO's "response to crimes of sexual violence" are unavailable as a matter of law.

DATED this 8th day of June, 2012.

JONES, SKELTON & HOCHULI, P.L.C.


By /s/ Lori L. Voepel
    William R. Jones, Jr.
    John T. Masterson
    Joseph J. Popolizio
    Lori L. Voepel
    2901 North Central Avenue, Suite 800
    Phoenix, Arizona  85012
    Attorneys for Defendants Maricopa County
    Sheriff's Office and Joseph M. Arpaio

ORIGINAL electronically filed
this 8th day of June, 2012.

COPY mailed/e-mailed this 8th day of June, 2012, to:

Thomas E. Perez
Roy L. Austin
U.S. Department of Justice
Civil Rights Division
950 Pennsylvania Avenue, NW
Washington, DC  20530

Richard K. Walker
Robert L. Dysart
Walker & Peskind, PLLC
16100 North 71st Street, Suite 140
Scottsdale, AZ 85254
Attorneys for Maricopa County, Arizona

Dan K. Webb
J. Erik Connolly
Winston & Strawn, LLP
35 West Wacker Drive
Chicago, IL 60601
Attorneys for Maricopa County, Arizona

 /s/  Ginger Stahly
_____