Thomas E. Perez
Assistant Attorney General
Roy L. Austin, Jr. (CA Bar #211491)
Deputy Assistant Attorney General
Jonathan M. Smith (DC Bar #396578)
Deeana Jang (CA Bar #111714)
Edward G. Caspar (MA Bar #650566)
Winsome G. Gayle (NY Bar #3974193)
Jennifer L. Mondino (NY Bar #4141636)
Sergio Perez (CA Bar #274798)
U.S. Department of Justice, Civil Rights Division
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
(tel.) 202-305-3655 / (fax) 202-514-6273,
(email) sergio.perez@usdoj.gov

Attorneys for the United States

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>Maricopa County, Arizona; Maricopa County Sheriff's Office; and Joseph M. Arpaio, in his official capacity as Sheriff of Maricopa County, Arizona,<br><br>Defendants. | No. 2:12-cv-00981-ROS<br><br>**UNITED STATES' RESPONSE TO MOTION TO DISMISS BY DEFENDANTS ARPAIO AND MCSO** |

The United States' Complaint seeks relief from wide ranging violations of constitutional rights by the Defendants, including discriminatory policing and jail practices and retaliatory actions against County residents who have spoken out against the Defendants. In this motion, Defendants Joseph M. Arpaio and the Maricopa County Sheriff's Office (MCSO) do not take issue with the claims that they have engaged in a pattern or practice of intentional discrimination and unlawful arrests and detentions, but

move to dismiss those claims seeking relief from disparate impact discrimination; discrimination against limited English proficient (LEP) Latino inmates of their jails; and retaliatory actions that violate the First Amendment. Defendants further move to dismiss MCSO as a defendant, contending that it lacks capacity to be sued, and to block a small portion of the relief that the United States is seeking. The United States opposes the Defendants' motion in all respects.

ANALYSIS

**I. The Complaint Sufficiently Alleges Disparate Impact to Support the Third, Fourth, and Fifth Claims.**

The Defendants move to dismiss the disparate impact claims in the Complaint only for an alleged lack of "sufficiently specific statistical data." Motion to Dismiss, Doc. 35, at 4 [hereinafter MTD]. Their argument is without merit. Their argument misconstrues the pleading standards applicable in federal cases and discounts the Complaint's allegations providing sufficient support for the disparate impact claims.

Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); Erickson v. Pardus, 551 U.S. 89, 93 (2007) (per curiam). While a complaint may not simply recite the elements of a cause of action and must contain factual allegations that "plausibly suggest an entitlement to relief," Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011), Rule 8 "does not require 'detailed factual allegations' . . . ." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Rather, "the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Erickson, 551 U.S. at 93 (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)). "Rule 8(a) 'does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' to support the allegations." Starr, 652 F.3d at 1217 (quoting Twombly, 550 U.S. at 556). There is no heightened pleading standard for civil rights actions. See Gilligan v. Jamco Dev. Corp.,

108 F.3d 246, 249 (9th Cir. 1997) (citing Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 168 (1993)).

The United States' Complaint sufficiently pleads the disparate impact claims. The regulations implementing Title VI explicitly prohibit practices that result in a disparate impact based on race, color, or national origin. In administering a program or activity, a funding recipient may not "utilize criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin . . . ." 28 C.F.R. § 42.104(b)(2). To survive a motion to dismiss, a complaint alleging disparate impact must identify a specific practice on the part of the defendant and allege sufficient facts that plausibly suggest that the defendant's practice caused a disproportionate adverse impact on a protected class. Darensburg v. Metro. Transp. Comm'n, 636 F.3d 511, 519 (9th Cir. 2011); McQueen v. City of Chicago, 803 F. Supp. 2d 892, 907 (N.D. Ill. 2011); Jenkins v. N.Y.C. Transit Auth., 646 F. Supp. 2d 464, 469-70 (S.D.N.Y. 2009); see Starr, 652 F.3d at 1216 (regarding general pleading standard).

The United States' Complaint alleges such facts. The Complaint identifies a broad range of practices by the Defendants, including targeting Latinos for routine traffic enforcement, purported immigration and human smuggling law enforcement activities, and large-scale immigration suppression operations; unlawful detention of Latinos to determine their immigration status; unlawful detention and targeting of Latinos during worksite raids; the failure to provide necessary Spanish-language assistance in MCSO jails; and routinely penalizing and failing to allow LEP inmates meaningful access to its jail services. See Complaint, Doc. 1, ¶¶ 22, 117, 118, 124, 125, 127, 129, 130, and 132.

The Complaint also shows how the Defendants' practices cause a disparate impact against Latinos. It alleges that MCSO officers routinely and unlawfully target Latinos in undertaking these practices, see, e.g., id. ¶¶ 25, 34, 54, 66, 117, 125, 129, 132; that, depending on where in the County they are driving, Latino drivers are four times, seven times, and nine times more likely to be stopped by MCSO officers than non-Latino drivers engaged in the same conduct, see id. ¶¶ 28-30; that the discriminatory conduct of

MCSO officers is engendered and facilitated in part by the ability to exercise broad, unfettered discretion and their lack of sufficient training and oversight, see, e.g., id. ¶¶ 35-37, 39, 40, 53, 76, 80, 81, 87, 135; that as a result, vehicles occupied by Latinos are far more likely to be stopped by MCSO officers than those occupied by non-Latinos, see id. ¶ 41; that MCSO officers routinely and unlawfully detain Latino occupants of cars or worksites to determine their immigration status, see id. ¶¶ 47-49, 64, 66, 68, 72, 74; that the Defendants have selected locations for their large-scale enforcement operations because of complaints by non-Latino residents that there are Latinos in those areas, see id. ¶ 58; that such large-scale operations result in extensive seizures of law-abiding Latinos who happen to be present, see id. ¶60; that raids have resulted in the unlawful detention of dozens of Latinos for several hours, see, e.g., id. ¶ 72; that virtually all of the Defendants' worksite raids have taken place at businesses where the majority of employees are Latino, see id. ¶ 70; that, during such raids, MCSO officers typically seize all Latinos present, whether or not they have lawful grounds to do so, see id. ¶72; and that MCSO officers typically do not detain the non-Latino employers during such raids, see id. ¶ 78. The Complaint further alleges that the Defendants' failure to develop and implement policies and practices to ensure meaningful access to services in MCSO jails for LEP Latino inmates has had a concrete disparate impact on Latino LEP prisoners, including the exclusion of LEP Latino inmates from necessary services such as requests for religious services and legal information, id. ¶ 125, attention to basic sanitary needs, id. ¶ 126, and access to recreation, clothing or food, id. ¶ 130; and that the Defendants' failure to provide adequate language assistance results in Latino LEP prisoners being subjected to hostility from other prisoners and waiving critical rights, such as their right to challenge removal proceedings, see id. ¶¶ 128, 132.

Such facts, taken as true, identify particular practices of the Defendants, show how they cause disproportionate adverse impacts on Latinos, and therefore "plausibly suggest an entitlement to relief" on the disparate impact claims in the Complaint. Starr, 652 F.3d at 1216. The Defendants' argument—that disparate impact claims, as a matter of law,

must be pleaded with allegations of "specific statistical data," MTD, Doc. 35, at 4—has no basis in the Federal Rules. As the Supreme Court plainly has said, "[s]pecific facts are not necessary . . . ." Erickson, 552 U.S. at 93. Fellow District Courts have considered and rejected this precise argument. See McQueen, 803 F. Supp. 2d at 906-07 ("A Title VII disparate impact claim need not allege statistical support to survive a motion to dismiss."); accord Jenkins, 646 F. Supp. 2d at 469 ("To the extent the defendants' argument is that a plaintiff must provide statistical support for a disparate impact claim in order to survive a motion to dismiss, that argument is incorrect. It would be inappropriate to require a plaintiff to produce statistics to support her disparate impact claim before the plaintiff has had the benefit of discovery.").

Moreover, the United States has found no judicial precedent that embraces the Defendants' argument, and the cases cited by the Defendants do not support it. The Defendants cite to the district court opinion in Bennett v. Schmidt, see MTD, Doc. 35, at 7), but the Seventh Circuit reversed the district court in that case and found that the complaint was sufficient because it need not "contain all of the evidence needed to prevail at trial," and because the "Rules of Civil Procedure make a complaint just the starting point." Bennett v. Schmidt, 153 F.3d 516, 518 (7th Cir. 1998). Rose v. Wells Fargo & Co., on which the Defendants principally rely, concerned a motion for summary judgment. See Rose, 902 F.2d 1417, 1419 (9th Cir. 1990). The remaining cases cited by the Defendants, far from holding that statistics are required to plead a disparate impact case, held merely that the statistics and other facts that the plaintiffs did allege, even if treated as true, did not show that the plaintiffs were entitled to relief. See Fanaka v. Warner Bros, 2000 WL 1846090, *1-3 (C.D. Cal. 2000); Brown v. Coach Stores, Inc., 30 F. Supp. 2d 611, 613 (S.D.N.Y. 1997); United States v. Nara Bank, 2010 WL 2766992, *2-3 (C.D. Cal. May 28, 2010) (unreported).

The United States' Complaint sufficiently pleads the disparate impact claims, and the Defendants' motion to dismiss these claims should be denied.

**II. Defendants' Discrimination against Latino LEP Inmates Violates Title VI.**

Defendants move to dismiss Count IV and part of Count V of the United States' Complaint, arguing that Title VI and its implementing regulations do not bar discrimination against LEP persons. The motion should be denied. Consistent with binding Supreme Court precedent and the weight of persuasive agency interpretation of Title VI regulations, the allegations in the United States' Complaint sufficiently make out a claim of national origin discrimination in violation of Title VI and its implementing regulations.

Because Defendants have accepted Federal financial assistance, Title VI and its implementing regulations prohibit Defendants from excluding persons from participation in, denying persons the benefits of, or subjecting persons to discrimination under the programs and services of the Defendants' jails on the basis of national origin. 42 U.S.C. § 2000d; 28 C.F.R. § 42.104. The vast majority of LEP inmates in the Defendants' jails are Latino. Complaint, Doc. 1, ¶118. By failing to provide necessary assistance to Latino LEP prisoners to understand communications regarding jail operations and services, instructions from staff, inmate rights to food, religious worship, exercise, and legal process, and by punishing Latino LEP inmates for their inability to understand instructions given only in English, see id., ¶¶ 117-37, Defendants deny persons meaningful access to their programs and activities on the basis of national origin. See Lau v. Nichols, 414 U.S. 563, 568 (1974) (concerning LEP students' access to educational programs).

That language-based discrimination constitutes a form of national origin discrimination prohibited by Title VI and its implementing regulations is well established by judicial precedent, long-standing federal agency regulations, and more than 35 years of consistent interpretation of those regulations by the Department of Justice. In 1974, the Supreme Court held that Title VI and its implementing regulations required a federally funded school district to ensure that LEP students were provided with meaningful access to the district's educational programs. Lau, 414 U.S. 563. In so

holding, the Court ruled that in an English-operated system that gave no language assistance to over 1800 Chinese LEP students, there could be "no equality of treatment merely by providing students with the same facilities, textbooks, teachers, and curriculum; for students who do not understand English are effectively foreclosed from any meaningful education." Id. at 566. The Court found that providing LEP students fewer benefits than others "denies them a meaningful opportunity to participate in the educational program—all earmarks of discrimination banned by the [Title VI] regulations." Id. at 568.

As in Lau, Defendants conduct their jail operations in English and, despite knowledge of a large Latino LEP jail population, provide inadequate and inconsistent language assistance to Latino LEP inmates, thereby denying such inmates meaningful access to jail programs and activities and intentionally discriminating against them on the basis of national origin. See id.; Sandoval v. Hagan, 197 F.3d 484, 510-11 (11th Cir. 1999) (holding that English-only driver's license tests constituted Title VI disparate impact, national origin discrimination), rev'd on other grounds sub nom. Alexander v. Sandoval, 532 U.S. 275 (2001); Almendares v. Palmer, 284 F. Supp. 2d 799, 808 (N.D. Ohio 2003) (holding that plaintiff sufficiently alleged Title VI violation based on Defendant's failure to ensure bilingual services in a food stamp program); see also Colwell v. Dep't of Health & Human Servs., 558 F.3d 1112, 1116-17 (9th Cir. 2009) (characterizing Lau as concluding that "discrimination against LEP individuals was discrimination based on national origin in violation of Title VI"); Yniguez v. Arizonans for Official English, 69 F.3d 920, 947 (9th Cir. 1995) (noting, though not in a Title VI case, that "language is a close and meaningful proxy for national origin"), vacated on other grounds sub nom. Arizonans for Official English v. Arizona, 520 U.S. 43 (1997); cf. Odima v. Westin Tucson Hotel Co., 991 F.2d 595, 601 (9th Cir. 1993) (explaining that "accent and national origin are obviously inextricably intertwined"); Asian Am. Bus. Grp. v. City of Pomona, 716 F. Supp. 1328 (C.D. Cal. 1989) (holding that a law requiring

commercial signs to devote half of their space to English constitutes national origin discrimination).

For more than 40 years, federal agencies consistently have interpreted Title VI's prohibition on national origin discrimination as requiring that LEP individuals have meaningful access to recipients' federally funded programs. See, e.g., Dep't of Health, Education, and Welfare, Identification of Discrimination and Denial of Services on the Basis of National Origin, 35 Fed. Reg. 11,595 (July 18, 1970); Notice of Proposed Rulemaking, Nondiscrimination on the Basis of Race, Color, or National Origin Under Programs Receiving Federal Financial Assistance Through the Department of Health and Human Services, 45 Fed. Reg. 82,972 (Dec. 17, 1980) [hereinafter HHS Title VI NPRM]; Exec. Order No. 13,166, Improving Access for Persons with Limited English Proficiency, 65 Fed. Reg. 50,121 (Aug. 11, 2000);[1] Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons, 67 Fed. Reg. 41,455 (Dep't of Justice, June 18, 2002).

An agency's interpretation of its own regulation is "controlling" unless plainly erroneous or inconsistent with the regulation. Auer v. Robbins, 519 U.S. 452, 461 (1997). Moreover, DOJ's interpretation of Title VI is entitled to special deference, since it is the agency charged with coordinating government-wide compliance with Title VI. See Exec. Order No. 12250, 45 Fed. Reg. 72,995 (Nov. 2 1980); Consol. Rail Corp. v. Darrone, 465 U.S. 624, 634 (1984); Andrus v. Sierra Club, 442 U.S. 347, 357-58 (1979).

The Department of Justice consistently has interpreted the prohibition against national origin discrimination in its Title VI regulations to require funding recipients like the Defendants to take appropriate measures to ensure that LEP persons have meaningful access to the recipients' programs. See Dep't of Justice Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin

[1] Since 2000, the majority of federal funding agencies have published guidance on the obligations of recipients of federal financial assistance to provide meaningful language access.

Discrimination Affecting Limited English Proficient Persons, 67 Fed. Reg. 41,455 (June 18, 2002) ("Under DOJ regulations implementing Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d, et seq. (Title VI), recipients of Federal financial assistance have a responsibility to ensure meaningful access to their programs and activities by persons with limited English proficiency (LEP)."). The Department's regulations explicitly apply to sheriffs' departments and jails. See id. at 41459, 41466. And its interpretation is consistent with those of other federal agencies concerning their regulations implementing Title VI. See, e.g., Executive Order 13,166, Improving Access for Persons with Limited English Proficiency, 65 Fed. Reg. 50,121 (Aug. 11, 2000); HHS Title VI NPRM, supra p.8 (Dec. 17, 1980).

Against this clear, consistent, and lengthy history, Defendants rely on two inapposite cases from other jurisdictions to support their Motion to Dismiss, Mumid v. Abraham Lincoln High Sch., 618 F.3d 789 (8th Cir. 2010), and Franklin v. District of Columbia, 960 F. Supp. 394 (D.D.C. 1997), rev'd on other grounds, 163 F.3d 625 (D.C. Cir. 1998). Mumid is inapposite because the defendant school in that case did not fail altogether to provide language assistance to LEP students, but delayed special education testing of LEP students for three years for "a legitimate non-discriminatory reason . . . namely, that it did not believe that it could reliably assess whether a student needed special-education services until the student had been in the country long enough to learn English." Mumid, 618 F.3d at 794. In this context, the court held that, because the defendant did not delay testing of other foreign-born students, the policy did not facially discriminate on the basis of national origin. Inexplicably, Mumid fails even to mention Lau. In Lau, as in Mumid, school authorities provided the requested services to some members of the plaintiffs' national origin group, but not to others. See Lau, 414 U.S. at 564. Yet, in Lau, this did not preclude a finding of national origin discrimination. Franklin, too, fails to cite or distinguish Lau, and the Court of Appeals ultimately vacated and reversed the opinion on other grounds. See Franklin v. District of Columbia, 163 F.3d 625 (D.C. Cir. 1998). Moreover, the court noted that the defendant in Franklin did

offer programs for LEP inmates and that programs were cut back because of budgetary restrictions, not for invidious reasons. Franklin, 960 F. Supp. at 432. In any event, Mumid and Franklin each concerned claims of intentional discrimination and would have no bearing on the United States' disparate impact claims.

The national origin discrimination claims based on Defendants' failure to allow LEP Latino inmates to access the programs and services of its jails are supported by longstanding Supreme Court precedent and over 35 years of consistent interpretation of the Title VI regulations by the Department of Justice. The Defendants fail to rebut that authority. Their motion to dismiss Count IV and part of Count V therefore should be denied.

## III. Section 14141 Plainly Protects against First Amendment Violations, and the United States Has Standing To Enforce It.

Defendants do not contest that they are engaged in repeated First Amendment violations. Instead, Defendants assert that § 14141, which protects against patterns or practices of violations "of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States," 42 U.S.C. § 14141(a), does not apply to protect against violations of the First Amendment. MTD, Doc. 35, at 12-16. Defendants also maintain that the United States lacks standing to enforce the statute, id. at 16-17, although it explicitly authorizes the Attorney General to do so. Finally, Defendants inaccurately assert that the Complaint can only include misconduct related to immigration enforcement. Id. at 15. Their arguments lack any merit.

### A. By the Plain Language of the Statute, Section 14141 Protects against Violations of the First Amendment.

"Statutory interpretation begins with the plain language of the statute." United States v. Rosales, 516 F.3d 749, 758 (9th Cir. 2008). Section 14141 prohibits law enforcement officers from engaging in a pattern or practice "that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the

United States." 42 U.S.C. § 14141. It contains no limitation on the nature of the constitutional or federal rights that it protects.

Defendants emphasize that the legislative history of a never-enacted predecessor to § 14141 focused primarily on the problem of police brutality. "If the plain meaning of the statute is unambiguous," however, "that meaning is controlling and we need not examine legislative history as an aide to interpretation unless 'the legislative history clearly indicates that Congress meant something other than what it said.'" United States v. Williams, 659 F.3d 1223, 1225 (9th Cir. 2011). The legislative history does not suggest that Congress meant to limit in any way the nature of constitutional rights that it sought to protect. In fact, the House Committee Report specifically references a complaint of police misconduct concerning retaliatory arrests such as those at issue in this case: "In New York City, bystanders who complain about police actions are arrested and "run through the system." H.R. Rep. 102-242(I), at 136 (1991).

The Defendants also assert that lawsuits enforcing § 14141 have focused primarily on "systematic police brutality," MTD, Doc. 35, at 14, but the history of the United States' investigations under § 14141 simply is not dispositive of the statute's purpose or scope. Defendants further cite a lack of precedent concerning the use of § 14141 to protect against First Amendment violations, see MTD, Doc. 35, at 14, but very few cases address § 14141 at all, a fact that speaks to the general high degree of professionalism of our nation's law enforcement offices, the cooperation that the United States virtually always receives when it notifies a jurisdiction of likely § 14141 violations, and the audacity of the Defendants' pattern or practice of First Amendment violations.

Still, reference to similar statutes can be instructive in interpreting § 14141. See United States v. Novak, 476 F.3d 1041, 1051 (9th Cir. 2007). "Courts generally interpret similar language in different statutes in a like manner when the two statutes address a similar subject matter." Id. Like Section 14141, Section 1983 protects against "the deprivation of any rights, privileges, or immunities secured by the Constitution . . . ." 42 U.S.C. § 1983. It is "clearly established" that § 1983 provides a cause of action against

law enforcement officials under the First Amendment for their retaliation against persons who complain against them. Beck v. City of Upland, 527 F.3d 853, 871 (9th Cir. 2008); accord Zilich v. Longo, 34 F.3d 359, 364-65 (6th Cir. 1994); see Mendocino Envtl. Ctr. v. Mendocino Cty., 192 F.3d 1283, 1302 (9th Cir. 1999) (preserving plaintiffs' § 1983 claim against law enforcement officers for violating their First Amendment rights through unfounded arrests and intimidation). Because § 14141 and § 1983 use similar language to address a similar subject matter, they "should be interpreted harmoniously." Tides v. Boeing Co., 644 F.3d 809, 814 (9th Cir. 2011).

The plain language of § 14141, its legislative history, and precedent applying similar language in § 1983 all show that § 14141 protects against First Amendment violations.

### B. The United States Has Standing To Enforce Section 14141.

Defendants also argue that the United States lacks standing to bring such First Amendment claims on behalf of third parties. See MTD, Doc. 35, at 16-17. The United States brings no such claim. It has asserted its own right, as explicitly provided by Congress, to enforce § 14141. See 42 U.S.C. § 14141(b) (explicitly authorizing the Attorney General to bring a civil action in the name of the United States to obtain appropriate relief); see also H.R. Rep. 102-242(I), at 135 (1991) (explaining that the legislation would "grant[] standing to the United States Attorney General . . . to obtain civil injunctive relief").

### C. The Complaint Sufficiently Alleges a Claim Based on the Defendants' Pattern or Practice of First Amendment Violations.

Defendants also suggest that the allegations in the Complaint do not support a claim under § 14141 for a pattern or practice of First Amendment violations because not all of the allegations relate to immigration enforcement. See MTD, Doc. 35, at 15. But the Complaint is not, and is not required to be, solely about misconduct related to immigration enforcement. Rather, it addresses a pattern or practice of unconstitutional retaliatory actions by the Defendants against those who spoke out against them,

regardless of the specific subject matter of the speech, and including, but not limited to, expression that criticized the Defendants' immigration enforcement practices. See Complaint, Doc. 1, ¶¶ 138-51.

The Complaint sufficiently alleges the First Amendment claim. The First Amendment prohibits a government official from subjecting an individual to retaliatory actions for protected speech. Hartman v. Moore, 547 U.S. 250, 256 (2006). Such unconstitutional retaliation entails government action that would chill or silence a person from future First Amendment activities, so long as the government official's desire to cause the chilling effect was a but-for cause of the action. Skoog v. County of Clackamas, 469 F.3d 1221, 1232 (9th Cir. 2006). As discussed above, a complaint's factual allegations need only "plausibly suggest an entitlement to relief." Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011). The Complaint easily clears this notice-pleading hurdle. It alleges, among other things, that the Defendants' former Chief Deputy, acting on their behalf, filed five separate complaints with the Arizona State Bar targeting attorneys who spoke out publicly against the Defendants, and that each of the complaints was dismissed for lack of supporting facts or evidence, see Complaint, Doc. 1, ¶ 140; that a former County Attorney acted in concert with the Defendants to file a lawsuit baselessly accusing people who had publicly criticized the Defendants, id., ¶ 142; that the Defendants have used unjustified arrests as a means to intimidate and retaliate against persons who have spoken out against their immigration practices, id., ¶ 144; that the Defendants engaged in such retaliation not only against County officials but against private individuals perceived as critics of the Defendants, including a peaceful protestor of the Defendants' immigration policies and persons who voiced their disapproval of the Defendants during County Board meetings, id., ¶¶ 146-49; and that Defendant Arpaio publicly stated that he would arrest individuals even for activities that courts have held were protected by the First Amendment, id., ¶ 150.

The Complaint sufficiently alleges that Defendants have engaged in a pattern or practice of First Amendment violations so as to support a claim for relief under § 14141.

For the foregoing reasons, the United States respectfully requests that the Court deny the Defendants' motion to dismiss Count VI of the Complaint.

**IV. MCSO Is Subject to Suit in Federal Court.**

Defendants move to dismiss all claims against Defendant MCSO, contending that MCSO "is a nonjural entity without capacity to sue or be sued." MTD, Doc. 35, at 3. Their motion should be denied. MCSO is subject to suit pursuant to state law and because it has accepted federal funds that require adherence to civil rights laws.

State law generally resolves questions of a party's capacity to suit. See Fed. R. Civ. P. 17(b)(3). In determining questions of state law, a federal court's task is to predict how the state's highest court would resolve the question, considering both decisions from the state's intermediate appellate courts and from other jurisdictions. Soltani v. W. & S. Life Ins. Co., 258 F.3d 1038, 1045 (9th Cir. 2001). Though federal courts should not disregard decisions of state intermediate appellate courts, neither should a federal court follow a flawed state court opinion when convinced by other persuasive arguments that the state's highest court would hold otherwise. Dimidowich v. Bell & Howell, 803 F.2d 1473, 1482-83 (9th Cir. 1986).

Defendants note that an Arizona intermediate appellate court addressed the question of MCSO's capacity to suit in Braillard v. Maricopa County, 232 P.3d 1263 (Ariz. Ct. App. 2010). There, the court held that MCSO lacked capacity to be sued because state statutes explicitly conferred such capacity on counties but did not explicitly do so for sheriffs' offices. Id. at 1269. The court in Braillard failed to consider two arguments, however, that support MCSO's capacity to be sued. First, state law permits MCSO to be sued as a "public entity." As this court previously has held, Arizona law permits "public entities" to be sued, whether or not state statutes explicitly confer them with such capacity. See Carey v. Maricopa County, 602 F. Supp. 2d 1132, 1143 (D. Ariz. 2009) (Silver, J.) (citing Ariz. Rev. Stats. § 12-820 notes). Arizona law defines "public entity" as "any political subdivision" of Arizona. Id. (citing Ariz. Rev. Stats. § 12-820(6)). A "political subdivision," as defined by state courts, "exists for the purpose of

discharging some function of local government, . . . has a prescribed area, and . . . possesses authority for subordinate self government by officers selected by it." McClanahan v. Cochise College, 540 P.2d 744, 747 (Ariz. Ct. App. 1975). MCSO meets that definition. MCSO discharges the law enforcement responsibilities of the county, it operates in the prescribed area of Maricopa County, and it possesses the authority to appoint officers, such as sheriff's deputies, for self government. See Ariz. Rev. Stats. § 11-409. As such, MCSO is a "public entity" subject to suit. See Carey, 602 F. Supp. 2d at 1143-44 (holding that Maricopa County's integrated health system and medical center constitute public entities subject to suit). But see Wilson v. Maricopa County, 2005 WL 3054051, *2 (D. Ariz. Nov. 15, 2005) (holding that MCSO is not a "public entity").[2]

Second, MCSO should not be dismissed from the case because it is a recipient of federal funds and should be subject to suit under Title VI "to enjoin any unlawful use of those funds." Ortega Melendres v. Arpaio, 598 F. Supp. 2d 1025, 1039 (D. Ariz. 2009) (denying MCSO's motion to dismiss based on its nonjural status after MCSO failed to rebut the opposing argument based on Title VI). Though Rule 17(b) refers to state law to determine a party's capacity to suit, the Supreme Court has held that the rule should not block suit against a party in federal court in a case that raises questions "of primary importance in the working out of justice and in protecting individuals and society from possibility of oppression and injury in their lawful rights . . . ." United Mine Workers v. Coronado Coal Co., 259 U.S. 344, 390 (1922) (holding that a labor union could be sued in federal court for violations of the Anti-Trust Act even though state law did not give the union the capacity to be sued in its own name, but required suit of its individual members). The United States' suit under Title VI seeks to remedy a pattern or practice of

---

[2] Federal District Court opinions have divided on the question whether MCSO is a jural entity subject to suit. See Payne v. Arpaio, 2009 WL 3756679, *4 (D. Ariz. Nov. 4, 2009) (holding that state law did not "confer separate jural status" on MCSO); Auble v. Maricopa County, 2009 WL 3335425, *2 (D. Ariz. Oct. 14, 2009) (noting division); Ortega Melendres v. Arpaio, 598 F. Supp. 2d 1025, 1039 (D. Ariz. 2009) (declining to dismiss MCSO as a "non-jural entity"); Wilson v. Maricopa County, 2005 WL 3054051, *2 (D. Ariz. Nov. 15, 2005) (holding that MCSO is not a jural entity).

racially discriminatory policing and jail policies, unlawful detentions, and retaliatory action by Defendants against individuals who speak out against them. As such, it raises questions "of primary importance in the working out of justice and in protecting individuals and society from possibility of oppression and injury in their lawful rights." Coronado Coal, 259 U.S. at 390. MCSO therefore should be subject to suit in this case.

**V. Defendants' Objections to Particular Remedies Are Premature.**

Lastly, Defendants argue that the United States seeks certain injunctive relief that Defendants assert is unavailable as a matter of law, and they ask the Court to "find that [such] injunctive relief" is unavailable. MTD, Doc. 35, at 21. Defendants' motion is premature at best and should be denied.

Defendants bring their motion under Rule 12(b)(6), but that rule concerns the legal sufficiency of a plaintiff's claims, not the appropriateness of the relief sought. See Fed. R. Civ. P. 12(b)(6); City of New York v. A-1 Jewelry & Pawn, Inc., 247 F.R.D. 296, 353 (E.D.N.Y. 2007) ("As to the [defendants'] contention that the remedy sought by the [plaintiff] is impermissibly vague or unconstitutional, a motion for failure to state a claim properly addresses the cause of action alleged, not the remedy sought."). Objections to the specific nature of the requested relief must await later stages of litigation. See id. (denying motion to dismiss based on the nature of the remedy sought and stating, "It is the court that will craft any remedy. Only when that remedy has been determined may defendants contest its application . . . ."); California v. Kinder Morgan Energy Partners, L.P., 569 F. Supp. 2d 1073, 1082-83 n.2 (S.D. Cal. 2008) (denying motion to dismiss in which defendants asked the court to strike the plaintiffs' request for certain injunctive relief and deferring the question to later stages of the case).

In any event, the case on which Defendants rely does not foreclose in all circumstances the injunctive relief that the United States seeks, but merely requires the scope of the relief to match the scope of the proven harm. See Lewis v. Casey, 518 U.S. 343, 357(1996). The full scope of the harm caused by the Defendants can be determined

only after discovery. The Defendants' motion to declare certain relief unavailable at this early stage of the case therefore should be denied.

CONCLUSION

For the foregoing reasons, the United States respectfully asks the Court to deny the Defendants' Motion to Dismiss in all respects.

Respectfully,

Thomas E. Perez
Assistant Attorney General

/s/ Edward G. Caspar
Roy L. Austin, Jr. (CA Bar #211491)
Jonathan M. Smith (DC Bar #396578)
Deeana Jang (CA Bar #111714)
Edward G. Caspar (MA Bar #650566)
Winsome G. Gayle (NY Bar #3974193)
Jennifer L. Mondino (NY Bar #4141636)
Sergio Perez (CA Bar #274798)
U.S. Department of Justice, Civil Rights Division
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
Tel. (202) 305-3655/Fax (202) 514-6273
Sergio.perez@usdoj.gov
Attorneys for the United States

DATED: June 22, 2012

CERTIFICATE OF SERVICE

I certify that on or about June 22, 2012, a true and correct copy of the foregoing pleading was served on counsel of record by the Court's CM/ECF system.

/s/ Edward G. Caspar
EDWARD G. CASPAR