IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CV-12-00981-PHX-ROS |
| Plaintiff, | **ORDER** |
| vs. | |
| Maricopa County, Arizona; et al., | |
| Defendants. | |

Pending before the Court are Defendants' motions to dismiss. (Docs. 35 and 37). For the reasons below, Maricopa County Sheriff's Office ("MCSO") will be dismissed, but the claims against Sheriff Joseph M. Arpaio ("Arpaio") and Maricopa County, Arizona (the "County") will be allowed to proceed.

**BACKGROUND**

On May 10, 2012, the United States of America ("Plaintiff") filed a Complaint against the County, MCSO and Arpaio in his official capacity. The Complaint alleges six claims for relief: Count One for intentional discrimination on the basis of race, color or national origin in violation of the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141 ("Section 14141") and the Due Process and Equal Protection clauses of the Fourteenth Amendment; Count Two for unreasonable searches, arrests and detentions lacking probable cause or reasonable suspicion in violation of Section 14141 and the Fourth Amendment; Count Three for disparate impact and intentional discrimination on the basis of race, color

1  or national origin in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d
2  - 2000d-7 ("Title VI"); Count Four for disparate impact and intentional discrimination
3  against limited English proficient ("LEP") Latino prisoners in violation of Title VI; Count
4  Five for disparate impact and intentional discrimination in violation of Defendants'
5  contractual assurances under Title VI; Count Six for retaliation against Defendants' critics
6  in violation of Section 14141 and the First Amendment. (Doc. 1, ¶¶ 165-188).  Defendants
7  move to dismiss.

## ANALYSIS

### A.     Legal Standard

Under Rule 8 of the Federal Rules of Civil Procedure, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  The complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quotation omitted).  A plaintiff must allege facts sufficient "to raise a right to relief above the speculative level." *Id.*  The complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 at 555).

### B.     MCSO

The MCSO moves to dismiss because it is a non-jural entity, incapable of suing or being sued in its own name.  State law generally determines a party's capacity to be sued. *See* Fed. R. Civ. P. 17(b)(3).  Under Arizona law, "Government entities have no inherent power and possess only those powers and duties delegated to them by their enabling statutes.

1 Thus, a governmental entity may be sued only if the legislature has so provided." *Braillard v. Maricopa County*, 232 P.3d 1263, 1269 (Ariz. Ct. App. 2010) (citations omitted). In *Braillard*, the Arizona Court of Appeals recognized the question of "[w]hether MCSO is a nonjural entity is apparently an issue of first impression in our state courts." *Id.* The Court noted, "[a]lthough A.R.S. § 11-201(A)(1) provides that counties have the power to sue and be sued through their boards of supervisors, no Arizona statute confers such power on MCSO as a separate legal entity." *Id.* *Braillard* "therefore conclude[d] MCSO is a nonjural entity and should be dismissed from this case." *Id.* The MCSO's motion to dismiss will be granted because the MCSO is a nonjural entity.[1]

## C. Sheriff Arpaio

### 1. Disparate Impact Claims in Counts III, IV and V

Counts III, IV and V allege disparate impact and intentional discrimination under Title VI. The Sheriff seeks to dismiss the disparate impact portion of Counts III, IV and V for failure to allege sufficient statistical evidence of discriminatory effect.

A prima facie case of disparate impact requires the plaintiff: (1) identify the specific practices or policies being challenged; (2) show disparate impact; and (3) prove causation. *Rose v. Wells Fargo & Co.,* 902 F.2d 1417, 1424 (9th Cir. 1990). The second and third factors are generally shown with statistics. *Id.* To establish causation, the plaintiff must offer "statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of [a particular group] because of their membership in a protected

---

[1] Prior to May 27, 2010, whether MCSO is a jural entity was not firmly decided in this Court. *See, e.g., Scotti v. City of Phoenix*, No. CV-09-1264-PHX-MHM, 2010 WL 994649, at *5 (D. Ariz. March 17, 2010) ("the Arizona state courts have not yet addressed the issue of whether police departments, sheriff's offices, and entities with similar legal identities are non-jural under Arizona state law, and decisions issued by courts within the District of Arizona have been conflicting"). On May 27, 2010, the Arizona Court of Appeals decided *Braillard*, resolving the issue. Since *Braillard*, courts have cited *Braillard* for the proposition that the MCSO is not a jural entity capable of being sued. *E.g., Abrah v. City of Scottsdale Police Dept.,* 2010 WL 4102563 at *1 (D. Ariz. Oct. 18, 2010) (dismissing MCSO).

1  group." *Id.* (citing *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 108 S.Ct. 2777, 2788-89 (1988)).  "The statistical disparities 'must be sufficiently substantial that they raise such an inference of causation.'" *Id.* (quoting *Watson*, 108 S.Ct. at 2789)).  "The 'significance' or 'substantiality' of numerical disparities is judged on a case by case basis." *Id.* (citing *Watson*, 108 S.Ct. at 2789 n.3).

At the motion to dismiss stage, a complaint need not allege statistical data. *McQueen v. City of Chi.*, 803 F. Supp. 2d 892 (N.D. Ill. 2011) ("A Title VII disparate impact claim need not allege statistical support to survive a motion to dismiss.")[2]; *Garcia v. Country Wide Fin. Corp.*, No. EDCV 07-1161-VAP (JCRx), 2008 WL 7842104 (C.D. Cal. Jan. 17, 2008) (plaintiff "is not required at the pleading stage to produce statistical evidence proving a disparate impact") (citing *Twombly*, 127 S.Ct. at 1964-65).  "It would be inappropriate to require a plaintiff to produce statistics to support her disparate impact claim before the plaintiff has had the benefit of discovery." *Jenkins v. N.Y. City Transit Auth.*, 646 F. Supp. 2d 464, 469-70 (S.D.N.Y. 2009).  At the motion to dismiss stage, "there is no reason [a plaintiff] would have this kind of statistical evidence yet." *Mata v. Ill. State Police*, No. 00 C 0676, 2001 WL 292804, at *4 (N.D. Ill. Mar. 22, 2001).

The Sheriff argues these cases are no longer good law because they rely on *Swierkiewicz v. Sorema*, 534 U.S. 506 (2002), which has subsequently been overruled.  However, *Swierkiewicz* was overruled because it applied a standard less than the plausibility standard set forth in *Twombly* and *Iqbal*.  Here, Plaintiff does not argue for a standard less than plausibility.  Plaintiff acknowledges the plausibility standard.  Although *Swierkiewicz* was overruled by *Twombly* and *Iqbal*, post-*Twombly* and *Iqbal* cases have held statistical data is still not required at the motion to dismiss stage. *See McQueen*, 803 F. Supp. 2d 892 (citing *Iqbal*); *Jenkins*, 646 F. Supp. 2d at 469-70 (citing *Iqbal* and *Twombly*); *Garcia*, 2008 WL 7842104 (citing *Twombly*).

---

[2] "We look to Title VII disparate impact analysis in analyzing Title VI claims." *Darensburg v. Metro. Transp. Com'n*, 636 F.3d 511, 519 (9th Cir. 2011).

1 The Complaint alleges MCSO officers routinely and unlawfully target Latinos through pretextual traffic stops. As a result, vehicles occupied by Latinos are far more likely to be stopped by MCSO officers than those occupied by non-Latinos.[3] The Complaint alleges: MCSO officers detain Latinos in cars or at worksites without probable cause; Defendants select locations for large-scale crime suppression sweeps based on complaints by non-Latino residents that Latinos are in those areas, resulting in extensive seizures of law-abiding Latinos who happen to be present; MCSO officers detain all Latinos during worksite raids and do not detain non-Latino employers during such raids; and when MCSO officers search suspected drop houses, they also detain law-abiding Latinos in neighboring houses with no probable cause or reasonable suspicion. As a result, Latinos are far more likely to be deprived of their constitutional rights than non-Latinos. The Complaint alleges Defendants failed to develop and implement policies and practices to ensure LEP Latino inmates have equal access to jail services such as sanitary needs, food, clothing, legal information and religious services. The Complaint alleges the discriminatory conduct of MCSO officers is facilitated by broad, unfettered discretion and lack of training and oversight.

Plaintiff has alleged (1) a practice or policy being challenged; (2) disparate impact; and (3) causation. *Rose,* 902 F.2d at 1424. Plaintiff has alleged "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570). As such, the Sheriff's motion to dismiss the disparate impact claims in Counts III, IV and V will be denied.

---

[3] Although not required, Plaintiff has alleged statistical evidence for disparate impact claims based on pretextual traffic stops and crime suppression sweeps. Plaintiff alleges a 2011 study shows Latino drivers are four to nine times more likely to be stopped for traffic violations by MCSO officers than non-Latino drivers engaged in similar conduct. Specifically, Latino drivers are almost four times more likely to be stopped in the southwest portion of the County, over seven times more likely to be stopped in the northwest portion of the County, and nearly nine times more likely to be stopped in the northeast portion of the County.

- 5 -

**2.     LEP Discrimination**

The Sheriff moves to dismiss Count IV and part of Count V insofar as they allege discrimination against LEP Latino prisoners. The Sheriff argues Title VI's prohibition against intentional discrimination "on the ground of race, color, or national origin" does not cover language proficiency. 42 U.S.C. §§ 2000d. In other words, the Sheriff argues language is not a proxy for national origin.

However, longstanding case law, federal regulations and agency interpretation of those regulations hold language-based discrimination constitutes a form of national origin discrimination under Title VI. In *Lau v. Nichols*, 414 U.S. 563, 568 (1974) *abrogated on other grounds by Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978), the Supreme Court held Title VI's prohibition against discrimination on national origin covered discrimination against LEP individuals. *See also Colwell v. Dep't of Health & Human Servs.*, 558 F.3d 1112, 1116-17 (9th Cir. 2009) (noting *Lau* concluded "discrimination against LEP individuals was discrimination based on national origin in violation of Title VI"). In *Lau*, the school district ran an English-operated system with no language assistance for 1800 Chinese LEP students. The Court ruled there was "no equality of treatment merely by providing students with the same facilities, textbooks, teachers, and curriculum; for students who do not understand English are effectively foreclosed from any meaningful education." *Id.* at 566. Thus, the LEP students were denied "a meaningful opportunity to participate in the educational program - all earmarks of discrimination banned by the [Title VI] regulations." *Id.* at 568. Thus, under *Lau*, Title VI's prohibition against national origin discrimination covers language proficiency.

In addition, the DOJ has interpreted Title VI's prohibition against national origin discrimination requires funding recipients to ensure LEP persons have meaningful access to the recipient's programs. *See* Dep't of Justice Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons, 67 Fed. Reg. 41455 (June 18, 2002) ("Under DOJ regulations implementing Title VI . . . recipients of Federal financial assistance have a

- 6 -

1 responsibility to ensure meaningful access to their programs and activities by persons with
2 limited English proficiency (LEP)."). The Department's regulations explicitly apply to
3 sheriffs' departments and jails. *See id.* at 41459, 41466. An agency's interpretation of its
4 own regulation is "controlling" unless plainly erroneous or inconsistent with the regulation.
5 *Auer v. Robbins*, 519 U.S. 452, 461 (1997). The DOJ coordinates government-wide
6 compliance with Title VI and its interpretation of Title VI is entitled to special deference.
7 *See* Exec. Order No. 12250, 45 Fed. Reg. 72,995 (Nov. 2 1980); *Consol. Rail Corp. v.*
8 *Darrone*, 465 U.S. 624, 634 (1984); *Andrus v. Sierra Club*, 442 U.S. 347, 357-58 (1979).

9 Further, federal agencies consistently interpret Title VI's prohibition on national
10 origin discrimination to require federal funding recipients to provide LEP individuals
11 meaningful access to their programs. *See, e.g.,* Dep't of Health, Education, and Welfare,
12 Identification of Discrimination and Denial of Services on the Basis of National Origin, 35
13 Fed. Reg. 11,595 (July 18, 1970); Notice of Proposed Rulemaking, Nondiscrimination on
14 the Basis of Race, Color, or National Origin Under Programs Receiving Federal Financial
15 Assistance Through the Department of Health and Human Services, 45 Fed. Reg. 82,972
16 (Dec. 17, 1980); Exec. Order No. 13,166, Improving Access for Persons with Limited
17 English Proficiency, 65 Fed. Reg. 50,121 (Aug. 11, 2000); Guidance to Federal Financial
18 Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination
19 Affecting Limited English Proficient Persons, 67 Fed. Reg. 41,455 (Dep't of Justice, June
20 18, 2002).

21 Defendants rely on two cases to support their argument that national origin does not
22 cover LEP individuals under Title VI: *Mumid v. Abraham Lincoln High Sch.*, 618 F.3d 789
23 (8th Cir. 2010), and *Franklin v. District of Columbia*, 960 F. Supp. 394 (D.D.C. 1997), *rev'd*
24 *on other grounds*, 163 F.3d 625 (D.C. Cir. 1998). In *Mumid*, the school delayed special
25 education testing of LEP students for three years for "a legitimate non-discriminatory reason
26 . . . namely, that it did not believe that it could reliably assess whether a student needed
27 special-education services until the student had been in the country long enough to learn
28 English." *Mumid*, 618 F.3d at 794. The school did not delay testing of other foreign-born

students, and the Eighth Circuit concluded the policy did not facially discriminate on the basis of national origin. In *Franklin*, the defendant offered programs for LEP inmates, and the programs were cut back because of budgetary restrictions, not invidious reasons. *Franklin*, 960 F. Supp. at 432. Neither *Mumid* nor *Franklin* cite, let alone distinguish *Lau*. In light of the factual differences and the absence of any discussion of the Supreme Court's decision in *Lau*, the Court finds *Mumid* and *Franklin* distinguishable.

Plaintiff alleges Defendants conduct their jail operations in English and provide inadequate language assistance to its large Latino LEP population, thereby denying Latino LEP inmates meaningful access to jail programs such as sanitary needs, food, clothing, legal information and religious services. Under longstanding Supreme Court precedent and the DOJ's interpretation of Title VI regulations, the Court finds Plaintiff has stated a claim for national origin discrimination against the LEP population.

### 3. First Amendment Retaliation

Section 14141 prohibits law enforcement officers from engaging in a pattern or practice "that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States." 42 U.S.C. § 14141. The plain language of the statute allows for a Section 14141 claim based on a First Amendment deprivation. The First Amendment prohibits a government official from retaliating against an individual for protected speech. *E.g., Hartman v. Moore*, 547 U.S. 250, 256 (2006). The First Amendment prohibits retaliation taken to chill future speech. *E.g., Skoog v. County of Clackamas*, 469 F.3d 1221, 1232 (9th Cir. 2006).

The Complaint alleges former County Attorney Andrew Thomas acted in concert with Defendants to file a baseless lawsuit accusing people who had publicly criticized Defendants and baseless Arizona State Bar complaints against attorneys who spoke out against Defendants. The Complaint alleges Defendants used unjustified arrests to intimidate and retaliate against critics of their immigration policies. These allegations state a claim for First Amendment retaliation under Section 14141.

The Sheriff argues these allegations are "inaccurate," but this is a factual

1  determination not properly before the Court at the motion to dismiss stage. The Sheriff
2  argues Section 14141 claims typically focus on police brutality. This does not forbid a
3  Section 14141 claim based on the First Amendment that is permitted by the plain language
4  of the statute.

5  The Sheriff argues Plaintiff lacks standing to bring such First Amendment claims on
6  behalf of third parties. Plaintiff, however, does not assert claims on behalf of third parties.
7  It asserts its own right to enforce Section 14141, as explicitly provided by Congress. 42
8  U.S.C. § 14141(b) (explicitly authorizing Attorney General to bring civil action in the name
9  of the United States to obtain appropriate relief); *see also* H.R. Rep. 102-242(I), at 135
10 (1991) (explaining legislation would "grant[] standing to the United States Attorney General
11 . . . to obtain civil injunctive relief").

12 Finally, the Sheriff argues the Complaint does not state a Section 14141 claim because
13 not all of the First Amendment violations relate to immigration enforcement. Plaintiff's
14 authority to enforce Section 14141 is not limited to immigration matters. Plaintiff may seek
15 injunctive relief to address Defendants' alleged pattern and practice of constitutional
16 violations by retaliating against critics regardless of whether the subject matter is
17 immigration related. Therefore, the Court will deny the Sheriff's motion to dismiss Count
18 VI for First Amendment retaliation.

19 **4.  Scope of Remedies**

20 The Sheriff moves to dismiss a portion of Plaintiff's prayer for relief that seeks an
21 order for Defendants to adopt and implement policies regarding its policing and jail
22 operations. A 12(b)(6) motion to dismiss challenges the legal sufficiency of the pleadings,
23 not the appropriateness of the relief sought. *See* Fed. R. Civ. P. 12(b)(6); *City of New York*
24 *v. A-1 Jewelry & Pawn, Inc.*, 247 F.R.D. 296, 353 (E.D.N.Y. 2007) ("[A] motion for failure
25 to state a claim properly addresses the cause of action alleged, not the remedy sought."). The
26 scope of the relief must match the scope of the harm proven. *Lewis v. Casey*, 518 U.S. 343,
27 357 (1996). This will be determined after discovery.

28 The Sheriff cites *Casey* for the proposition that interference with prison operations is

prohibited. But *Casey* does not stand for such a broad proposition. In *Casey,* the Supreme Court set aside an injunctive order developed without any input from state prison authorities, and remanded for further proceedings. *Casey*, 518 US. at 362-63. The Sheriff cites *Sensing v. Harris*, 172 P.3d 856, 859 (Ariz. Ct. App. 2007), for the proposition that a court cannot override law enforcement priorities. Again, *Sensing* does not stand for such a broad proposition. In *Sensing*, the Arizona Court of Appeals affirmed the trial court's decision to dismiss a complaint seeking a mandamus directing the city police chief to enforce a soliciting ordinance. By contrast, here Plaintiff seeks to enforce federal anti-discrimination laws. Nothing in *Sensing* prohibits Plaintiff from pleading injunctive relief to remedy discriminatory law enforcement conduct. Therefore, the Court will deny the Sheriff's motion to dismiss a portion of Plaintiff's prayer for relief.

**D.     County**

The County argues it should be dismissed because it has no authority over the MCSO and Sheriff and therefore has no liability for, or power to stop, the alleged discrimination by the MCSO and Sheriff. (Doc. 37).

Municipal liability arises where an alleged constitutional deprivation is caused by a policy or custom of the municipality. *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 691-94 (1978); *Fogel v. Collins*, 531 F.3d 824, 834 (9th Cir. 2008). "[A] policy is a deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Id.* (quoting *Fairley v. Luman*, 281 F.3d 913, 918 (9th Cir. 2002) (per curiam) (internal quotations omitted)). "Whether a state official is a final policy maker for purposes of municipal liability is a question of state law that is to be determined by the district court." *Ortega Melendres v. Arpaio*, 598 F. Supp. 2d 1025 (D. Ariz. 2009) (citing *Streit v. County of Los Angeles*, 236 F.3d 552, 560 (9th Cir. 2001)). "When determining whether an individual has final policymaking authority, courts ask whether the individual at issue has authority 'in a particular area, or on a particular issue.'" *Id.* (quoting *McMillian v. Monroe County*, 520 U.S. 781, 785 (1997)).

By statute, Arizona law charges county sheriffs with the responsibility of conducting law enforcement and jail activity on the part of the county. Arizona Revised Statute § 11-441A provides the "sheriff shall":

> 1. Preserve the peace.
>
> 2. Arrest and take before the nearest magistrate for examination all persons who attempt to commit or who have committed a public offense.
>
> 3. Prevent and suppress all affrays, breaches of the peace, riots and insurrections which may come to the knowledge of the sheriff. . . .
>
> 5. Take charge of and keep the county jail, including a county jail under the jurisdiction of a county jail district, and the prisoners in the county jail.

A.R.S. § 11-441A; *see also* Ariz. Const. art. XII, §§ 3-4 (providing that there shall be created in an for each County of the State a Sheriff and that the Sheriff's duties, powers, and qualifications shall be prescribed by law).

Under *Flanders v. Maricopa County*, 203 Ariz. 368 (Ct. App. 2002) and *Guillory v. Greenlee County*, No. CV 05-352 TUC DCB, 2006 WL 2816600 (D. Ariz. Sept. 28, 2006), Arizona Counties can be held liable for the Sheriff's discretionary acts related to jail management and law enforcement policy. *Guillory* specifically held:

> The Sheriff is an enumerated officer of the Defendant County. 11-401(A)(1). As a matter of law, the County is liable for policies made by the Sheriff, pursuant to his designated powers and duties as provided for by statute: A.R.S. § 11-441. *See e.g., Flanders*, 54 P.3d at 847 (holding county liable because the sheriff is a county officer whose duties regarding jail operations are fixed by law, A.R.S. § 11-441(5)).
>
> Section 11-441(A)(2) provides that the Sheriff shall arrest and take before a magistrate for examination all persons who attempt to commit or who have committed a public offense. The purpose of this duty is the prompt and orderly administration of criminal justice, including the Sheriff's discretionary investigatory determination of when enough evidence has been obtained to make an arrest. *Cf. Arizona v. Monaco*, 207 Ariz. 75, 83 P.3d 553, 558-59 (Ariz. App. 2004) (explaining the statute does not create a constitutional right to be arrested upon first discovery of criminal activity because sheriff must be permitted to exercise discretion to conduct investigation until enough evidence is obtained for a conviction). This makes the Sheriff the final policymaker regarding criminal investigations.
>
> Under A.R.S. § 11-444, actual and necessary expenses of the Sheriff must be allowed and paid by the County. The Court finds that this fiscal independence

> further demonstrates that the Sheriff is the designated and final policymaker for the County regarding the needs of its officers for the prompt and orderly administration of criminal justice . . . .

*Guillory*, 2006 WL 2816600 at *4.

Moreover, courts routinely find the Sheriff is the final policymaking authority for the County in analogous § 1983 matters. *See Wilson v. Maricopa County*, 463 F. Supp. 2d 987, 991 (D. Ariz. 2006) (citing A.R.S. § 11-441A and holding "Arizona law makes clear that the Sheriff is the final policymaker for the County's jails. The Court accordingly concludes that Sheriff Arpaio is the County's final policymaker for purposes of municipal liability under § 1983 arising out of events at tent city."); *Flanders*, 54 P.3d 837 (holding in § 1983 case that Maricopa County is responsible for Sheriff Arpaio's jail policies); *see also Cortez v. County of L.A.*, 294 F.3d 1186, 1189 (9th Cir. 2002) ("[T]he County is subject to § 1983 liability for the Sheriff's actions taken here pursuant to his role as administrator of the county jail."); *Guillory*, 2006 WL 2816600 at *4 (D. Ariz. Sept. 28, 2006) ("Here, the alleged inadequate training was a policy of the County because the Sheriff was the policymaker for the County regarding the officer training . . . ."); *United States v. City of Columbus*, No. 2:99-cv-1097, 2000 WL 1133166, at *8 (S.D. Ohio Aug. 3, 2000) (concluding that liability under § 14141 can be established by evidence that would establish liability under § 1983).

Municipalities create policies in three ways: first, in a "'policy statement, ordinance, regulation or decision officially adopted and promulgated'" by the municipality's lawmaking body; second, by "a single edict or act by a municipal officer with final policy making authority"; or third, by "a widespread custom or practice [that] creates a de facto municipal policy." *Greenawalt v. Sun City West Fire Dist.*, 250 F.Supp. 2d 1200, 1215 (D. Ariz. 2003) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978)). The focus here is on the Sheriff's policymaking authority.

Courts "must apply pleading standards in a realistic, common-sense fashion that recognizes that at the pleading stage (i.e., prior to discovery occurring) a plaintiff frequently lacks the actual details concerning a contested policy or custom." *Id.* at 1216. "In the Ninth Circuit, plaintiffs need not specifically allege a policy, it is enough if the policy may be

- 12 -

inferred from the allegations of the complaint." *Id.* The Complaint satisfies this pleading requirement because it alleges Defendants failed to implement adequate policies, training or accountability mechanisms to remedy the pattern and practice of unlawful conduct and prevent discrimination against Latinos. Plaintiff alleges a custom, policy and practice of targeting, searching, arresting and detaining Latinos without probable cause or reasonable suspicion because of their race, color and national origin.

Under Arizona law, the Sheriff has final policymaking authority with respect to County law enforcement and jails, and the County can be held responsible for constitutional violations resulting from these policies. The policymaker analysis also supports Plaintiff's Title VI claims against the County because Title VI reaches the actions of relevant "decisionmakers." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) (holding that a successful showing of a Title VI violation rests on the actions of a decisionmaker). In light of the Arizona statutes and case law acknowledging the Sheriff's policymaking authority, the County's motion to dismiss will be denied.

Accordingly,

**IT IS ORDERED** the motion to dismiss filed by Maricopa County Sheriff's Office and Sheriff Joseph M. Arpaio **(Doc. 35)** is **GRANTED IN PART AND DENIED IN PART**. The Maricopa County Sheriff's Office is dismissed.

**IT IS FURTHER ORDERED** Maricopa County's motion to dismiss **(Doc. 37)** is **DENIED**.

DATED this 11th day of December, 2012.

Roslyn O. Silver
Chief United States District Judge