1
2
3
4
5
6
7
8

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CV-12-00981-PHX-ROS |
| Plaintiff, | **ORDER** |
| v. | |
| Maricopa, County of, et al., | |
| Defendants. | |

Before the Court are the parties' cross-motions for summary judgment (Doc. 332, 334, 345).

## BACKGROUND

### I. The Parties

Plaintiff the United States brought the present action alleging a pattern or practice of discrimination against Latinos in Maricopa County, Arizona by Defendants Joseph M. Arpaio ("Arpaio") and Maricopa County in violation of the Constitution and federal statutes. Defendant Arpaio is the Sheriff of Maricopa County and heads the Maricopa County Sheriff's Office ("MCSO"). As MCSO's chief officer, Arpaio directs law enforcement throughout Maricopa County.[1] He is responsible for MCSO's policies and operations, which include all facets of policing and prison administration. MCSO is a subdivision of Maricopa County. Maricopa County's primary governing body is the

---

[1] MCSO is a non-jural entity, which the Arizona Court of Appeals has determined cannot be sued. *Braillard v. Maricopa County*, 232 P.3d 1263, 1269 (Ariz. Ct. App. 2010).

Board of Supervisors (the "Board"). The Board consists of five Supervisors, each of whom is elected from one of Maricopa County's five districts. Maricopa County determines the budgets and provides the funding for its subdivisions, including municipal courts, public schools, and law enforcement (i.e. MCSO). Maricopa County receives federal financial assistance from the United States, which it distributes to various county subdivisions, including MCSO.

**II. The Prior Litigation:** *Melendres v. Arpaio*

In 2007, private individual plaintiffs initiated a class action lawsuit against Arpaio, MCSO, and Maricopa County, alleging MCSO officers engaged in racial discrimination against Latinos "under the guise of enforcing immigration law." *Ortega-Melendres v. Arpaio*, 836 F. Supp. 2d 959, 969 (D. Ariz. 2011), *aff'd sub nom. Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012) (hereinafter "*Melendres*"). The case focused on "saturation patrols," which were described as "crime suppression sweeps" in which officers saturate a given area and target persons who appeared to be Latino for investigation of their immigration status. (2:07-CV-02513-GMS, Doc. 26 at 10). Jose de Jesus Ortega-Melendres, the named plaintiff, was stopped in his vehicle by members of the MCSO's Human Smuggling Unit and detained without probable cause while officers investigated his immigration status, along with those of his passengers. *Melendres v. Arpaio*, 989 F. Supp. 2d 822, 880 (D. Ariz. 2013); (2:07-CV-02513-GMS, Doc. 26 at 17). The certified class of plaintiffs encompassed "[a]ll Latino persons who, since January 2007, have been or will be in the future stopped, detained, questioned or searched by [the defendants'] agents while driving or sitting in a vehicle on a public roadway or parking area in Maricopa County, Arizona." *Melendres v. Arpaio*, 695 F.3d 990, 995 (9th Cir. 2012). *See also Ortega-Melendres v. Arpaio*, 836 F. Supp. 2d 959, 994 (D. Ariz. 2011).

In May 2009, Maricopa County requested a stay pending the outcome of the United States' investigation of Arpaio's practices, which had begun one month earlier. The United States opposed the motion, as did Arpaio, and the court denied the stay due to the timing and uncertainty regarding the outcome of the United States' investigation. *Melendres v. Maricopa Cnty.*, No. 07-cv-02513, 2009 WL 2515618, at *4 (D. Ariz. Aug.

13, 2009). Over the course of the *Melendres* litigation, the United States requested deposition transcripts and filed motions for protective orders regarding discovery. It also sought to transfer a 2010 Title VI enforcement action to the *Melendres* court.

In October 2009, the *Melendres* court granted a joint motion and stipulation to dismiss Maricopa County without prejudice. (2:07-CV-02513-GMS, Doc. 194). The stipulation stated, "Defendant Maricopa County is not a necessary party at this juncture for obtaining the complete relief sought." (2:07-CV-02513-GMS, Doc. 178).

On May 24, 2013, the *Melendres* court issued Findings of Fact and Conclusions of Law. *Melendres v. Arpaio*, 989 F. Supp. 2d 822 (D. Ariz. 2013) ("*Melendres* Order"). The court held MCSO's "saturation patrols all involved using traffic stops as a pretext to detect those occupants of automobiles who may be in this country without authorization," *id.* at 826, and "MCSO's use of Hispanic ancestry or race as a factor in forming reasonable suspicion that persons have violated state laws relating to immigration status violates the Equal Protection Clause of the Fourteenth Amendment." *Id.* at 899. The court also found MCSO conducted discriminatory traffic stops outside of saturation patrols. *Id.* at 844-845, 889-890. The *Melendres* Order enjoined MCSO from "using Hispanic ancestry or race as [a] factor in making law enforcement decisions pertaining to whether a person is authorized to be in the country, and [] unconstitutionally lengthening [vehicle] stops." *Id.* at 827.

After the ruling, the United States filed a statement of interest concerning potential forms of relief.[2] On October 2, 2013, the court issued its Supplemental Permanent Injunction/Judgment Order. *Melendres v. Arpaio*, No. CV-07-02513-PHX-GMS, 2013 WL 5498218, at *1 (D. Ariz. Oct. 2, 2013) ("Supplemental Order"). The order permanently enjoined Defendants from: 1) "[d]etaining, holding or arresting Latino occupants of vehicles in Maricopa County based on a reasonable belief, without more,

---

[2] The statement of interest was made pursuant to 28 U.S.C. § 517, which permits the Attorney General to send officers of the Department of Justice to "any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States." 28 U.S.C. § 517. *See M.R. v. Dreyfus*, 697 F.3d 706, 735 (9th Cir. 2012) (comparing "statement of interest" under 28 U.S.C. § 517 to an amicus brief).

that such persons are in the country without authorization"; 2) "[u]sing race or Latino ancestry as a factor in deciding whether to stop any vehicle" or in deciding whether a vehicle occupant was in the United States without authorization; (3) "[d]etaining Latino occupants of vehicles stopped for traffic violations for a period longer than reasonably necessary to resolve the traffic violation in the absence of reasonable suspicion that any of the vehicle's occupants have committed or are committing a violation of federal or state criminal law"; (4) "[d]etaining, holding or arresting Latino occupants of a vehicle . . . for violations of the Arizona Human Smuggling Act without a reasonable basis for believing the necessary elements of the crime are present"; and (5) "[d]etaining, arresting or holding persons based on a reasonable suspicion that they are conspiring with their employer to violate the Arizona Employer Sanctions Act." *Id.* The Supplemental Order also contained numerous provisions regarding the implementation of bias-free policing, including standards for bias-free detention and arrest policies and training, as well as detailed policies and procedures for ensuring and reviewing MCSO's compliance with the *Melendres* Order. The procedures included the appointment of an independent monitor to report on Arpaio and MCSO's compliance and collection of traffic stop data. *Id.*

Arpaio and MCSO appealed the *Melendres* Order and the Supplemental Order (collectively, the "*Melendres* injunction"), challenging provisions which addressed non-saturation patrol activities and arguing the evidence was insufficient to sustain the district court's conclusion that Arpaio and MCSO's unconstitutional policies extended beyond the context of saturation patrols. *Melendres v. Apraio*, No. 13-16285, Opening Brief of Defendant/Appellant Arpaio, Doc. 32-1, at 2, 13-15, 17-18 (March 17, 2014). MCSO also argued it was not a proper party in the case. *Id.*

On April 15, 2015, the Ninth Circuit issued an opinion holding MCSO was not a proper party because it is a non-jural entity lacking separate legal status from Maricopa County. *Melendres v. Arpaio*, 784 F.3d 1254 (9th Cir. 2015). The Ninth Circuit ordered Maricopa County substituted as a party in lieu of MCSO. *Id.* at 1260. But the court also stated, "[o]n remand, the district court may consider dismissal of Sheriff Arpaio in his

- 4 -

official capacity because 'an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.'" *Id.*[3] In addition, the court held the *Melendres* injunction was not overbroad because it applied to activities beyond saturation patrols: "Although the evidence largely addressed [the] use of race during saturation patrols, the district court did not clearly err in finding [Arpaio's] policy applied across-the-board to all law enforcement decisions—not just those made during saturation patrols."[4]   *Id.* However, the court found the requirements for the independent monitor "to consider the 'disciplinary outcomes for *any* violations of departmental policy' and to assess whether Deputies are subject to 'civil suits or criminal charges . . . for off-duty conduct" were not narrowly tailored and ordered the district court "to tailor [these provisions] to address only the constitutional violations at issue." *Id.* at 1267.

**III. The Litigation Before This Court: *U.S. v. Maricopa County***

On March 10, 2009, the United States Department of Justice ("DOJ") sent Arpaio a letter notifying him it was commencing an investigation of his office. (Doc. 333-3 at 6). Over a year later, on August 3, 2010, DOJ issued a "Notice of noncompliance with the obligation to cooperate with the Department of Justice investigation pursuant to Title VI of the Civil Rights Act of 1964." (Doc. 333-3 at 9) ("Notice Letter"). Although the Notice Letter appears to have been mailed only to counsel for MCSO, counsel for Maricopa County responded to it. (Doc. 333-3 at 9). On August 12, 2010, Maricopa County's private counsel wrote to the United States to express Maricopa County's "desire[] to cooperate in any way possible with the [United States'] investigation referenced in the Notice Letter," emphasizing, "[a]s a recipient of Title VI funds, Maricopa County believes it has an obligation to cooperate." *Id.* Maricopa County offered to use its subpoena power to procure documents in aid of DOJ's investigation. *Id.* at 10. The letter also stated Maricopa County would "[notify] MCSO that it [could] not

---

[3] On May 15, 2015, Maricopa County filed a Petition for Rehearing on its substitution as a party in *Melendres*.

[4] The reference to "all law enforcement decisions" was referring to decisions made regarding vehicle stops outside of the context of official saturation patrols.

expend any public funds, including on outside counsel, to resist any DOJ Title VI inquiry," and that "Maricopa County [would] not pay those bills as resisting a Title VI inquiry is outside the scope of the employment of any elected or appointed official." *Id.*

On December 15, 2011, DOJ sent Maricopa County Attorney Bill Montgomery ("Montgomery") a 22-page letter notifying him of the investigation into MCSO and announcing "the findings of the Civil Rights Division's investigation into civil rights violations by the [MCSO]." (Doc. 333-2 at 2) ("Findings Letter"). The Findings Letter did not reference Maricopa County, specifically. Montgomery immediately responded that DOJ had "noticed the wrong party." (Doc. 333-3 at 12). On January 17, 2012, DOJ responded it would continue to include Maricopa County in all correspondence because its "investigation potentially affect[ed] Maricopa County as the conduit of federal financial assistance to MCSO." (Doc. 333-3 at 14).

On May 9, 2012, DOJ advised Maricopa County:

> [I]n accordance with the notice requirements set forth in DOJ's Title VI regulations, 42 C.F.R. § 108(d)(3), it is the intention of the Department of Justice to file a civil action against Maricopa County, the Maricopa County Sheriff's Office, and Sheriff Joseph M. Arpaio in order to remedy the serious Constitutional and federal law violations, including noncompliance with Title VI, as noted in our December 15, 201[1] Findings Letter.

(Doc. 333-3 at 25). The following day, the United States filed a complaint in this Court, outlining six claims for relief against Arpaio, MCSO, and Maricopa County:

(1) Intentional discrimination on the basis of race, color or national origin in violation of the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141 ("Section 14141") and the Due Process and Equal Protection clauses of the Fourteenth Amendment.

(2) Unreasonable searches, arrests and detentions lacking probable cause or reasonable suspicion in violation of Section 14141 and the Fourth Amendment.

(3) Disparate impact and intentional discrimination on the basis of race, color or national origin in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d-2000d-7 ("Title VI").

(4) Disparate impact and intentional discrimination against limited English proficient ("LEP") Latino prisoners in violation of Title VI.

(5) Disparate impact and intentional discrimination in violation of Defendants' contractual assurances under Title VI.

(6) Retaliation against Defendants' critics in violation of Section 14141 and the First Amendment.

(Doc. 1).

Arpaio, MCSO, and Maricopa County moved to dismiss. On December 12, 2012, the Court denied Maricopa County's motion and granted Arpaio and MCSO's motion in part. (Doc. 56). MCSO was dismissed from the case based on the Arizona Court of Appeals decision, *Braillard v. Maricopa County*, which held MCSO is a non-jural entity, lacking the capacity to sue and be sued. 224 Ariz. 481, 487 (Ct. App. 2010).

The remaining parties proceeded with discovery. The United States and Arpaio now each move for partial summary judgment. (Doc. 332, 345). Maricopa County moves for summary judgment on all claims. (Doc. 334).

## ANALYSIS

### I. Legal Standard

Under Rule 56, summary judgment is appropriate when the moving party demonstrates the absence of a genuine dispute of material fact and entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *United States v. Kapp*, 564 F.3d 1103, 1114 (9th Cir. 2009). A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248.

A party seeking summary judgment bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex*, 477 U.S. at 323. The moving party can satisfy this burden in two ways: either (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating the nonmoving party failed to establish an essential element of the nonmoving party's case on which the

nonmoving party bears the burden of proof at trial. *Id.* at 322-23. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

Once the moving party establishes the absence of genuine disputes of material fact, the burden shifts to the nonmoving party to set forth facts showing a genuine dispute remains. *Celotex*, 477 U.S. at 322. The nonmoving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials of his pleadings." *Anderson*, 477 U.S. at 256.  The party opposing summary judgment must also establish the admissibility of the evidence on which it relies.  *Orr v. Bank of America, NT & SA*, 285 F.3d 285 F.3d 764, 773 (9th Cir. 2002) (a court deciding summary judgment motion "can only consider admissible evidence"); *see also Beyene v. Coleman Sec. Services, Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988) ("It is well settled that only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment."); Fed. R. Civ. P. 56, 2010 Advisory Committee Notes ("The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated.").

When ruling on a summary judgment motion, the court must view every inference drawn from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 601 (1986). The court does not make credibility determinations with respect to evidence offered. *See T.W. Elec.*, 809 F.2d at 630-631 (citing *Matsushita*, 475 U.S. at 587). Summary judgment is therefore not appropriate "where contradictory inferences may reasonably be drawn from undisputed evidentiary facts." *Hollingsworth Solderless Terminal Co. v. Turley*, 622 F.2d 1324, 1335 (9th Cir. 1980).

## II. Justiciability

### A. Justiciability of Claims Against Arpaio

Arpaio argues the United States' claims involving discriminatory traffic stops in

Counts One, Two, Three, and Five are moot.[5] He argues the *Melendres* injunction eliminated all threat of immediate and future discriminatory traffic stops, as well as the ability of this Court to provide redress for those claims.[6] The United States argues its traffic stop claims are not moot for four reasons: (1) the *Melendres* injunction does not reach all of the conduct challenged in the present suit because it is necessarily tied to and based upon the immigration-related operations at issue in *Melendres*; (2) the federal government has unique interests which warrant providing it with its own enforcement mechanism for the types of reforms and controls in the *Melendres* injunction; (3) Arpaio appealed the scope of the *Melendres* injunction; and (4) the *Melendres* injunction is years away from full implementation.

Mootness doctrine prevents courts from ruling "when the issues presented are no longer live and therefor the parties lack a cognizable interest for which the courts can grant a remedy." *Alaska Ctr. For Env't v. U.S. Forest Serv.*, 189 F.3d 851, 854 (9th Cir. 1999). "The party asserting mootness bears the burden of establishing that there is no effective relief that the court can provide." *Forest Guardians v. Johanns*, 450 F.3d 455,

---

[5] In the "Introduction" of the complaint, the United States summarizes the basis of the lawsuit as "discriminatory police conduct directed at Latinos." (Doc. 1 at 1). This conduct includes: 1) stopping, detaining, and arresting Latinos on the basis of race; 2) denying Latino prisoners with limited English language skills constitutional protections; and 3) illegally retaliating against perceived critics through baseless criminal actions, lawsuits, and administrative actions. (Doc. 1 at 1-2). Specifically, Count One alleges violations of 42 U.S.C. § 14141 and the Fourteenth Amendment based on a pattern or practice of law enforcement practices, including traffic stops, workplace raids, home raids, and jail operations, with the intent to discriminate. Count Two alleges violations of 42 U.S.C. § 14141 and the Fourth Amendment based on a pattern or practice of unreasonable searches and seizures conducted without probable cause or reasonable suspicion. Count Three alleges violations of Title VI based on the use of federal financial assistance by persons alleged to be engaging in discriminatory law enforcement practices. Count Five alleges violations of Title VI's contractual assurances.

[6] Arpaio argues the same facts regarding redressability to claim the action is moot, the Court lacks subject matter jurisdiction, the United States lacks standing, and the action is not ripe. In doing so, he often conflates the standards pertaining to each doctrine. Because standing is measured at the time an action is commenced (in this case, May 10, 2012) and the *Melendres* injunction was not issued until over a year later (May 24, 2013), it appears the only cognizable justiciability argument Arpaio makes concerns mootness. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 570, n. 5 (1992) ("[S]tanding is to be determined as of the commencement of suit"). Therefore, the Court will analyze the viability of the United States' claims under mootness doctrine.

461 (9th Cir. 2006). And "[t]hat burden is 'heavy'; a case is not moot where *any* effective relief may be granted." *Id.* "Partial relief in another proceeding cannot moot an action that legitimately seeks additional relief." *Flagstaff Med. Ctr., Inc. v. Sullivan*, 962 F.2d 879, 885 (9th Cir. 1992).

As a general principle, "the government is not bound by private litigation when the government's action seeks to enforce a federal statute that implicates both public and private interests." *California v. IntelliGender, LLC*, 771 F.3d 1169, 1177 (9th Cir. 2014) (internal quotation marks and citation omitted). *See also Hathorn v. Lovorn*, 457 U.S. 255, 268 n. 23 (1982); *City of Richmond v. United States*, 422 U.S. 358, 373 n. 6 (1975). For example, in *E.E.O.C. v. Goodyear Aerospace Corp.*, the Ninth Circuit held the Equal Employment Opportunity Commission's ("EEOC") "interests in determining the legality of specific conduct and in deterring future violations are distinct from the employee's interest in a personal remedy." 813 F.2d 1539, 1542 (9th Cir. 1987). For that reason, the Court held the EEOC's enforcement action was not mooted by a private plaintiff's lawsuit and settlement based on the same facts. *Id.* at 1543 ("[The private plaintiff's] settlement does not moot the EEOC's right of action seeking injunctive relief to protect employees as a class and to deter the employer from discrimination.").

*Goodyear Aerospace Corp.* involved a previous suit by an individual private plaintiff. But the court's analysis relied in part on *Secretary of Labor v. Fitzsimmons*, where the prior suit was a private class action. 805 F.2d 682 (7th Cir. 1986). In *Fitzsimmons*, the Seventh Circuit held the Secretary of Labor was not barred by res judicata from bringing an ERISA enforcement action based on the same facts as a previously settled class action in which the Secretary had intervened. *Fitzsimmons*, 805 F.2d at 699. The decision was based in part on the history and structure of ERISA. The court noted ERISA arose out of concern over the "increasingly interstate" "operational scope and economic impact" of employee benefit plans and the direct effect such plans had on the "well-being and security of millions of employees and their dependents." *Id.* at 689 (citing 29 U.S.C. § 1001(a)). Employee benefit plans were also thought to "substantially affect the revenues of the United States" and therefore to be "affected with

a national public interest." *Id.* The statute provided the Secretary of Labor the right to intervene in any action brought by a participant, beneficiary, or fiduciary. *Id.*

The defendants in *Fitzsimmons* argued the right to intervene in private lawsuits created privity between the Secretary of Labor and the private plaintiffs so as to bar the Secretary from bringing a separate enforcement action. In determining no privity existed between the government and the private class of plaintiffs, the court articulated compelling and unique government interests, which justified the Secretary's separate, second lawsuit:

> [I]t is clear that the Secretary does have a unique, distinct, and separate public interest, duty and responsibility in bringing this ERISA action to enforce the trustees' fiduciary obligations and duties, to ensure public confidence in the private pension system that provides billions of dollars of capital for investments affecting federal tax revenues and interstate commerce, and most importantly, to protect the income of the retired workers and beneficiaries. Further, the Secretary of Labor has a separate interest when he intervenes so as to prevent the establishment of harmful legal precedent as well as to ensure uniformity in the enforcement and application of ERISA laws.

*Id.* at 696.[7] *See also Herman v. S. Carolina Nat. Bank*, 140 F.3d 1413, 1424 (11th Cir. 1998) (same) (citing *Beck v. Levering*, 947 F.2d 639, 642 (2d Cir. 1991)); *Donovan v. Cunningham*, 716 F.2d 1455, 1462-63 (5th Cir. 1983)).

The Supreme Court has addressed the situation where the government seeks injunctive relief which is potentially duplicative of relief already afforded to a private party. In *United States v. Borden Co.*, the Supreme Court held a private plaintiff's injunctive relief did not bar the federal government from bringing suit for injunctive relief under the Clayton Act, 15 U.S.C. § 25. 347 U.S. 514, 520 (1954). The district court had held the violations described in the government's complaint and shown at the trial were, "for the most part, old violations . . . [and] the [private injunction] assure[d], as

---

[7] The court went so far as to conclude "private parties can never be representatives of this clear, specific, and unambiguous *national* interest of the Secretary," *id.*, and "even if one were to assume that the interests of the Secretary and the class plaintiffs were the same . . . where the Secretary did not participate in structuring the settlement agreement it is impossible to conclude that the private plaintiffs had adequately represented the Secretary's interests." *Id.* at 695, n. 16.

completely as any decree can assure, that there will be no new violations." *Id.* at 517-518 (internal quotation marks and citation omitted). The Supreme Court reversed, holding that the district court's reasoning ignored "the prime object of civil decrees secured by the Government—the continuing protection of the public, by means of contempt proceedings, against a recurrence of [] violations." *Id.* at 519. The Court continued:

> Should a private decree be violated, the Government would have no right to bring contempt proceedings to enforce compliance; it might succeed in intervening in the private action but only at the court's discretion. The private plaintiff might find it to his advantage to refrain from seeking enforcement of a violated decree; for example, where the defendant's violation operated primarily against plaintiff's competitors. Or the plaintiff might agree to modification of the decree, again looking only to his own interest. In any of these events it is likely that the public interest would not be adequately protected by the mere existence of the private decree. It is also clear that Congress did not intend that the efforts of a private litigant should supersede the duties of the Department of Justice in policing an industry. Yet the effect of the decision below is to place on a private litigant the burden of policing a major part of the milk industry in Chicago, a task beyond its ability, even assuming it to be consistently so inclined." *Id.* at 519.

Thus, the Supreme Court recognized the government's interest in enforcing the provisions of a privately-held injunction, as well as its duty to enforce its laws may justify a second injunction. The private decree was to be considered in determining whether the government could show a likelihood of recurring illegal activity, but it was not dispositive of that question. *Id.* at 520.

The Supreme Court also determined that, in stating the United States district attorneys and the Attorney General had a duty to institute equity proceedings to enforce antitrust laws while also allowing private plaintiffs to obtain injunctive relief, the Clayton Act created a scheme in which "private and public actions were designed to be cumulative, not mutually exclusive." *Id.* at 518.

A similar conclusion applies to Title VI, one of the statutes under which the United States' brings its claims. Title VI is part of the Civil Rights Act of 1964, a sweeping piece of legislation which banned racial discrimination in voting, schools, workplaces, and public accommodations and created mechanisms through which the

federal government could enforce each provision. The Act was passed in the context of widespread conflict and unrest regarding racial desegregation, including resistance to desegregation by state and local governments and private individuals. Its purpose was to harness the power of the federal government to eradicate racial discrimination throughout the United States, regardless of local bias. The Supreme Court has held private plaintiffs may bring suit under Title VI for violations caused by intentional discrimination but not disparate impact discrimination. *Alexander v. Sandoval*, 532 U.S. 275 (2001). The federal government, by contrast, may sue for either intentional or disparate impact discrimination. *See infra*, Part III(A). And federal agencies which extend federal financial assistance are both "authorized and *directed* to effectuate [its] provisions." 42 U.S.C. § 2000d (emphasis added). Just as in *Borden Co.*, the statutory scheme of Title VI and the Civil Rights Act of 1964 lends itself to and is enhanced by viewing private enforcement action as supplemental and cumulative to government enforcement action.

The other statute under which the United States brings these claims, the Violent Crime Control and Law Enforcement Act of 1994, may be best known for its crime prevention measures, including a federal ban on assault weapons and increased federal funding of local law enforcement. *See* Rachel A. Harmon, *Federal Programs and the Real Costs of Policing*, 90 N.Y.U. L. Rev. 870, 883 n. 35-36 (2015). But the Act also contains provisions directed at reforming law enforcement. For instance, under § 14141, the relevant section here, the Attorney General has discretion to bring civil actions to obtain appropriate equitable and declaratory relief to eliminate the pattern or practice of law enforcement that violates constitutional rights and privileges.

Portions of the United States' claims of discriminatory policing involve conduct addressed in *Melendres*—discriminatory vehicle stops related to immigration enforcement. But the United States' claims also include allegations regarding discriminatory home raids, worksite raids, and non-motor vehicle related arrests and detentions, which are different in important respects from those presented in *Melendres*. For one, the United States' claims are not confined to immigration enforcement, but extend to discrimination in general law enforcement.

Despite this overlap, the United States possesses a unique interest, which supports the finding of a live controversy as to allegations regarding discriminatory traffic stops. Furthermore, the purposes of Title VI and § 14141 would be served by permitting the United States to bring its own enforcement actions, regardless of previous action taken by private plaintiffs. The United States' interest in this case is distinct from those of private plaintiffs' in *Melendres*. As with the Secretary of Labor in *Fitzsimmons*, the federal government has an interest in the uniform and robust enforcement of federal civil rights legislation nationwide. Its interest in preventing the type of discrimination charged in this case extends beyond the well-being of a defined class of plaintiffs to the safety, security, and just and harmonious coexistence of all citizens. The United States likewise has an interest in ensuring confidence in law enforcement activities which utilize federal funding and may affect interstate commerce. In addition, the findings in Part III(A), *infra*, show congressional intent to permit the federal government to bring an enforcement action. To paraphrase *Fitzsimmons*, to hold mootness doctrine bars the Attorney General from independently pursuing enforcement of Title VI would effectively limit the authority of the Attorney General under the statute—something a court will not do in the absence of an explicit legislative directive. *See Fitzsimmons*, 805 F.2d at 691.

In addition, the *Melendres* injunction does not moot the portions of the United States' claims which overlap with *Melendres* because continued violations by Arpaio and MCSO following the issuance of the injunction demonstrate a real and immediate threat of future harm, as well as the importance of granting the United States authority to enforce injunctive relief addressing MCSO's discriminatory traffic stops. *See Borden Co.*, 347 U.S. at 519; (2:07-CV-2513-GMS, Doc. 948) (Arpaio's stipulation to violations of the *Melendres* injunction by Arpaio and MCSO); (2:07-CV-2513-GMS, Doc. 0127 at 118-125). In addition, in the context of the United States' broader claims, its claims regarding traffic stops may lead to different injunctive measures than those put forth in *Melendres*, where the allegations of discriminatory traffic stops were brought in isolation. In other words, the *Melendres* injunction may afford some, but only partial relief for the United States' claims. *See Flagstaff Med. Ctr., Inc.*, 962 F.2d at 885.

1    In sum, it is premature for the Court to conclude the United States' allegations
2    would lead to a replica of the *Melendres* injunction. And, even if portions of the order
3    were replicated, the United States' unique interest in enforcing those provisions and the
4    continuing threat of future harm it faces render the claims justiciable.

5    **B. Justiciability of Claims Against Maricopa County**

6    Maricopa County argues the United States does not have standing because it has
7    failed to show "the harms it alleges are 'likely to be redressed' by a judgment against the
8    County." (Doc. 334 at 8). The United States contends it has shown a likelihood of redress
9    and that the "law of the case" precludes the County's argument. (Doc. 348 at 8).

10   To have Article III standing, a plaintiff must demonstrate: (1) it has suffered
11   "injury in fact—an invasion of a legally protected interest which is . . . concrete and
12   particularized"; (2) "a causal connection between the injury and the conduct complained
13   of"; and (3) the likelihood "the injury will be redressed by a favorable decision." *Lujan v.*
14   *Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992) (internal quotation marks and
15   citations omitted).

16   In a previous order, the Court held, "Under Arizona law, the Sheriff has final
17   policymaking authority with respect to County law enforcement and jails, and the County
18   can be held responsible for constitutional violations resulting from these policies," (Doc.
19   56 at 13), and denied Maricopa County's motion to dismiss, including the allegation of
20   lack of standing.[8]

21   "Law of the case" doctrine "preclude[s a court] from reexamining an issue
22   previously decided by the same court, or a higher court, in the same case." *United States*
23   *v. Jingles*, 702 F.3d 494, 499 (9th Cir. 2012) (citation omitted). The doctrine applies
24   where an issue was "decided explicitly or by necessary implication in [the] previous
25   disposition." *Id.* (internal quotation marks and citation omitted).

26   In finding Maricopa County could be held responsible for Arpaio's constitutional
27   violations, the Court ruled, by necessary implication, the County was capable of

28   _____

[8] The Court reaffirmed this decision in denying Maricopa County's motion for reconsideration. (Doc. 73).

- 15 -

redressing those violations. Nonetheless, Maricopa County now claims the Court's previous analysis was flawed because it relied on precedents from § 1983 cases involving claims for monetary, rather than injunctive relief. Maricopa County acknowledges A.R.S. § 11-201 gives it the power to determine MCSO's budget, but maintains that authority is insufficient to influence or control how MCSO is run. Maricopa County also claims: 1) the County cannot "cure the alleged violations here" (Doc. 356 at 10); 2) the United States has failed to show Arpaio and MCSO engage in "assessing, collecting, safekeeping, managing or disbursing the public revenues" such that they would fall under Maricopa County's supervisory authority pursuant to A.R.S. § 11-251(1); and 3) A.R.S. § 11-444 severely limits its authority to withhold funding.

Although the cases on which the Court's previous order relied involved claims under § 1983, which allows for monetary as well as injunctive relief, the reasoning applied to find Maricopa County potentially liable for MCSO's constitutional violations was not premised on the form of relief sought, but rather on the bases for "policymaker" liability. *See Flanders v. Maricopa Cnty.*, 203 Ariz. 368, 378 (Ct. App. 2002).

As will be discussed at greater length in Part III(B)(i), *infra*, the logic of "policymaker" liability under § 1983 applies to produce institutional liability under Title VI and its sister statute, Title IX, as well. *See Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) (holding that a successful showing of a Title VI violation rests on the actions of a decisionmaker). The Court's previous order relied on numerous state court decisions identifying the sheriff as a policymaker for Maricopa County, *United States v. Maricopa Cnty., Ariz.*, 915 F. Supp. 2d 1073, 1082-84 (D. Ariz. 2012), (Doc. 56), and that determination is the law of this case. *See United States v. Jingles*, 702 F.3d 494, 499 (9th Cir. 2012).

Regarding Maricopa County's argument that its inability to "cure the alleged violations" destroys the United States' standing, the United States is correct that it need only show the potential for partial redress. *See Meese v. Keene*, 481 U.S. 465, 476

1   (1987).[9]

2       The sheriff is independently elected. Ariz. Const. art. XII, § 3. And his duties are

3   statutorily required. A.R.S. § 11-441. Those duties range from "[p]reserve[ing] the

4   peace" to "[a]rrest[ing] . . . persons who attempt to commit or who have committed a

5   public offense" to "[t]ak[ing] charge of and keep[ing] the county jail." A.R.S. § 11-441.

6       However, A.R.S. § 11-251(1) provides:

7       The board of supervisors, under such limitations and restrictions as are prescribed
        by law, may: . . . Supervise the official conduct of all county officers and officers
8       of all districts and other subdivisions of the county charged with assessing,
        collecting, safekeeping, managing or disbursing the public revenues, see that such
9       officers faithfully perform their duties and direct prosecutions for delinquencies.

10

11  A.R.S. § 11-251(1). And the Arizona Court of Appeals has held the sheriff is an "officer"

12  within the definition provided in this subsection. *Fridena v. Maricopa Cnty.*, 18 Ariz.

13  App. 527, 530 (Ct. App. 1972). Therefore, the Board of Supervisors is charged with

14  supervising the sheriff under the statute.

15       The Board's authority over the sheriff's budget is somewhat constrained by A.R.S.

16  § 11-444(A), which states: "The sheriff shall be allowed actual and necessary expenses

17  incurred by the sheriff in pursuit of criminals, for transacting all civil or criminal

18  business." But the statute also provides that the Board meet monthly to allocate funds to

19  the sheriff for the payment of such expenses and that the sheriff "render a full and true

20  account of such expenses" every month to the Board. A.R.S. § 11-444(B)-(C).

21       In 1965, the Arizona Attorney General's Office issued an opinion interpreting

22  A.R.S. § 11-444,[10] which stated:

23       [T]he board of supervisors, being the agency of the county vested with

24       [9] It is also worth noting that policymaker liability under § 1983 is not premised on
25  complete control of the principal over the official in question. Rather, the amount of
    control the defendant, i.e. the county board of supervisors, possesses over the official is
26  but one factor in the determination of whether that official qualifies as a policymaker for
    the municipal government. *Goldstein v. City of Long Beach*, 715 F.3d 750, 755 (9th Cir.
27  2013) *cert. denied sub nom. Cnty. of Los Angeles, Cal. v. Goldstein*, 134 S. Ct. 906, 187
    L. Ed. 2d 778 (2014).

28       [10] The relevant language of A.R.S. § 11-444 in 1965 was substantially similar to
    its present form.

responsibility for allowing claims, must be satisfied in each instance when examining the claims of sheriffs . . . that the expenses claimed are for a public purpose and are the actual and necessary expenses thereof.

Op. Atty. Gen. No. 65-18. This reading harmonizes the funding requirements of A.R.S. § 11-444 with the Board's duty under A.R.S. § 11-251(1) to "see that such officers faithfully perform their duties and direct prosecutions for delinquencies." A.R.S. § 11-251(1). *Cf. Pinal Cnty. v. Nicholas*, 179 P. 650, 651-52 (Ariz. 1919) (holding, in executing its duty to pay "necessary expenses" of the County Attorney, "the board of supervisors is charged with the duty of supervising all expenditures incurred by him, and rejecting payment of those which are illegal or unwarranted"). Therefore, the Board can refuse to fund inappropriate activities, which is exactly what the United States wants Maricopa County to do.

Maricopa County's argument centers on its purported inability to initiate any authorized action to affect Arpaio's compliance with the law or a court order, given the sheriff's statutory duties and electoral independence and the Board's statutory obligation to fund his activities. But Maricopa County admits it has the ability and duty "to facilitate compliance of the Sheriff and other constitutional officers with judicial orders." (Doc. 334 at 9, n. 2). And the United States identified numerous ways in which Maricopa County could, within its authority, exercise oversight and influence over Arpaio. For instance, Maricopa County could put the sheriff on a line-item budget and use its power to withhold approval for capital expenditures, salary increases and the like to encourage compliance with court orders. (Docs. 348 at 10-12; 349 at ¶13-26). The United States also discussed actions Maricopa County has already taken to oversee and control MCSO's fiscal management to ensure its compliance with county policy. (Docs. 348 at 13; 349 at ¶13). In the name of sound fiscal management, and at least partially in response to constituent complaints, the Board has, in the past, ordered audits and "operational efficiency reviews" of MCSO's vehicle use, extradition and travel policy, and staffing practices and ordered "oversight functions" be performed by the County Office of Management and Budget. (Docs. 349-2, 349-3). In fact, Maricopa County's

own initial response to DOJ's investigation stated the County could deny MCSO reimbursement for funds expended in an effort to resist the investigation, as such resistance was "outside the scope of the employment of any elected or appointed official." (Doc. 333-3 at 10). This evidence and the Arizona Attorney General's interpretation of the relevant statutes, show Maricopa County has the ability to afford at least partial redress for violations committed by Arpaio, MCSO, and Maricopa County.

In addition, another district court recently upheld taxpayers' standing to sue Maricopa County in challenging the expenditure of municipal funds for MCSO's enforcement of an allegedly discriminatory statute. *Puente Arizona v. Arpaio*, No. CV-14-01356-PHX-DGC, 2015 WL 58671 at *11 (D. Ariz. Jan. 5, 2015) ("[A] favorable decision would . . . prevent[] further expenditures for enforcement of the identity theft laws.") (citing *Hinrichs v. Bosma*, 440 F.3d 393, 397–98 (7th Cir. 2006) ("Such an injury is redressed not by giving the tax money back . . . but by ending the unconstitutional spending practice.")).[11] *See also We Are Am./Somos Am., Coal. of Arizona v. Maricopa Cnty. Bd. of Supervisors*, 809 F. Supp. 2d 1084, 1104 (D. Ariz. 2011) (finding plaintiffs had alleged injury sufficient to confer standing to sue county/Board of Supervisors, the sheriff, and others in action seeking suspension of the use of municipal funds for MCSO enforcement of discriminatory policy). In *Puente*, as here, Maricopa County argued its inability to control the County's criminal law enforcement meant that allowing Maricopa County to remain a party "could result in it being 'bound by an injunction that is not within its authority to comply with under Arizona law.'" 2015 WL 58671 at *25. The court held "[t]his fact might limit [Maricopa County's] exposure to contempt or other remedies if an injunction is disregarded, but it does not alter the fact that the County is a proper defendant." *Id.*

Even assuming Maricopa County's control over MCSO's operations is limited to control over funding, as opposed to direct and complete oversight and control of enforcement operations, that control establishes Maricopa County could contribute to the

---

[11] Arpaio and Maricopa County's arguments against standing in that case focused on injury, not redressability.

1    requested relief, which is all the law requires to create standing. Therefore, summary

2    judgment on this issue will be denied.[12]

3    **III. Maricopa County's Liability Under Title VI and 42 U.S.C. § 14141**

4          Maricopa County advances several arguments for granting summary judgment in

5    its favor with respect to the United States' claims under Title VI (Counts Three, Four,

6    and Five) and § 14141 (Counts One, Two, and Six). First, Maricopa County claims Title

7    VI does not authorize the United States to file suit to enforce its provisions. Next,

8    Maricopa County claims neither Title VI nor § 14141 authorize imputation of liability

9    from Arpaio and MCSO to Maricopa County. Alternatively, Maricopa County argues

10   even if the statutes authorize imputation, the County would not be liable for the alleged

11   violations. Finally, Maricopa County claims the United States failed to comply with the

12   notice requirements of Title VI.[13]

13        **A. Authorization to File Suit Under Title VI**

14         Maricopa County argues summary judgment in its favor as to Counts Three, Four,

15   and Five is required because Title VI does not authorize the United States to bring suit to

16   enforce its provisions. Maricopa County draws a comparison between Title VI and Title

17   IV, the latter of which explicitly authorizes the Attorney General "to institute . . . in the

18   name of the United States a civil action . . . against such parties and for such relief as may

19   be appropriate." 42 U.S.C. § 2000c-6. Maricopa County claims that because "Congress

20   knew how to authorize a lawsuit by [the United States]," there is "'strong evidence' that

21   no lawsuit was authorized here." (Doc. 334 at 6). The United States challenges this

22   assertion through interpretation of the phrase "any other means authorized by law" in

23   Title VI. 42 U.S.C. § 2000d-1.

24         Under Title VI, compliance may be effected "by termination of or refusal to grant

---

25       [12] The Ninth Circuit's recent decision in substituting Maricopa County for MCSO

26   in *Melendres*, although it does not discuss Maricopa County's capability of redressing the
     wrongs found in that case or implementing the *Melendres* injunction, supports a finding

27   of standing against Maricopa County in this case. *Melendres v. Arpaio*, 784 F.3d 1254
     (9th Cir. 2015).

28       [13] The standing argument raised by Maricopa County was addressed in the
     previous section. *See* Part II(B), *supra*.

or to continue assistance" or "by any other means authorized by law." 42 U.S.C. § 2000d-1. The parties focus on the interpretation of the phrase "any other means authorized by law." The United States relies on *National Black Police Association*, *Inc. v. Velde*, 712 F.2d 569, 575 (D.C. Cir. 1983) and *United States v. Baylor University Medical Center*, 736 F.2d 1039, 1050 (5th Cir. 1984), each of which recognizes "any other means authorized by law" as including enforcement options beyond administrative action. *See also Guardians Ass'n v. Civil Serv. Comm'n of City of New York*, 463 U.S. 582, 630 (1983) (J. Marshall, dissenting) ("[I]n extending grants the United States has always retained an inherent right to sue for enforcement of the recipient's obligation."). Maricopa County claims *Velde* and *Baylor University Medical Center* do not represent the current approach to statutory interpretation which was abandoned by the Supreme Court in *Alexander v. Sandoval.* 532 U.S. 275 (2001).

In *Sandoval*, the Supreme Court condemned lower courts' liberal implication of private rights of action "to provide remedies as are necessary to make effective [] congressional purpose" and established a stricter standard requiring more explicit findings of congressional intent to support such causes of action. 532 U.S. 275, 287 (2001). In determining the congressional intent behind § 602 of Title VI the Court endeavored to discern the "focus" of the provision. *Sandoval*, 532 U.S. at 288-289.[14] The Court held: "Statutes that focus on the person regulated rather than the individuals protected create 'no implication of an intent to confer rights on a particular class of persons.'" *Id.* at 289. It found § 602 focused neither on persons regulated nor individuals protected, but instead exclusively on federal agency enforcement. *Id.* ("[Section] 602 is 'phrased as a directive to federal agencies engaged in the distribution of public funds,' . . . . When this is true, '[t]here [is] far less reason to infer a private remedy in favor of individual persons.'"). The implication, then, is that where a statutory provision focuses

---

[14] DOJ promulgated regulations under § 602 prohibiting disparate impact racial discrimination in federally-funded programs. 28 CFR § 42.104(b)(2) (2000). *Sandoval* did not affect previous decisions establishing a private right of action to enforce § 601, which prohibits intentional discrimination based on race in federally-funded programs. *Id.* at 281.

on a particular party, it is more likely Congress intended to confer a right of action on that party to enforce the provision. The logic of *Sandoval*, therefore, supports finding a right of action for federal agency enforcement under § 602 of Title VI.

The Sixth Circuit appears to be the only federal court of appeals to have addressed the meaning of "any other means authorized by law" as it applies to means of government enforcement following *Sandoval*. The Sixth Circuit acknowledged the pre-*Sandoval* understanding of the phrase and found it authorized the government to bring suit to enforce a statutory provision.[15] *United States v. Miami Univ.*, 294 F.3d 797, 808 (6th Cir. 2002) ("We believe that the fourth alternative ['take any other action authorized by law with respect to the recipient'] expressly permits the [agency] to bring suit to enforce the [statutory] conditions in lieu of its administrative remedies.") (citing *Baylor Univ. Med. Ctr.*, 736 F.2d at 1050; *Nat'l Black Police Ass'n*, 712 F. 2d at 575). *Cf. United States v. Marion Cnty. Sch. Dist.*, 625 F.2d 607, 611 (5th Cir. 1980) ("[T]he government's right to sue to enforce its contracts exists as a matter of federal common law, without necessity of a statute . . . Congress may nullify the right, but, as the Supreme Court has repeatedly emphasized, courts are entitled to conclude that Congress has done so only if the evidence of Congress' intent is extremely, even unmistakably, clear.").

Maricopa County claims Congress rejected an amendment to Title VI explicitly authorizing public judicial enforcement of Title VI. The rejected amendment provided that a recipient of federal funds "assume[d] a legally enforcible [sic] undertaking . . . [and the] United States district courts [would] have jurisdiction [over] civil actions brought in connection with such undertakings by either the United States or by any recipient aggrieved by action take under any such undertaking." 110 Cong. Rec. 2493-94 (1964). The author of the proposed amendment, Congressman Meader, envisioned such disputes being governed by the law of contracts. 110 Cong. Rec. 2493 (1964). But the amendment was rejected in favor of the broader provision for enforcement of contractual obligations not only through the courts, but by "any . . . means authorized by law." In the words of

---

[15] The phrase, as interpreted, appeared in the Family Educational Rights and Privacy Act ("FERPA").

Congressman Celler, the Meader Amendment would have "den[ied] much needed flexibility to the Federal agencies to effectuate their nondiscrimination policy . . . [in contrast to the version using 'any other means authorized by law' which] seeks to preserve [] the maximum [] existing procedures . . . including any judicial review." 110 Cong. Rec. 2494 (1964). The record of the congressional debate surrounding this amendment clearly shows Congress's intent that the provisions of Title VI be enforceable through lawsuits to allow enforcement by judicial review.

Furthermore, to the extent the phrase "any other means authorized by law" may be ambiguous as it appears in Title VI, the Court must defer to DOJ's interpretation. *See City of Arlington, Tex. v. F.C.C.*, 133 S. Ct. 1863, 1868 (2013) (citing *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)). DOJ regulations interpret the phrase "any other means authorized by law" in Title VI to include "[a]ppropriate proceedings brought by the Department to enforce any rights of the United States under any law of the United States (including other titles of the Act), or any assurance or other contractual undertaking." 28 C.F.R. § 42.108(a)(1).

Based on the foregoing, summary judgment for Maricopa County regarding the United States' ability to enforce Title VI through lawsuits will be denied.

## B. Imputation of Liability

Maricopa County claims neither Title VI nor § 14141 authorize imputation of liability from Arpaio and MCSO to Maricopa County. It contrasts these statutes with 42 U.S.C. § 1983, which explicitly creates liability for entities which cause others to commit constitutional violations. The United States claims the Court already decided Maricopa County can be held liable for Arpaio's violations in its order on the early motion to dismiss. It also contends Arpaio's actions constitute the actions of Maricopa County for purposes of liability under § 14141 and Title VI.[16]

---

[16] In its recent *Melendres* decision, the Ninth Circuit held, on remand, the district court could consider whether dismissal of Sheriff Arpaio in his official capacity was warranted because, typically, a suit against a person in his official capacity is, "in all respects other than name, [] treated as a suit against the entity." *Melendres v. Arpaio*, 784 F.3d 1254, 1260 (9th Cir. 2015). Because the court did not specify whether Arpaio is or is

### i. Title VI (42 U.S.C. §§ 2000d-2000d-7)

Maricopa County refers to itself as "the Board," as in, the Board of Supervisors. (Doc. 334 at 12). The United States argues for a broader understanding of persons comprising county government for purposes of Title VI liability. It argues Maricopa County's policymakers constitute the County under the statute and that Maricopa County violated Title VI in two ways: First, through the Board, by failing to live up to its contractual obligations, and second, through the pattern, practice, and policy of discrimination promulgated by Arpaio, the County's policymaker.

Section 1983 explicitly provides liability for government entities which cause others to violate constitutional rights. 42 U.S.C. § 1983. Under § 1983, municipal liability for officers' actions is not automatic but attaches "when execution of [the] government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). In other words, a violation caused by a municipal policy, e.g. a policy made by a municipal policymaker, is a violation by the municipality. *See Flanders v. Maricopa Cnty.*, 203 Ariz. 368, 378, 54 P.3d 837, 847 (Ct. App. 2002) ("Liability [under § 1983] is imposed, not on the grounds of *respondeat superior*, but because the agent's status cloaks him with the governmental body's authority.").

"To hold a local government liable for an official's conduct [under § 1983], a plaintiff must first establish that the official (1) had final policymaking authority 'concerning the action alleged to have caused the particular constitutional or statutory violation at issue' and (2) was the policymaker for the local governing body for the purposes of the particular act." *Weiner v. San Diego Cnty.*, 210 F.3d 1025, 1028 (9th Cir. 2000) (citing *McMillian v. Monroe County Alabama*, 520 U.S. 781, 785 (1997)). In analyzing the second question—whether a policymaker may be associated with a

---

not an appropriate party and because no party has argued this point, the Court will not decide it. The Ninth Circuit's statement does, however, bolster the Court's assessment of the relationship between Maricopa County and Arpaio and the potential for Maricopa County's liability.

particular government entity for purposes of liability—the amount of control the government entity, i.e. the county board of supervisors, possesses over the official is but one factor. *Goldstein v. City of Long Beach*, 715 F.3d 750, 755 (9th Cir. 2013) *cert. denied sub nom. Cnty. of Los Angeles, Cal. v. Goldstein*, 134 S. Ct. 906, 187 L. Ed. 2d 778 (2014). Other factors include the county's obligation to defend or indemnify the official, the scope of the official's duties, and the official's definition in the state constitution. *Goldstein*, 715 F.3d at 755-762. The Court's previous order held Arpaio "has final policymaking authority with respect to County law enforcement and jails, and [based on that,] the County can be held responsible for constitutional violations resulting from these policies." *United States v. Maricopa Cnty., Ariz.*, 915 F. Supp. 2d 1073, 1082-84 (D. Ariz. 2012); (Doc. 56).

Title VI does not explicitly provide liability for entities which cause others to violate the statute. Title VI provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. The section is enforceable through termination or refusal of federal funding or "by any other means authorized by law." 42 U.S.C. § 2000d-1. Termination or refusal of funding is "limited to the particular political entity, or part thereof, or other recipient as to whom [an express finding on the record . . . of a failure to comply] has been made and, shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found." 42 U.S.C. § 2000d-1.

No court has directly confronted the question of whether "policymaker" liability applies under Title VI. But case law on Title IX, which parallels Title VI,[17] is instructive.

---

[17] *See Cannon v. Univ. of Chicago*, 441 U.S. 677, 684 (1979) (stating Title IX was patterned on Title VI). Title IX prohibits discrimination in federally funded educational programs on the basis of gender instead of race. 20 U.S.C. § 1681. Like Title VI, Title IX authorizes termination or refusal of funding for "the particular political entity, *or part thereof*, or other recipient *as to whom [an express finding on the record . . . of a failure to comply] has been made* and, shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found," as well as enforcement

- 25 -

Like Title VI, Title IX does not explicitly provide liability for causing others to violate the statute, nor for classic respondeat superior liability. In *Gebser v. Lago Vista Independent School District*, the Supreme Court held "Congress did not intend to allow recovery [under Title IX] where liability rests solely on principles of vicarious liability or constructive notice." 524 U.S. 274, 288 (1998). *See also Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 640 (1999) ("[A] recipient of federal funds may be liable in damages under Title IX only for its own misconduct."). Instead, a principal can be held liable for "employees' independent actions" only if, after actual notice to an "appropriate person,"[18] the principal fails to adequately respond to the employees' violations, thus demonstrating "deliberate indifference" to the alleged violation. *Gebser*, 524 U.S. at 289-291 ("It would be unsound, we think, for a statute's *express* system of enforcement to require notice to the recipient and an opportunity to come into voluntary compliance while a judicially *implied* system of enforcement permits substantial liability without regard to the recipient's knowledge or its corrective actions upon receiving notice.") (emphasis in original). This sort of "deliberate indifference" is a form of intentional discrimination by the employer/principal directly, not a form of vicarious liability. *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 182 (2005).

An institution is also directly liable for its "own official decision[s]." *Gebser*, 524

---

through "any other means authorized by law." 20 U.S.C. § 1682.

[18] An "appropriate person," under Title IX is, "at a minimum, an official of the recipient entity with authority to take corrective action to end the discrimination." *Id.* at 290. In the context of schools (the primary entities governed by Title IX), "appropriate person" can refer to teachers, principals, or school boards, depending on the authority of those actors within a particular educational system. *See Smith v. Metro. Sch. Dist. Perry Twp.*, 128 F.3d 1014, 1020-21 (7th Cir. 1997) ("While a principal has some authority over the activities within his school, the [state] statutes place institutional control over 'program or activities' with the school district and school board . . . [and] does not give assistant principals administrative control over educational programs or activities. . . . Thus neither a principal nor an assistant principal can be considered a grant recipient.").

Notice to an "appropriate person" is also required under Title VI. And at least one district court has extended the Supreme Court's interpretation of this phrase in Title IX to Title VI, holding a person with "authority to take corrective action to end the alleged discrimination" can be liable under Title VI if, after notice of another's violation of the statute, the authority fails to take corrective action. *Rubio ex rel. Z.R. v. Turner Unified Sch. Dist. No. 202*, 475 F. Supp. 2d 1092, 1098-99 (D. Kan. 2007).

- 26 -

U.S. at 290-291. The Ninth Circuit and others have held a separate finding of "deliberate indifference" is not necessary when an institutional policy violates the statute. *Mansourian v. Regents of Univ. of California*, 602 F.3d 957, 967-969 (9th Cir. 2010). *See also Simpson v. Univ. of Colorado Boulder*, 500 F.3d 1170, 1178 (10th Cir. 2007) ("[A] funding recipient can be said to have 'intentionally acted in clear violation of Title IX,' when the violation is caused by official policy.") (citing *Davis*, 526 U.S. at 642). Because a "policymaker" is not acting individually, but on behalf of the institution/entity, and his policies are the policies of the entity, no imputation takes place in charging the entity with violations stemming from those policies—they are the policies of the entity, not merely the individual.

This logic parallels the reasoning that undergirds the law establishing "policymaker" liability under § 1983 and applies with equal force to Title VI. Maricopa County is directly liable for violations resulting from its official policy, which includes policy promulgated by Arpaio. *See United States v. Maricopa Cnty., Ariz.*, 915 F. Supp. 2d 1073, 1082-84 (D. Ariz. 2012). These policies constitute intentional acts by Maricopa County for which no imputation is required. Therefore, summary judgment on the grounds of impermissible imputation (i.e. vicarious liability) under Title VI will be denied.

### ii. 42 U.S.C. § 14141

Maricopa County claims § 14141 imposes liability only on an entity which engages directly in conduct that results in constitutional injury.

The Violent Crime Control and Law Enforcement Act of which § 14141 is a part provides, among other things, grants for state and local law enforcement agencies to improve police training and practices and help prevent crime. Pub. L. 103-322, 42 U.S.C. Ch. 136, §§ 13701-14223. Section 1414, specifically, provides:

> It shall be unlawful for any governmental authority, or any agent thereof, or any person acting on behalf of a governmental authority, *to engage in* a pattern or practice of conduct by law enforcement officers or by officials . . . that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States.

- 27 -

42 U.S.C. § 14141 (emphasis added).

The Court is unable to find a case speaking directly to the question of vicarious or imputed liability under § 14141. However, again, the logic of policymaker liability discussed in the preceding section would render Maricopa County directly, not indirectly liable under the statute. In addition, the United States has sued and settled under the statute with various governments for violations committed by law enforcement departments. *See United States v. State of New Jersey, et al.*, 3:99-cv-05970-MLC-JJH; *United States v. City of New Orleans*, 731 F.3d 434 (5th Cir. 2013); *United States v. Puerto Rico*, 922 F. Supp. 2d 185 (D.P.R. 2013). All of these cases ended in settlement and in none did the defendant government challenge liability by arguing vicarious or imputed liability was unavailable under § 14141. Therefore, the case law suggests liability is available to sue governments whose law enforcement violates the statute. Summary judgment will not be granted to Maricopa County on this issue of imputation of liability under § 14141.

**C. Liability Under Title VI and 42 U.S.C. § 14141**

Maricopa County argues it is entitled to summary judgment regarding its liability under Title VI and § 14141, even if imputation is permitted because "the County cannot control the Sheriff's policies and practices relating to law enforcement or jailing." (Doc. 334 at 18). This argument was addressed in Part II(B), *supra*. Maricopa County has sufficient authority to provide some redress for violations committed by Arpaio and MCSO. Therefore, the argument is without merit.

Maricopa County further claims its contractual assurances under Title VI must be read in accordance with Arizona law, including statutory limitations on the Board of Supervisors' authority regarding the Sheriff. To the extent Maricopa County entered into a contract for which it lacked the authority to agree, Maricopa County argues, the contract is void. (Doc. 351 at 13).

The United States has the power to sue to enforce its contracts. *See Cotton v. United States*, 52 U.S. 229, 231, 13 L. Ed. 675 (1850); *Rex Trailer Co. v. United States*,

350 U.S. 148, 151 (1956). And "[f]ederal law governs the interpretation of contracts entered pursuant to federal law where the federal government is a party." *Chickaloon-Moose Creek Native Ass'n., Inc. v. Norton*, 360 F.3d 972, 980 (9th Cir. 2004).

Neither party offered authority addressing how courts treat the enforcement of an *ultra vires* contract between a county and the federal government. But the Court rejected the contention that Maricopa County lacked *any* authority to enforce the nondiscrimination mandate that attaches to federal funds under Title VI. *See* Part II(B), *supra*; (Doc. 56). Even if "persons dealing with public officers are bound, at their peril, to know the extent and limits of their power," the United States is, at the very least, entitled to hold Maricopa County accountable for failing to take action it was authorized to take under Arizona law with respect to Arpaio and MCSO, which could have helped prevent violations of Maricopa County's contractual obligations under Title VI. *See Pinal Cnty. v. Pomeroy*, 60 Ariz. 448, 455 (1943). Therefore, summary judgment will be denied on the issues of Maricopa County's liability for its contractual assurances and violations under § 14141.

### D. Notice of Maricopa County's Violations

Finally, Maricopa County argues the United States failed to provide notice regarding "any alleged improper conduct on its [Maricopa County's] part," as required by Title VI. (Doc. 334 at 5). The United States claims it provided Maricopa County with proper notice of the violations for which it seeks to hold the County accountable.

Title VI provides: "no [] action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means." 42 U.S.C.A. § 2000d-1. The regulations state notification of "failure to comply and action to be taken to effect compliance" must be given to the "[funding] recipient or other person." 28 C.F.R. § 42.108(d)(3). The Supreme Court has interpreted "appropriate person" under Title IX, a parallel statute, to mean "at a minimum, an official of the recipient entity with authority to take corrective action to end the discrimination." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998). The notice provision in Title

IX, which requires actual, not constructive notice, however, only applies "when the alleged Title IX violation consists of an institution's deliberate indifference to acts that 'do not involve official policy of the recipient entity.'" *Mansourian v. Regents of Univ. of California*, 602 F.3d 957, 967 (9th Cir. 2010) (citing *Gebser*, 524 U.S. at 290). Again, the Court interprets the provisions of Title VI in parallel with those of its sister statute, Title IX. *See* n. 19, *supra*.

Maricopa County first responded to DOJ's notice of MCSO's noncompliance with its obligation to cooperate in DOJ's investigation in August of 2010. (Doc. 333-3 at 9). In that response, Maricopa County characterized DOJ's correspondence as a "Notice Letter" and appeared to embrace its own obligation to assist in the investigation, including by denying MCSO funding for expenses for activities contrary to the law. *Id.* But on December 15, 2011, in response to DOJ's Findings Letter, discussing the results of its investigation, Maricopa County Attorney Bill Montgomery ("Montgomery") responded that the United States had "noticed the wrong party" and directed DOJ to Jones, Skelton & Hochuli, P.L.C. ("Jones Skelton"), MCSO's counsel of record. (Doc. 333-3 at 12). Approximately one month after Montgomery sent his letter, on January 17, 2012, DOJ replied, stating:

> It has not always been clear who represents the [MCSO] with respect to different matters, so we felt it made sense to provide notice to both you and the attorneys who represented MCSO with respect to our [a previous] lawsuit. *Since our current investigation potentially affects Maricopa County as the conduit of federal financial assistance to MCSO, we will continue to carbon copy you on significant correspondence between us and [Jones Skelton].*

(Doc. 333-3 at 14) (emphasis added).

DOJ continued to copy Montgomery and Maricopa County on its correspondence with Jones Skelton, which revealed the United States' position that Jones Skelton and MCSO were not engaging in good faith negotiations with the federal government. (Doc. 333-3 at 15-20). On May 9, 2012, the United States wrote to Jones Skelton and Montgomery separately to advise each of its plans to file suit. In its letter to Montgomery, the United States stated MCSO's counsel had chosen to "cancel negotiations" and that

1  the United States had "determined the [MCSO's] compliance . . . [could not] be secured

2  through voluntary means." (Doc. 333-3 at 25). Finally, the letter stated:

3
> Based on the foregoing, please be advised that in accordance with the notice
> requirements set forth in DOJ's Title VI regulations, 42 C.F.R. § 108(d)(3) [sic], it
4
> is the intention of the Department of Justice to file a civil action against Maricopa
5
> County, [MCSO], and [Arpaio] in order to remedy the serious Constitutional and
> federal law violations . . . noted in our December 15, 2012 [sic] Findings Letter.
6

7  (Doc. 333-3 at 25-26).

8      Maricopa County argues that because the Findings Letter refers only to Title VI

9  violations by MCSO, not Maricopa County, the letter cannot constitute proper notice to

10 Maricopa County under the statute. The United States argues the notice provided to

11 Maricopa County via the January 17, 2012 letter, "numerous communications" between

12 attorneys for the United States and Maricopa County, and meetings between DOJ and "at

13 least two county commissioners" was sufficient to place Maricopa County on notice of its

14 liability and provide it with an opportunity to respond.[19] The United States also argues

15 that because MCSO is not a jural entity separate, for legal purposes, from Maricopa

16 County, its communications with MCSO count towards notice to Maricopa County.[20]

17     To the extent Maricopa County attempts to defeat claims based on official policies

18 which allegedly violated Title VI, its argument fails. The Supreme Court has held notice

19 _____

20 [19] DOJ's meeting with county supervisors highlights an issue which has yet to be
    resolved by the facts presented, but which is not necessary to the issue of notice.
21  Maricopa County points out that DOJ's meeting with the supervisors took place without
    Montgomery or any representative from the Maricopa County Attorney's Office
22  ("MCAO") and that this could mean one of two things: either (1) the United States did
    not believe the Board of Supervisors (in other words, Maricopa County) was represented
23  by MCAO, or (2) the United States did believe the Board of Supervisors was represented
    by MCAO and committed an ethical violation by meeting with the Board without
24  MCAO's presence, notification, or consent. If the first option is true, communications
    with Montgomery would be irrelevant to the question of notice. If the second is true,
25  communications with Montgomery would be relevant, but the United States would have
    also committed an ethical violation. Maricopa County's motion does not clarify one way
26  or another whether MCAO was representing Maricopa County at the time of the United
    States' communications or whether the United States believed it to be.
27
    [20] All of the communications the United States claims constituted notice occurred
28  after the Arizona Court of Appeals ruling in *Braillard v. Maricopa County*, 224 Ariz.
    481, 487 (Ct. App. 2010) (establishing MCSO as a non-jural entity).

requirements like the one contained in Title VI only apply where the violation stems from the practices of individual actors or staff, not institutional decisions such as those embodied by official policy. *See Gebser*, 524 U.S. at 290 (holding notice required in case not involving official policy of recipient entity); *Mansourian*, 602 F.3d at 967-969 ("[T]he Supreme Court has made clear that no notice requirement is applicable to Title IX claims that rest on an affirmative institutional decision [such as the promulgation of institutional policies]").

Even if notice was required to hold Maricopa County liable for Arpaio and MCSO's actions (as opposed to its policies), Maricopa County's argument that "[t]elling a party that an investigation 'potentially affects' them is a far cry from providing notice 'of the failure to comply with [Title VI],'" (Doc. 356 at 9), is not facially apparent from the correspondence, and Maricopa County cites no law to support it. On its face, the Findings Letter constitutes notice of Maricopa County's liability "as the conduit of federal financial assistance to MCSO" for violations of its contractual assurances under Title VI. Maricopa County concedes the Findings Letter put it on notice of MCSO's violations and does not argue this notification was sent to an "inappropriate person." Furthermore, earlier correspondence from August of 2010 indicates Maricopa County was fully aware not only of potential violations by MCSO, but also of its own obligation to cooperate with and assist DOJ in investigating and remedying those violations. Therefore, summary judgment on the issue of the adequacy of notice under Title VI will be denied.

**IV. Non-Mutual, Offensive Issue Preclusion and Counts One, Three, and Five**

Having resolved that liability is possible, the next issue is whether the United States has actually proven such liability.

The United States seeks to preclude Arpaio and Maricopa County from contesting the issues decided in *Melendres* which reappear in this case and argues those issues entitle the United States to summary judgment on portions of its discriminatory policing claims contained in Counts One, Three, and Five. These counts, as set forth in the complaint, are based on alleged discrimination in multiple areas of law enforcement:

traffic stops, workplace raids, home raids, and jail operations. The *Melendres* court found discrimination in one of those areas: traffic stops. In effect therefore, the United States is seeking summary judgment on a narrower form of the counts it outlined in its original complaint. It argues the Court can grant summary judgment on these narrow grounds and allow the United States to prove additional grounds at trial.

### A. Application of Non-Mutual, Offensive Issue Preclusion to Arpaio

Arpaio claims applying non-mutual, offensive issue preclusion as to the findings from *Melendres* would be unfair and, therefore, cannot apply. The United States argues non-mutual, offensive issue preclusion should apply because an identity of issues exists, the issues were actually litigated and decided, and the United States did not improperly interfere in the previous litigation or adopt a "wait and see" strategy.

Issue preclusion, formerly known as collateral estoppel, has the "dual purpose of protecting litigants from the burden of relitigating an identical issue . . . and of promoting judicial economy by preventing needless litigation." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 (1979). However, the offensive use of issue preclusion may have the opposite effect, encouraging plaintiffs to "wait and see" in a way which may "increase rather than decrease the total amount of litigation." *Id.* at 330. Thus, special care must be taken when considering whether to apply non-mutual, offensive issue preclusion.

Ordinary issue preclusion requires a party show: "(1) the issue sought to be litigated is sufficiently similar to the issue presented in an earlier proceeding and sufficiently material in both actions to justify invoking the doctrine, (2) the issue was actually litigated in the first case, and (3) the issue was necessarily decided in the first case." *Appling v. State Farm Mut. Auto. Ins. Co.*, 340 F.3d 769, 775 (9th Cir. 2003).[21] A

---

[21] An "identity of issues" exists where:

(1) There is substantial overlap between the evidence or argument to be advanced in the second proceeding and that advanced in the first,

(2) The new evidence or argument involves the application of the same rule of law as that involved in the prior proceeding,

(3) Pretrial preparation and discovery related to the matter presented in the first

plaintiff seeking non-mutual, offensive issue preclusion, however, must also show its application would not be unfair. *See Parklane Hosiery Co.*, 439 U.S. 322, 330-331 (1979). A number of circumstances may render offensive issue preclusion unfair and therefore impermissible. For instance, where a defendant "may have little incentive to defend vigorously, particularly if future suits are not foreseeable . . . [or] if the judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments . . . [or] where the second action affords the defendant procedural opportunities unavailable in the first action that could readily cause a different result." *Id.* at 330-331.

Arpaio does not contest the identity of issues between *Melendres* and certain aspects of the United States' complaint. Nor does he argue these issues were not actually litigated or necessarily decided. Instead, Arpaio focuses entirely on the question of fairness. He first argues the United States adopted a "wait and see" strategy in the *Melendres* litigation and that it deliberately withheld suit until the *Melendres* decision so that it could use the findings from that case in this suit. "Wait and see" was explicitly denounced by the Supreme Court as contrary to judicial economy and a factor disfavoring application of non-mutual, offensive issue preclusion. *Id.* at 329. As proof of this strategy, Arpaio offers Maricopa County's motion to stay *Melendres* pending the outcome of DOJ's investigation. But Arpaio himself opposed the stay, as did the *Melendres* plaintiffs, and ultimately, the court denied the motion. The *Melendres* court reasoned: "[I]t is doubtful that the DOJ investigation will necessarily overlap with the issues of this case sufficient to prove markedly beneficial. Even if they did, the length of the stay proposed by the County undercuts any such utility." *Melendres v. Maricopa Cnty.*, No. 07-CV-02513-PHX-GMS, 2009 WL 2515618, at *2 (D. Ariz. Aug. 13, 2009).

---

action can reasonably be expected to have embraced the matter sought to be presented in the second,

(4) The claims involved in the two proceedings are closely related.

*Kamilche Co. v. United States*, 53 F.3d 1059, 1062 (9th Cir. 1995) *opinion amended on reh'g sub nom. Kamilche v. United States*, 75 F.3d 1391 (9th Cir. 1996).

At the time of the court's ruling, discovery in *Melendres* was closed and the dispositive motion deadline had passed. It was unclear when DOJ's investigation, which had begun a few months prior, would be complete. Not only was the *Melendres* court's denial of the stay reasonable, it is not a basis for attributing a "wait and see" strategy to the United States now. In addition, despite being aware of DOJ's ongoing investigation, neither Arpaio nor any other party moved to join the United States as a party in *Melendres*.

The evidence also does not support Arpaio's argument that the United States was "heavily involved in the *Melendres* litigation" in such a way as would render application of non-mutual, offensive issue preclusion unfair. (Doc. 346 at 8). Arpaio attempts to characterize the United States as seeking influence and control in *Melendres*, but the United States more accurately describes its actions as "routine efforts to stay apprised of related litigation." (Doc. 354 at 6). The United States requested and was denied the opportunity to attend depositions. *Melendres v. Arpaio*, No. CV-07-02513-PHX-GMS, 2009 WL 3489402, at *1 (D. Ariz. Oct. 28, 2009). It ordered transcripts, requested a protective order for documents the parties sought in discovery, attended status conferences relevant to its document production, and requested a related case be transferred to the judge who was handling *Melendres*. The United States' statement of interest, filed after the *Melendres* court published its decision, offered the services and suggestions of the federal government regarding addressing constitutional violations in law enforcement agencies. The statement even discussed the possibility of a "global settlement encompassing the United States' claims," an option the *Melendres* litigants, including Arpaio, failed to pursue. (2:07-CV-02513-GMS, Doc. 580).

Finally, contrary to the few non-controlling and distinguishable cases Arpaio cites, this is not a case in which the United States could have easily joined the prior litigation. *Cf. Charles J. Arndt, Inc. v. City of Birmingham*, 748 F.2d 1486, 1494 (11th Cir. 1984) (individual plaintiff was aware of and testified in the earlier suit); *In re Air Crash Disaster at Stapleton Int'l Airport, Denver, Colo., on Nov. 15, 1987*, 720 F. Supp. 1505, 1523 (D. Colo. 1989) *rev'd on other grounds by Johnson v. Cont'l Airlines Corp.*, 964 F.2d 1059 (10th Cir. 1992) (plaintiffs were aware of, testified in, and were represented by

the same counsel as plaintiffs in earlier suit). The timing issues discussed above, as well as the differences between the federal government joining litigation versus an individual plaintiff doing so, indicate the difficulty that would have been involved in consolidating these two cases.

Because the United States did not "purpose[fully] elude[] the binding force of an initial resolution of a simple issue" nor improperly interfere in the initial proceeding such that this case would represent its second bite of the apple, non-mutual, offensive issue preclusion would not be unfair and, therefore, should be granted in this case. *Starker v. United States*, 602 F.2d 1341, 1349-1350 (9th Cir. 1979). Indeed, employing the doctrine here will promote judicial economy and all parties' interest in expeditious resolution. Therefore, summary judgment on this issue will be granted, and the United States will be permitted to offer the factual findings and rulings from *Melendres* in support of its claims.

**B. Application of Non-Mutual, Offensive Issue Preclusion to Maricopa County**

Maricopa County argues non-mutual, offensive issue preclusion should not apply to the County, which was not a party to *Melendres*. The United States argues non-mutual, offensive issue preclusion should apply to Maricopa County because the County was only dismissed from the previous suit because of its identity with MCSO, which was a party and, further, that Maricopa County is in privity with MCSO and Arpaio with respect to the previous litigation and was adequately represented therein.

"A person who was not a party to a suit generally has not had a 'full and fair opportunity to litigate' the claims and issues settled in that suit." *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008). But the Supreme Court has recognized six categories of exceptions to this general principle. A nonparty may be precluded from relitigating an issue from a prior case when: (1) the nonparty agreed to be bound by the determinations of the prior case; (2) the nonparty had a "pre-existing 'substantive legal relationship'" with a party

bound by the judgment;[22] (3) the nonparty was "adequately represented by someone with the same interests who [wa]s a party";[23] (4) the nonparty "'assume[d] control' over the litigation in which [the] judgment was rendered;" (5) a party to the previous litigation was a "designated representative" or proxy of the nonparty; and (6) a special statutory scheme "expressly foreclose[es] successive litigation by nonlitigants."[24] *Sturgell*, 553 U.S. at 893-895. The third exception, adequate representation, requires: (1) the interests of the nonparty and the party to the prior litigation were aligned in the litigation; (2) the party to the prior litigation either understood itself to be acting in a representative capacity *or* the original court took care to protect the interests of the nonparty; and, in certain circumstances, (3) the nonparty had notice of the original suit. *Id.* at 900.[25]

The *Sturgell* decision represented a retreat from what the Supreme Court characterized as lower courts' expansive readings of "privity" doctrine as it applied to issue preclusion. The phrase "substantive legal relationship" was deliberately substituted for "privity" in an attempt to narrow the scope of the exception. *See id.* at 894, n. 8. Previously, the Supreme Court had held issue preclusion could be applied to a nonparty of the previous case when the nonparty was in privity with a party to the prior litigation. *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 402-403 (1940). In *Adkins*, the Supreme Court held a suit involving the National Bituminous Coal Commission, a federal entity, was binding on the entire federal government. *Adkins*, 310 U.S. at 402 ("There is privity between officers of the same government."). "The crucial point," the Court stated, "[was] whether or not in the earlier litigation [the party] had authority to represent [the nonparty's] interests in a final adjudication of the issue in controversy." *Id.* at 403. The Ninth Circuit and other courts subsequently went further, holding that when

---

[22] "Qualifying relationships include, but are not limited to, preceding and succeeding owners of property, bailee and bailor, and assignee and assignor." *Id.* at 894.

[23] E.g. Class actions.

[24] I.e. Bankruptcy proceedings.

[25] *Sturgell* does not make clear whether the three additional factors articulated as the requirements of "adequate representation" apply to all of the categories for proper nonparty issue preclusion or just the one for "adequate representation."

1    interests are sufficiently aligned, there may even be privity between "governmental

2    authorities as public enforcers of ordinances and private parties suing for enforcement as

3    private attorneys general." *In re Schimmels*, 127 F.3d 875, 881 (9th Cir. 1997). In

4    *Sturgell*, the Supreme Court reframed its precedent as "endeavor[ing] to delineate

5    discrete exceptions [to the bar against nonparty preclusion] that apply in 'limited

6    circumstances.'" *Sturgell*, 553 U.S. at 888.[26]

7          The parties in *Melendres* jointly stipulated to dismiss Maricopa County as "'not . .

8    . necessary' to obtain 'complete relief.'" *See* (2:07-CV-02513-GMS, Doc. 178); *Ortega

9    Melendres v. Arpaio*, 598 F. Supp. 2d 1025, 1039 (D. Ariz. 2009). But the stipulation was

10   made before the Arizona Court of Appeals ruled on MCSO's status as a non-jural entity.

11   The stipulation was likely related to the County's funding structure. Because Maricopa

12   County funds MCSO, "[w]hether the County or the Sheriff is liable is of no practical

13   consequence . . . they both lead to the same money." *Payne v. Arpaio*, No. CV09-1195-

14   PHX-NVW, 2009 WL 3756679, at *6 (D. Ariz. Nov. 4, 2009). MCSO is not a separate

15   legal entity from the County. *Braillard v. Maricopa County*, 232 P.3d 1263, 1269 (Ariz.

16   Ct. App. 2010). In its motion to dismiss in *Melendres*, Maricopa County called MCSO its

17   political subdivision. (Doc. 355-1 at 20). Therefore, there is little doubt Maricopa County

18   would qualify for the "substantive legal relationship" exception to the bar against

19   nonparty issue preclusion.

20         Even if the requirements for the "adequate representation" exception also apply,

21   Maricopa County qualifies for nonparty issue preclusion. Maricopa County argues its

22   interests were not aligned with MCSO because "the County contested its responsibility

23   for the Sheriff's actions." But MCSO *also* contested its liability for the Sheriff's actions

24   and Maricopa County and MCSO together submitted a joint answer and joint motion to

25         [26] The Supreme Court rejected the concept of "virtual representation," which it
26   described as a more "expansive" basis for nonparty preclusion. "Virtual representation"
     had various definitions in the lower courts. The D.C. Circuit's version held a nonparty
27   was virtually represented for purposes of preclusion where the nonparty: (1) shared an
     identity of interests with a party to the litigation, (2) was adequately represented in the
     prior litigation, and (3) had either a close relationship with the putative representative,
28   substantially participated in the prior case, or was tactically maneuvering to avoid
     preclusion. *Sturgell*, 553 U.S. at 889-890.

dismiss the complaint. Maricopa County argues MCSO could not have "'understood itself to be acting in a representative capacity' for the County." Again, Maricopa County and MCSO's joint representation by counsel in *Melendres* and their joint submissions, defenses, and arguments for dismissal demonstrate both the alignment of their interests and their understanding of themselves as indistinguishable legal entities for purposes of defending the suit. In fact, the Ninth Circuit recently ordered the *Melendres* court—post-trial and after the issuance of an injunctive order—to substitute Maricopa County for MCSO due to MCSO's status as a non-jural entity. *Melendres v. Arpaio*, 784 F.3d 1254 (9th Cir. 2015). Without discussing the issue, the Ninth Circuit appears to have assumed Maricopa County was adequately represented in the preceding *Melendres* litigation such that adding it as a party for purposes of injunctive relief was fair and reasonable.

Therefore, summary judgment on this issue will be granted. The same non-mutual, offensive issue preclusion that applies to Arpaio in this case as a result of *Melendres* will also apply to Maricopa County.[27]

### C. The Effect of Non-Mutual, Offensive Issue Preclusion

Application of non-mutual, offensive issue preclusion here means the United States will not have to relitigate facts and issues decided in *Melendres* which also underlie parts of the United States' current claims. Instead, those issues will be given "conclusive effect" here. *See* Restatement (Second) of Judgments § 13 (1982). The issues include MCSO's performance of traffic stops in connection with purported immigration and human smuggling law enforcement, including "crime suppression operations" and "saturation patrols," during which the officers unlawfully relied on race, color, or national origin, as well as MCSO's use of Hispanic ancestry or race as a factor in forming reasonable suspicion that persons violated state laws relating to immigration status in violation of the Equal Protection Clause of the Fourteenth Amendment. *See Melendres v. Arpaio*, 989 F. Supp. 2d 822 (D. Ariz. 2013). In sum, in deciding the merits of the United States' claims, the Court will treat the *Melendres* findings relating to discriminatory

---

[27] Neither party attempts to argue Maricopa County lacked notice of the previous case.

enforcement of immigration laws through vehicle stops as findings of fact in this case.

The United States argues these findings from *Melendres* entitle it to summary judgment on its discriminatory policing claims contained in Counts One, Three, and Five.[28]

### i. Count One

Count One claims violations of 42 U.S.C. § 14141 and the Fourteenth Amendment based on MCSO's law enforcement practices, including traffic stops, workplace raids, home raids, and jail operations.

Section 14141 provides: "It shall be unlawful for any governmental authority, or any agent thereof, or any person acting on behalf of a governmental authority, to engage in a pattern or practice of conduct by law enforcement officers . . . that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States." 42 U.S.C. § 14141. A "pattern or practice" is "more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 n.16 (1977). *See also Obrey v. Johnson*, 400 F.3d 691, 694 (9th Cir. 2005). In order to show a "pattern or practice," one must prove the conduct "was the [defendant's] standard operating procedure the regular rather than the unusual practice." *Teamsters*, 431 U.S. at 336.

There is no dispute that Arpaio is a "governmental authority" under the statute, and the *Melendres* court found Arpaio and MCSO violated the Constitution, specifically the Equal Protection Clause of the Fourteenth Amendment. *See Melendres v. Arpaio*, 989 F. Supp. 2d 822 (D. Ariz. 2013). Furthermore, the findings of *Melendres* amount to a "pattern or practice" under the statute. The *Melendres* court found Arpaio and MCSO at one time promulgated official policies which "expressly permitted officers to make racial classifications." *Melendres*, 989 F. Supp. 2d at 899. The court also found that even once

---

[28] The following analysis focuses on the *Melendres* court's findings as to Arpaio, but applies equally to Maricopa County because, as discussed in Part III(B), *supra*, Maricopa County is directly liable for the actions of Arpaio as its official policymaker on law enforcement matters and for MCSO, a non-jural subdivision of the County.

these explicit policies were discontinued for facially race-neutral ones, intentional discrimination on the basis of race continued to influence MCSO's operations. *Id.* at 902-904 (finding MCSO continued to instruct officers that although race could not be the only basis for law enforcement action, it was a legitimate factor, among others, on which they could base decisions pertaining to immigration enforcement). Overall, the court concluded Arpaio and MCSO's policies and procedures "institutionalize[d] the systematic consideration of race as one factor among others in forming reasonable suspicion or probable cause in making law enforcement decisions." *Id.* at 898. These findings clearly show a "pattern or practice." The discrimination found by the *Melendres* court was not of an isolated or accidental nature, but rather of standard operating procedure throughout MCSO.

The United States has thus satisfied all of the elements for proving a portion of Count One: violations of § 14141. However, the United States admits Count One is based not only on the pattern of discriminatory conduct found in *Melendres*, but also on "three other patterns or practices of unlawful conduct." (Doc. 332 at 9). Thus, any injunctive relief the Court ultimately grants will be based only on conduct it has found violated the law. *See Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105, 1116 (9th Cir. 2012) ("Courts should not enjoin conduct that has not been found to violate any law."). Therefore, in order to obtain the full and greater relief it seeks under Count One, including for allegations not decided in *Melendres* (namely a pattern or practice of discrimination in workplace raids, home raids, and jail operations), the United States will have the burden of proving those allegations at trial.

### ii. Count Three

Count Three alleges violations of Title VI and its implementing regulations based on Arpaio and MCSO's disparate impact and disparate treatment of Latinos and the office's receipt of federal financial assistance.

Title VI and its implementing regulations prohibit discrimination against any person on the basis of race, color, or national origin under "any program or activity receiving Federal financial assistance." 42 U.S.C. §§ 2000d; 28 C.F.R. §§ 42.104. A

"program or activity" is defined as: "(i) A department, agency, . . . or other instrumentality of a State or of a local government; or (ii) The entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government . . . ." 28 C.F.R. § 42.102(d).

MCSO is clearly a department of local government under the statute, and Arpaio is its head. It is undisputed that MCSO and Arpaio received federal financial assistance. And the *Melendres* court found MCSO and Arpaio discriminated on the basis of race. Thus, the United States has again shown the *Melendres* findings satisfy the elements of its claim. Summary judgment on a portion of Count Three will be granted. Again, this ruling only potentially entitles the United States to relief tailored to the findings in *Melendres*. Any additional and greater relief will be contingent on the United States proving additional Title VI violations at trial.

### iii. Count Five

Count Five is for violations of contractual assurances associated with Title VI and the receipt of federal financial assistance.

DOJ regulations under Title VI require each recipient of federal financial assistance to include an assurance that the recipient and subrecipients will comply with Title VI and its implementing regulations. *See* 28 CFR § 42.105(a), (b). Violations of Title VI, therefore, automatically violate these contractual assurances. Based on the foregoing, summary judgment on a portion of Count Five will be granted. Again, the relief granted will be based on the facts found in *Melendres* and any further facts and violations the United States may prove at trial.[29]

### V. Claims Related to LEP Inmates

Arpaio argues he is entitled to summary judgment on the allegations of intentional discrimination or disparate treatment regarding limited English proficient ("LEP")

---

[29] In addition to liability based on the actions of Arpaio and MCSO, Maricopa County is also liable for this claim based on the contractual assurances given by its Board of Supervisors, the entity which distributes federal funds to various County departments, including Arpaio and MCSO.

inmates in Counts Four and Five. In reply, he also argues he is entitled to summary judgment on allegations of disparate impact on LEP inmates. The United States claims it has submitted ample evidence that Arpaio has and continues to intentionally discriminate against LEP inmates in violation of Title VI. It also argues Arpaio did not initially move for summary judgment on the disparate impact claims.

Whether or not Arpaio raised it in his initial motion, his argument that Title VI applies only to intentional discrimination is not accurate. In *Alexander v. Sandoval*, the Supreme Court held § 601 of Title VI created a private cause of action only for intentional discrimination. 532 U.S. 275 (2001). But the Court chose to defer to regulations promulgated by DOJ under § 602 of the law, which prohibited activities having a disparate impact on the basis of race. *Sandoval*, 532 U.S. aqt 281-282. It assumed without deciding that these regulations were reasonable and, therefore, valid. *Id.* The focus in *Sandoval* was whether a private right of action existed to enforce the disparate impact regulations DOJ had created. The Court held it did not, but declined to address whether a disparate impact cause of action under Title VI existed. *Id.* As discussed in Part III(A), *supra*, the Supreme Court's analysis implies a cause of action for disparate impact discrimination does lie. Therefore, summary judgment on the claim for disparate impact discrimination will not be granted.

Regarding Arpaio's motion with respect to intentional discrimination, Title VI provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. DOJ's implementing regulations specifically prohibit "[restricting] an individual in any way in the enjoyment of any advantage or privilege enjoyed by others receiving any disposition, service, financial aid, or benefit under the program," 28 C.F.R. § 42.104(b)(1)(iv), or "[utilizing] criteria or methods of administration which have the *effect* of subjecting individuals to discrimination . . . [or] defeating or substantially impairing accomplishment of the objectives of the program as respects individuals of a particular race, color, or national origin." 28 C.F.R. § 42.104(b)(2) (emphasis added).

DOJ guidance provides, a federal funding recipient must "take reasonable steps to ensure 'meaningful' access to the information and services they provide [to LEP inmates]." Department of Justice, *Enforcement of Title VI of the Civil Rights Act of 1964—National Origin Discrimination Against Persons With Limited English Proficiency; Policy Guidance*, 65 FR 50123-01, 50124 (Aug. 16, 2000); Department of Justice, *Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons*, 67 Fed. Reg. 41455, 41469-70 (Jun 18, 2002).

The *McDonnell Douglas* burden shifting framework applies to Title VI disparate treatment claims. *Rashdan v. Geissberger*, 764 F.3d 1179, 1182 (9th Cir. 2014). "First, the plaintiff has the burden of proving by [a] preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the [treatment].'" *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 248 (1981) (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).

Arpaio argues he has made reasonable efforts to provide LEP inmates with meaningful access to information and services, thus defeating the United States' claim. He cites his DI-6 Policy, which states LEP inmates are to have "the same rights and protections mandated by federal, state, and local laws." (Doc. 345 at 10). The United States attacks these assertions on three grounds: (1) the DI-6 Policy on which Arpaio relies was not enacted until October 2013—eighteen months after the U.S. brought suit; (2) the pre-DI-6 Policy actions Arpaio took to address LEP discrimination were insufficient to meet the "reasonable steps" requirement; and (3) notwithstanding the enactment of the DI-6 Policy, evidence shows disparate treatment of a significant level of continuing harm to LEP inmates. The DI-6 Policy was, indeed, enacted in 2013. But Arpaio claims the policy memorialized "MCSO's long standing, reasonable efforts to ensure LEP inmates have meaningful access." (Doc. 358 at 6). He contests the claim that the United States' evidence proves "a ***significant number*** of LEP beneficiaries" are being deprived of access. *Id.* at 7 (emphasis in original). The arguments are fact-based, and the

facts are in dispute, namely how Arpaio and MCSO were treating LEP inmates prior and subsequent to the October 2013 enactment of the DI-6 Policy and the effects of that treatment. (*See* Doc. 353 beginning at ¶ 65). Therefore, this issue is not appropriate for summary judgment.

**VI. Retaliation Claims**

Arpaio argues he is entitled to summary judgment on Count Six: the United States' claim for retaliation pursuant to § 14141. Arpaio argues the claim is premised on bar complaints, which are absolutely privileged under state law, and lawsuits, for which the United States has failed to show he lacked reasonable suspicion or probable cause. The United States claims the Arizona privilege for state bar complaints does not bar suits for federal civil rights violations and that pleading a lack of probable cause is not required for a claim of retaliation in violation of the First Amendment.

**A. Bar Complaints**

Arpaio claims his complaints to the state bar cannot function as grounds for a claim for First Amendment violations. The United States contends the Arizona statute providing privilege for bar complaints cannot block a suit based on federal law and, by implication, can form the basis of such a suit.

Arizona courts have established "an absolute privilege extended to anyone who files a complaint with the State Bar alleging unethical conduct by an attorney." *Drummond v. Stahl*, 127 Ariz. 122, 126 (Ct. App. 1980) ("[P]ublic policy demands the free reporting of unethical conduct"). However, the Supreme Court and the Ninth Circuit have held that "state law cannot provide immunity from suit for federal civil rights violations." *Wallis v. Spencer*, 202 F.3d 1126, 1144 (9th Cir. 2000); *Martinez v. State of Cal.*, 444 U.S. 277, 285, n. 8 (1980) ("A construction of the federal statute which permitted a state immunity defense to have controlling effect would transmute a basic guarantee into an illusory promise; and the supremacy clause of the Constitution insures that the proper construction may be enforced"). For example, in *Imbler v. Pachtman*, the Court held common law prosecutorial immunity applies to cases under § 1983.  424 U.S.

409 (1976).[30] But the Fifth Circuit refused to extend prosecutorial immunity to decisions to bring complaints before state ethics commissions, even where a state law also provides absolute privilege for those complaints. *Lampton v. Diaz*, 639 F.3d 223, 229 (5th Cir. 2011) ("Lampton likely enjoys immunity from the state law claims under Mississippi law. . . . [H]owever, federal law does not provide immunity to complainants before state ethics committees . . . . In the absence of congressional action, we should not create that immunity merely because it may be desirable for some policy reason.").

Arpaio cites *Donahoe v. Arpaio* in support of his position. 869 F. Supp. 2d 1020 (D. Ariz. 2012) *aff'd sub nom. Stapley v. Pestalozzi*, 733 F.3d 804 (9th Cir. 2013). In *Donahoe*, Arpaio had filed suit against various Maricopa County officials—including members of the Board of Supervisors and judges—under the federal Racketeer Influenced and Corrupt Organization Act ("RICO"). He claimed the officials were improperly using their power to obstruct a criminal investigation. Arpaio's allegations spanned a variety of conduct and included his adversaries' filing of bar complaints against the County Attorney. *Id.* The officials sued Arpaio for retaliation for the exercise of their First Amendment rights. *Id.* The district court held Arpaio's alleged injuries were not actionable under RICO, nor was the conduct on which the claim was based, including bar complaints. *Id.* at 1053.

*Donahoe* is an anomaly. The case law cited above strongly indicates state law immunities do not bar federal suits or prevent those suits from being based on elements immune from suit under state law. The *Donahoe* court did not consider previous decisions regarding the interaction between state law immunities and federal causes of action, nor the Supremacy Clause issues on which those decisions were based. As an outlier, *Donahoe* is not a proper basis on which to grant this motion. Therefore, summary judgment will be denied on Arpaio's claim that bar complaints cannot form the basis of a retaliation claim.

---

[30] The Court also held the scope of that immunity was fixed at what it was in 1871, the year § 1983 was enacted.

- 46 -

### B. Probable Cause

Arpaio argues the United States' retaliation claim must fail because the United States does not and cannot show Arpaio lacked probable cause for the lawsuits it claims were retaliatory. The United States argues it is not required to show lack of probable cause to succeed in a claim for retaliatory law enforcement action.

To prove a claim for retaliation in violation of the First Amendment, a plaintiff must show: (1) the defendant "took action that 'would chill or silence a person of ordinary firmness from future First Amendment activities'" and (2) the defendant's "desire to cause the chilling effect was a but-for cause of the defendant's action." *Skoog v. Cnty. of Clackamas*, 469 F.3d 1221, 1232 (9th Cir. 2006) (citing *Mendocino Envtl. Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1300 (9th Cir.1999); *Hartman v. Moore*, 547 U.S. 250 (2006)).

At the time *Skoog* was decided, whether a plaintiff had to plead a lack of probable cause in order to satisfy the second requirement was "an open question in [the Ninth Circuit] and the subject of a split in other circuits." *Id.* The *Skoog* court held "a plaintiff need not plead the absence of probable cause in order to state a claim for retaliation." *Id.* The court contrasted this with the Supreme Court's ruling in *Hartman v. Moore*, where the Supreme Court held plaintiffs claiming retaliatory prosecution must plead lack of probable cause. 547 U.S. 250 (2006). The reason, the *Hartman* Court stated, was that a claim for retaliatory prosecution involves showing "an official bent on retaliation" convinced a prosecutor to filed suit. *Id.* at 260-266. In an "ordinary" retaliation claim, by contrast, the retaliatory action is performed directly by the retaliation-driven official. The causal link between retaliatory animus and retaliatory action, therefore, is more readily apparent in a case of pure retaliation than in a case of retaliatory prosecution where "some evidence must link the allegedly retaliatory official to a prosecutor whose action has injured the plaintiff[, and t]he connection, to be alleged and shown, is the absence of probable cause." *Id.* at 263.

The United States' claim against Arpaio includes ordinary retaliation, as well as retaliatory prosecution. It alleges, with retaliatory motive, Arpaio complained to the

Arizona Commission on Judicial Conduct, ordered arrests, and initiated lawsuits through then County Attorney Andrew Thomas ("Thomas"). (Doc. 1 at 23-25). Arpaio acknowledges *Skoog*, but argues "the Ninth Circuit has shifted away from [its] conclusion." (Doc. 345 at 14). He cites *Acosta v. City of Costa Mesa*, for the proposition that the Ninth Circuit has "affirmatively stated that the existence of probable cause is dispositive of a retaliatory *arrest* claim." (Doc. 345 at 14) (emphasis added); *see Acosta v. City of Costa Mesa*, 718 F.3d 800, 825 (9th Cir. 2013). *Acosta* addressed the question of whether arresting officers were entitled to qualified immunity for claims of retaliatory arrest. The Ninth Circuit held, for purposes of qualified immunity, "there [was no] *clearly established* First Amendment right to be free from a retaliatory arrest that is otherwise supported by probable cause." *Acosta*, 718 F.3d at 825 (citing *Reichle v. Howards*, 132 S. Ct. 2088, 2097 (2012)) (emphasis added). The United States argues, whether or not this right would have been clear to an arresting officer, it exists and applies here. The United States is correct.

As the Ninth Circuit's analysis in *Ford v. City of Yakima* shows, the question of the substance of a constitutional right is distinct from the question of whether that right was clearly established for purposes of qualified immunity. 706 F.3d 1188 (9th Cir. 2013). The Supreme Court has held *Hartman's* impact on the requirements for a claim of retaliatory arrest was "far from clear" at the time it was decided. Thus, an officer accused of retaliatory arrest could assert the defense of qualified immunity because *Hartman's* rule regarding probable cause did not necessarily extend to the area of retaliatory arrests. *Reichle v. Howards*, 132 S. Ct. 2088, 2095-96 (2012). But the Court specially noted, unlike in a claim for retaliatory prosecution, "in many retaliatory arrest cases, it is the officer bearing the alleged animus who makes the injurious arrest." *Id.* at 2096. Nevertheless, the Court stopped short of providing a definitive answer as to whether proving lack of probable cause was necessary to succeed on a claim for retaliatory arrest. Instead, the Court simply stated, "*Hartman* injected uncertainty into the law governing retaliatory arrests." *Id.* Since *Hartman* and *Reichle*, the Ninth Circuit has continued to hold "an individual has a right 'to be free from police action motivated by retaliatory

animus but for which there was probable cause.'" *Ford*, 706 F.3d at 1193 (citing *Skoog*, 469 F.3d at 1235).

Arpaio does not assert the defense of qualified immunity in this motion (nor could he in an action for declaratory or injunctive relief). The single issue is whether the United States' claim fails because it does not plead lack of probable cause. It does not. First, again the claim is premised, in part, on conduct for which the United States would not have to prove a lack of probable cause: judicial complaints and arrests. Second, Arpaio has not shown as a matter of law there *was* probable cause for the lawsuits in question, nor that the United States is incapable of proving there was not probable cause for the suits. Therefore, summary judgment on these grounds will be denied.

### C. Justiciability: Standing and Mootness

Arpaio denies he retaliated against his critics for voicing their disapproval of his practices. He also claims the United States lacks standing to bring a retaliation claim because the alleged conduct represents a past wrong with no real or immediate threat of future retaliation. The United States argues standing does not require the immediate threat of unlawful *conduct*, but rather *injury*, and that the harm caused by Arpaio's past retaliation persists. It also claims the "voluntary cessation" exception to mootness doctrine applies, maintaining this claim's justiciability.

In order for a case to be justiciable, "[t]he plaintiff must show that he 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged official conduct and the injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983) (citations omitted).

"It is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'" *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (citation omitted). A case only becomes moot in the context of a voluntary cessation "if subsequent events [make] it *absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* (citing *United States v. Concentrated Phosphate*

*Export Ass'n.*, 393 U.S. 199, 203 (1968)) (emphasis added). "[A] voluntary governmental cessation of possibly wrongful conduct [may be treated] with some solicitude." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 325 (5th Cir. 2009). But courts warn the solicitude should only be applied where the "self-correction . . . appears genuine." *Ragsdale v. Turnock*, 841 F.2d 1358, 1365 (7th Cir. 1988).

Arpaio does not contest that he and MCSO filed the lawsuits, submitted bar complaints, and performed the arrests the United States alleges. What Arpaio contests is the allegation that these actions were performed in retaliation for criticism he and his office received. In other words, that they were done with retaliatory animus. But the United States' facts are sufficient to raise a reasonable inference that Arpaio's actions were performed out of retaliatory animus. Arpaio's conclusory denials do not defeat this evidence. Therefore, summary judgment will not be granted on these grounds.

Arpaio's second argument—even if he at one time retaliated against critics in the manner alleged, there is insufficient proof the threat continues—is not persuasive. If the United States' allegations of past retaliation are true, there is a genuine issue of material fact as to the ongoing effect of those actions. Arpaio remains Sheriff of Maricopa County and retains the power he allegedly misused to perform acts of retaliation. He has offered no facts showing any fear or chilling his actions may have caused has permanently ended or abated since his claimed cessation. Therefore, summary judgment on this issue will be denied.

## VII. Obey the Law Injunction

Arpaio claims the United States' prayer for relief is an improper "obey the law" injunction, which entitles him to summary judgment on all counts. The United States argues the Court has broad discretion to shape remedies and it "would be premature to determine the availability of any injunctive relief without first hearing the evidence in dispute." (Doc. 350 at 17).

Under the federal rules, "[e]very order granting an injunction and every restraining order must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the complaint or other document—

the act or acts restrained or required." Fed. R. Civ. P. 65(d). As such, "blanket injunctions to obey the law are disfavored." *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1226 (C.D. Cal. 2007) (quoting *Mulcahy v. Cheetah Learning LLC,* 386 F.3d 849, 852 n. 1 (8th Cir. 2004)) (internal quotation marks omitted). But district courts have broad discretion to shape equitable remedies. *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 175 (2010). When an appellate court finds a trial court abused its discretion by issuing an overly broad order, it may strike those provisions "dissociated from those [acts] which a defendant has committed." *N.L.R.B. v. Express Pub. Co.*, 312 U.S. 426, 435 (1941). *See, e.g.*, *S.E.C. v. Smyth*, 420 F.3d 1225, 1233 (11th Cir. 2005) (holding general "obey-the-law" injunctions unenforceable).

The purpose of Rule 65(d) is to ensure defendants have fair notice of what conduct is prohibited and to avoid undue restraint. The Ninth Circuit has "not adopted a rule against 'obey the law' injunctions per se." *F.T.C. v. EDebitPay, LLC*, 695 F.3d 938, 944 (9th Cir. 2012). Instead the court recognizes, in certain circumstances, "injunction[s] . . . framed in language almost identical to the statutory mandate . . . [are not] vague" because they "adequately describe the impermissible conduct." *United States v. Miller*, 588 F.2d 1256, 1261 (9th Cir. 1978). *See also E.E.O.C. v. AutoZone, Inc.*, 707 F.3d 824, 842 (7th Cir. 2013) (holding "obey-the-law" injunctions *may* be an "appropriate" form of equitable relief where evidence suggests the proven illegal conduct may continue or be resumed, for example, when those responsible for workplace discrimination remain with the same employer or some other factor "convinces the court that voluntary compliance with the law will not be forthcoming").

A request for an injunction is not determinative of the type of relief the court will ultimately issue. Only if the court ultimately *issues* an inappropriately broad or non-specific injunction might a defendant be entitled to relief from that order. Hence, an overbroad *request* does not entitle the defendant to judgment as a matter of law on the underlying claims. Furthermore, in the Ninth Circuit, injunctions tracking statutory language are not *per se* invalid. Therefore, it is premature for Arpaio to challenge an injunctive order that has yet to be issued in a case in which numerous matters remain to

be decided. Summary judgment on these grounds will not be granted.

Accordingly,

**IT IS ORDERED** Defendant Maricopa County's Motion for Summary Judgment, (Doc. 334), is **DENIED.**

**IT IS FURTHER ORDERED** Defendant Arpaio's Motion for Partial Summary Judgment, (Doc. 345), is **DENIED.** His prior motion for partial summary judgment, which exceeded page limits, (Doc. 336), is **STRICKEN.**

**IT IS FURTHER ORDERED** Plaintiff the United States' Motion for Partial Summary Judgment, (Doc. 332), is **GRANTED.** Non-mutual, offensive issue preclusion bars relitigation of issues previously decided in *Melendres v. Arpaio*. As a result, summary judgment is granted regarding the discriminatory traffic stop claims in Counts One, Three, and Five.

Dated this 15th day of June, 2015.

Honorable Roslyn O. Silver
Senior United States District Judge