Mark Kappelhoff
 Deputy Assistant Attorney General
Judy Preston (MD Bar, no numbers assigned)
Timothy D. Mygatt (DC Bar No. 1021564)
Edward G. Caspar (MA Bar No. 650566)
Jennifer L. Mondino (NY Bar No. 4141636)
Paul Killebrew (LA Bar No. 32176)
Puneet Cheema (CA Bar No. 268677)
Matthew J. Donnelly (IL Bar No. 6281308)
U.S. Department of Justice, Civil Rights Division
Special Litigation Section
601 D St. NW, Suite 5200
Washington, D.C. 20004

Attorneys for the United States

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>                              Plaintiff,<br><br>v.<br><br>Maricopa County, Arizona; Maricopa County Sheriff's Office; and Joseph M. Arpaio, in his official capacity as Sheriff of Maricopa County, Arizona,<br><br>                              Defendants. | No. 2:12-cv-00981-ROS<br><br>**JOINT PROPOSED PRETRIAL ORDER** |

Pursuant to the Order Setting Bench Trial entered June 10, 2015 (Doc. 377), following is the Joint Proposed Pretrial Order, which the Court directed the parties to provide to the Court, via e-mail, on July 10, 2015.

A.    **TRIAL COUNSEL FOR THE PARTIES**

Plaintiff the United States:          Edward G. Caspar
                                                   Paul Killebrew
                                                   Puneet Cheema
                                                   Matthew J. Donnelly

U.S. Department of Justice
Civil Rights Division- PHB
950 Pennsylvania Avenue, NW
Washington, D.C. 20530
Tel. (202) 514-2000/Fax (202) 514-6273
edward.g.caspar@usdoj.gov

Defendant Maricopa County:

Dan K. Webb (admitted pro hac vice)
J. Erik Connolly (admitted pro hac vice)
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601
Telephone: (312) 558-5600
Fax: (312) 558-5700
dwebb@winston.com
econnolly@winston.com

Richard K. Walker (SBN 004159)
Charles W. Jirauch (SBN 004219)
WALKER & PESKIND, PLLC
16100 71ST Street, Suite 140
Scottsdale, Arizona 85254
Telephone: (480) 483-6336
Fax: (480) 483-6337
rkw@azlawpartner.com
cwj@azlawpartner.com

Defendants Maricopa County Sheriff's Office and Joseph M. Arpaio:

William R. Jones, Jr., Bar #001481
John T. Masterson, Bar #007447
Joseph J. Popolizio, Bar #017434
Justin M. Ackerman
Jones, Skelton & Hochuli, P.L.C.
2901 North Central Avenue, Suite 800
Phoenix, Arizona  85012
Telephone:  (602) 263-1700
Fax:  (602) 200-7801
wjones@jshfirm.com
jmasterson@jshfirm.com
jpopolizio@jshfirm.com
jackerman@jshfirm.com

2

B.   **STATEMENT OF JURISDICTION/VENUE**

Jurisdiction in this case is proper under 28 U.S.C. § 1331 and 1345.   Venue is proper in the District of Arizona pursuant to 28 U.S.C. § 1391(b).

C.   **NATURE OF ACTION**

This civil rights suit alleges four patterns or practices of unconstitutional conduct: (1) discriminatory policing against Hispanic persons in MCSO's saturation patrols, general traffic enforcement, and worksite operations targeting Hispanic immigrants, (2) detentions in violation of the Fourth Amendment during MCSO's worksite raids targeting Hispanic immigrants, (3) failures in the provision of language access to Hispanic limited-English-proficient (LEP) jail inmates, and (4) retaliatory police action against critics of Sheriff Arpaio and MCSO.   The United States seeks declaratory and injunctive relief in connection with these patterns or practices of unconstitutional conduct.

D.   **JURY/NON-JURY**

None of the parties have demanded a jury trial of all or any of the issues before the Court.

E.   **CONTENTIONS OF THE PARTIES**:

   1.   First Claim for Relief: Defendants' Law Enforcement Policies and Practices Violate 42 U.S.C. § 14141 and the Fourteenth Amendment

PLAINTIFF'S POSITION: Pursuant to its June 15, 2015 Order (Doc. 379), the Court has granted the United States' Motion for Partial Summary Judgment (Doc. 332), and thus has granted summary judgment regarding the discriminatory traffic stop claims encompassed in the United States' First Claim for Relief.   The remaining issues for the United States to prove relating to this claim are the scope of the violation and, in turn, the appropriate remedy to be ordered by the Court.

DEFENDANT ARPAIO'S POSITION: It appears that the United States does not intend to offer any testimony or other evidence on the merits of its claims for relief in

3

Count I of its Complaint beyond what has been determined by this Court in its Order granting Partial Summary Judgment on June 15, 2015.  Defendant Apraio contends, then, that no trial of any other issues related to Count I is necessary.  The remedy to be ordered by the Court should be based on further appropriate legal briefing by the parties.  To the extent that Plaintiff continues to seek relief based on any other activities, Plaintiff's First Claim remains to be tried and adjudicated.  The County's authority over the Sheriff with respect to law enforcement actions related to Count I remain to be adjudicated.

DEFENDANT MARICOPA COUNTY'S POSITION: The Court's ruling of June 15, 2015 (Doc. 379) granted Plaintiff's Motion for Partial Summary Judgment only insofar as Plaintiff's First Claim for Relief encompassed alleged racial profiling in traffic stops conducted by MCSO in the context of immigration enforcement activities.  To the extent that Plaintiff continues to seek relief based on any other activities, Plaintiff's First Claim remains to be tried and adjudicated.  Defendant Maricopa County also asserts that the question of whether it can be held legally liable for the actions of the Sheriff and MCSO on the facts of this case as they pertain to Plaintiff's First Claim and, if so, whether the Plaintiff would be, on that basis, entitled to any injunctive relief against the County, remain to be tried and adjudicated.

2.    Second Claim for Relief: Defendants' Searches, Arrests, and Detentions Violate 42 U.S.C. § 14141 and the Fourth Amendment

PLAINTIFF'S POSITION: In order to prevail on this claim, the United States must prove the following:  (1) the Defendants have unreasonably searched, arrested, or detained numerous persons in Maricopa County (see, e.g., Ganwich v. Knapp, 319 F. 3d 1115, 1122 (9th Cir. 2003) (seizure must be "carefully tailored" to meet the underlying justification in executing the warrant; detention may violate the Fourth Amendment if the detention is unreasonable or is carried out in an unreasonable manner)); Michigan v.

4

1   <u>Summers</u>, 452 U.S. 692, 707 (1981) (the manner of the detention may be unreasonable if

2   prolonged, painful, or degrading)); and (2) the unreasonable searches, arrests, or

3   detentions engaged in by the Defendants constitute a pattern or practice of conduct by

4   law enforcement officers that deprives persons of their rights under the Fourth

5   Amendment, in violation of 42 U.S.C. § 14141(a) (see <u>Int'l Bhd. of Teamsters v. United</u>

6   <u>States</u>, 431 U.S. 324, 336 (1977) (A "pattern or practice" is not just "sporadic" but

7   "widespread," "a routine and regular part" of the defendant's work, the defendant's

8   "standard operating procedure," and "the regular rather than the unusual practice.");

9   <u>Cherosky v. Henderson</u>, 330 F.3d 1243, 1247 (9th Cir. 2003) (applying same standard to

10  interpret "pattern or practice")).

11

12       DEFENDANT ARPAIO'S POSITION: Defendant Arpaio generally agrees with

13  Plaintiff's characterization of the issues pertaining to Plaintiff's Second Claim for Relief.

14  Defendants note, however, that Plaintiff's citations to case authority omit pertinent

15  authorities.  For example, in <u>INS v. Delgado, 466 U.S. 2010, 104 S.Ct. 1758, 80 L.Ed. 2d</u>

16  <u>247 (1984),</u> the Supreme Court rejected the claim that the entire work forces of two

17  factories were "seized" for the duration of the surveys when the INS placed agents near

18  the exits of the factory sites.  <u>Id.</u> at 218, 104 S.Ct. at 1763.  <u>See also Pearl Meadows</u>

19  <u>Mushroom Farm, Inc. v. Nelson, 723 F. Supp. 432, 447 (N.D. Cal. 1989) (noting that</u>

20  "[q]uestioning employees on their immigration status, by itself, is not a violation of the

21  Fourth Amendment."); <u>Contreras v. United States, 672 F.2d 307, 309 (2d Cir.1982)</u>

22  (recognizing that warrantless arrests are justified, "when the alien's deportability is clear

23  and undisputed.").   Finally, because the United States is solely seeking injunctive relief

24  premised upon an alleged past wrong, it must demonstrate a "real and immediate threat"

25  of repeated future harm.  <u>See City of Los Angeles v. Lyons</u>, 461 U.S. 95, 105, 109

26  (1983); <u>Clark v. City of Lakewood</u>, 259 F.3d 996, 1007 (9th Cir. 2001).

27

28

5

DEFENDANT MARICOPA COUNTY'S POSITION: Defendant generally agrees with Plaintiff's characterization of the issues pertaining to Plaintiff's Second Claim for Relief.   Defendant notes, however, that Plaintiff's citations to case authority omit pertinent authorities.   Defendant Maricopa County also asserts that the question of whether it can be held legally liable for the actions of the Sheriff and MCSO on the facts of this case as they pertain to Plaintiff's Second Claim and, if so, whether the Plaintiff would be, on that basis, entitled to any injunctive relief against the County, remain to be tried and adjudicated.

        3.    <u>Third Claim for Relief: Defendants' Treatment of Hispanics Violates Title VI</u>

PLAINTIFF'S POSITION: Pursuant to its June 15, 2015 Order (Doc. 379), the Court has granted the United States' Motion for Partial Summary Judgment (Doc. 332), and thus has granted summary judgment regarding the discriminatory traffic stop claims encompassed in the United States' Third Claim for Relief.   The remaining issues for the United States to prove relating to this claim are the scope of the violation and, in turn, the appropriate remedy to be ordered by the Court.

DEFENDANT ARPAIO'S POSITION: It appears that the United States does not intend to offer any testimony or other evidence on the merits of its claims for relief in Count III of its Complaint beyond what has been determined by this Court in its Order granting Partial Summary Judgment on June 15, 2015.  Defendant Apraio contends, then, that no trial of any other issues related to Count III is necessary.  The remedy to be ordered by the Court should be based on further appropriate legal briefing by the parties.  To the extent that Plaintiff continues to seek relief based on any other activities, Plaintiff's Third Claim remains to be tried and adjudicated.  The County's authority over the Sheriff with respect to law enforcement actions related to Count III remain to be adjudicated.

6

DEFENDANT MARICOPA COUNTY'S POSITION: The Court's ruling of June 15, 2015 (Doc. 379) granted Plaintiff's Motion for Partial Summary Judgment only insofar as Plaintiff's Third Claim for Relief encompassed alleged racial profiling in traffic stops conducted by MCSO in the context of immigration enforcement activities. To the extent that Plaintiff continues to seek relief based on any other activities, Plaintiff's Third Claim remains to be tried and adjudicated. Defendant Maricopa County also asserts that the question of whether it can be held legally liable for the actions of the Sheriff and MCSO on the facts of this case as they pertain to Plaintiff's Third Claim and, if so, whether the Plaintiff would be, on that basis, entitled to any injunctive relief against the County, remain to be tried and adjudicated.

4.   Fourth Claim for Relief: Defendants' Treatment of Hispanic LEP Jail Inmates Violates Title VI

PLAINTIFF'S POSITION: In order to prevail on this claim, the United States must prove either that Defendants intentionally discriminated against Hispanic LEP jail inmates in MCSO jails by refusing to provide them meaningful access to jail programs or services, in violation of Title VI, 42 U.S.C. § 2000d, or alternatively, that Defendants' language access policies and practices have an unjustified disparate impact on Hispanic LEP jail inmates, in violation of Title VI, 42 U.S.C. § 2000d, and the Title VI implementing regulations, 28 C.F.R. § 42.104(b)(2).

In order to prevail on this claim under an intentional discrimination theory, the United States must prove the following:  (1) the Defendants received and continue to receive federal financial assistance for their programs and activities (see, e.g., Rodriguez v. California Highway Patrol, 89 F.Supp.2d 1131, 1139 (N.D. Cal., 2000), quoting Fobbs v. Holy Cross Health Sys. Corp., 29 F.3d 1439, 1447 (9th Cir.1994) (To state a claim for damages under 42 U.S.C. § 2000d, et seq., a plaintiff must allege that (1) the entity involved is engaging in racial discrimination; and (2) the entity involved is receiving

federal financial assistance. Although the plaintiff must prove intent at trial, it need not be pled in the complaint."); (2) the Defendants have engaged in a pattern or practice of failing to take reasonable steps to provide meaningful access to Spanish-language services in MCSO jails (see, e.g., Int'l Bhd. of Teamsters, 431 U.S. at 336; Cherosky, 330 F.3d at 1247); (3) Defendants' failures to provide meaningful Spanish-language services in MCSO jails have a significantly adverse impact on Hispanic LEP jail inmates (see, e.g., Silva v. St. Anne Catholic Sch., 595 F. Supp. 2d 1171, 1182-85 (D. Kan. 2009) (to establish Title VI discrimination claim plaintiffs must show they suffered adverse action); C.S. v. Couch, 843 F. Supp. 2d 894, 907 (N.D. Ind. 2011) (explaining standard for holding a federal funding recipient liable under Title VI for a racially hostile environment)); and (4) the Defendants have intentionally subjected Hispanic LEP jail inmates to discrimination on the basis of those inmates' race, color, or national origin (see, e.g., Almendares v. Palmer, 284 F. Supp. 2d 799, 805-06 (N.D. Ohio 2003) (internal citations omitted) ("To prove intentional discrimination by a facially neutral policy, a 'plaintiff must show that the rule was promulgated or affirmed because of, not merely in spite of, its adverse impact on persons in the plaintiff's class . . . . Such discriminatory impact may be established through evidence of "disparate impact, history of the state action, and foreseeability and knowledge of the discriminatory onus placed upon the complainants."); Lau v. Nichols, 414 U.S. 563 (1974) (failure to provide language access to LEP persons may constitute discrimination on the basis on national origin)).

In order to prevail on this claim under a disparate impact theory, the United States must prove the following:  (1) the Defendants received and continue to receive federal financial assistance for their programs and activities (see, e.g., California Highway Patrol, 89 F. Supp. 2d at1139); (2) the Defendants' language access policies and practices have a significantly adverse or disproportionate impact on Hispanic LEP jail inmates (see, e.g., id. ("To establish a prima facie case that Defendants violated Title VI regulations, Plaintiffs must demonstrate that Defendants have a program, policy or practice that has a 'discriminatory impact.'"); Flores v. Arizona, 48 F. Supp. 2d 937, 949 (D. Ariz. 1999)

4368187.1
7/15/15

(internal citations omitted) (applying the disparate impact test used in Title VII disparate impact cases to disparate impact claims under Title VI)); and (3) the Defendants' language access policies and practices lack a substantial legitimate justification (see, e.g., Flores, 48 F. Supp. 2d at 950 (once Plaintiffs have demonstrated prima facie Title VI case of discriminatory impact, "burden shifts to the defendant to produce evidence that its disparate practices are based on legitimate business reasons")).

DEFENDANT ARPAIO'S POSITION:  Defendant Arpaio generally agrees with Plaintiff's characterization of the issues pertaining to Plaintiff's Second Claim for Relief. Defendants note, however, that Plaintiff's citations to case authority omit pertinent authorities.   For example, Defendant Arpaio also notes that under this analysis, to demonstrate a Title VI claim, Plaintiff must establish "more than the mere occurrence" of isolated, accidental, or sporadic discriminatory acts by Defendant.  *See* Int'l Bhd. of Teamsters, 431 U.S. at 336.  Rather, Plaintiff must demonstrate that the failure to provide information and services in a language other than English resulted in a significant number of LEP beneficiaries being unable to fully realize the intended benefits of a federally assisted program or activity.  *See Lau v. Nichols*, 414 U.S. 563, 568 (1974).  The Department of Justice has interpreted Lau to require Title VI funding recipients to take reasonable steps to provide meaningful access to the recipient's programs under the following four factor test: "the number or proportion of LEP persons in the eligible service population, the frequency with which LEP individuals come in contact with the program, the importance of the service provided by the program, and the resources available to the recipient."  See 65 F.R. 50123-01, 50124 (Aug. 16, 2000) (emphasis added); see also Auer v. Robbins, 519 U.S. 452, 461 (1997) (holding that an agency's interpretation of its own regulation is "controlling" unless plainly erroneous or inconsistent with the regulation).

Finally, because the United States is solely seeking injunctive relief premised upon an alleged past wrong, it must demonstrate a "real and immediate threat" of repeated

9

future harm.  See City of Los Angeles v. Lyons, 461 U.S. 95, 105, 109 (1983); Clark v. City of Lakewood, 259 F.3d 996, 1007 (9th Cir. 2001).

DEFENDANT MARICOPA COUNTY'S POSITION: Defendant generally agrees with Plaintiff's characterization of the issues pertaining to Plaintiff's Fourth Claim for Relief.   Defendant notes, however, that Plaintiff's citations to case authority omit pertinent authorities.   Defendant further notes that, pursuant to the Department of Justice's own Policy Guidance Document, recipients of federal funds are required to "take reasonable steps to ensure 'meaningful access' [for LEP individuals] to the information and services they provide."  65 Fed. Reg. 50123, 50124 (2000).  Defendant Maricopa County also asserts that the question of whether it can be held legally liable for the actions of the Sheriff and MCSO on the facts of this case as they pertain to Plaintiff's Fourth Claim and, if so, whether the Plaintiff would be, on that basis, entitled to any injunctive relief against the County, remain to be tried and adjudicated.

> 5.   Fifth Claim for Relief: Defendants' Treatment of Hispanics Violates the Title VI Assurances

PLAINTIFF'S POSITION: Pursuant to its June 15, 2015 Order (Doc. 379), the Court has granted the United States' Motion for Partial Summary Judgment (Doc. 332), and thus has granted summary judgment regarding the discriminatory traffic stop claims encompassed in the United States' Fifth Claim for Relief.  The remaining issues for the United States to prove relating to this claim are the scope of the violation and, in turn, the appropriate remedy to be ordered by the Court.

DEFENDANT ARPAIO'S POSITION:  It appears that the United States does not intend to offer any testimony or other evidence on the merits of its claims for relief in Count V of its complaint beyond what has been determined by this Court in its Order granting Partial Summary Judgment on June 15, 2015.  Defendant Apraio contends, then, that no trial of any other issues related to Count V is necessary.  The remedy to be

ordered by the Court should be based on further appropriate legal briefing by the parties. To the extent that Plaintiff continues to seek relief based on any other activities, Plaintiff's Fifth Claim remains to be tried and adjudicated.  The County's authority over the Sheriff with respect to law enforcement actions related to Count V remain to be adjudicated.

DEFENDANT MARICOPA COUNTY'S POSITION:  The Court's ruling of June 15, 2015 (Doc. 379) granted Plaintiff's Motion for Partial Summary Judgment only insofar as Plaintiff's Fifth Claim for Relief encompassed alleged racial profiling in traffic stops conducted by MCSO in the context of immigration enforcement activities.  To the extent that Plaintiff continues to seek relief based on any other activities, Plaintiff's Fifth Claim remains to be tried and adjudicated.  Defendant Maricopa County also asserts that the question of whether it can be held legally liable for the actions of the Sheriff and MCSO on the facts of this case as they pertain to Plaintiff's Fifth Claim and, if so, whether the Plaintiff would be, on that basis, entitled to any injunctive relief against the County, remain to be tried and adjudicated.

6.   Sixth Claim for Relief: Defendants' Retaliation Against Their Critics Violates 42 U.S.C. § 14141 and the First Amendment

PLAINTIFF'S POSITION: In order to prevail on this claim, the United States must prove that Defendants have engaged in a pattern or practice by law enforcement officers of retaliatory conduct that violates the First Amendment of the United States Constitution, in violation of 42 U.S.C. § 14141(a).  See Int'l Bhd. of Teamsters, 431 U.S. at 336; Cherosky, 330 F.3d at 1247; Mendocino Envtl. Center v. Mendocino Cnty., 192 F.3d 1283, 1300 (9th Cir. 1999) (setting forth general elements of First Amendment retaliation claim).  In order to establish retaliatory conduct in violation of the First Amendment, the United States must prove the following:  (1) the victim of the alleged

11

retaliation engaged in activity protected by the First Amendment (see, e.g., McKinley v. City of Eloy, 705 F.2d 1110, 1113 (9th Cir. 1983) (protected interest in criticizing public officials regarding matters of public concern); White v. Lee, 227 F.3d 1214 (9th Cir. 2000) (holding that attendance at local zoning board meetings is protected activity under the First Amendment.)); (2)  Defendants subjected the victims to adverse action (see, e.g., Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 67 (1963) ("[I]n the First Amendment context, courts must 'look through forms to the substance' of government conduct."); Coszalter v. City of Salem, 320 F.3d 968, 975 (9th Cir. 2003) (holding that the focus of inquiry should not depend on "any characterization of the government action" but on "whether the state had taken 'action designed to retaliate against and chill political expression.'"); (3) there is a substantial causal relationship between the activity protected by the First Amendment and the adverse action (see, e.g., Skoog v. County of Clackamas, 469 F.3d 1221, 1232 (9th Cir. 2006) (holding that a plaintiff must show that the "chilling effect was a but-for cause of the defendant's action" in allegations of prosecutorial retaliation) (internal citation omitted)); (4) Defendants intended to inhibit future activity protected by the First Amendment (see, e.g., Mendocino Envtl. Center, 192 F.3d at 1301 (intent to inhibit speech can be demonstrated either through direct or circumstantial evidence); Alpha Energy Savers v. Hansen, 381 F.3d 917, 929 (9th Cir. 2004), cert. denied, 544 U.S. 975 (2005) (A plaintiff "must provide more than 'mere evidence' that the defendants were aware of [plaintiff's] expressive conduct in order to establish a genuine material dispute as to whether retaliation was a substantial or motivating factor for their conduct.")); and (5) the adverse action would chill a person of ordinary firmness from continuing in the protected activity (see, e.g., Coszalter, 320 F.3d at 976 (holding that it is not a requirement that the alleged retaliatory act actually chill the intended victim's future protected expression—only that the act be reasonably likely to deter future First Amendment speech); Mendocino Envtl. Center, 192 F.3d at 1300 (same)).

1    DEFENDANT ARPAIO'S POSITION:  Defendant Arpaio generally agrees with
2  Plaintiff's characterization of the issues pertaining to Plaintiff's Sixth Claim for Relief.
3  Defendant notes, however, that Plaintiff's citations to case authority omit pertinent
4  authorities.  For example, "once the plaintiff shows that their protected conduct was a
5  motivating factor, the burden shifts to the defendant to show that he would have taken the
6  same action in the absence of the protected conduct, in which case the defendant cannot
7  be held liable."  Castle v. Appalachian Technical Coll, 631 F.3d 1194, 1197 (11th Cir.
8  2011); see also Hartman v. Moore, 547 U.S. 250, 260, 126 S. Ct. 1695, 1704, 164 L. Ed.
9  2d 441 (2006) ("[i]t may be dishonorable to act with an unconstitutional motive and
10  perhaps in some instances be unlawful, but action colored by some degree of bad motive
11  does not amount to a constitutional tort if that action would have been taken anyway.").

12    Finally, because the United States is solely seeking injunctive relief premised upon
13  an alleged past wrong, it must demonstrate a "real and immediate threat" of repeated
14  future harm.  See City of Los Angeles v. Lyons, 461 U.S. 95, 105, 109 (1983); Clark v.
15  City of Lakewood, 259 F.3d 996, 1007 (9th Cir. 2001).

16

17    DEFENDANT MARICOPA COUNTY'S POSITION: Defendant generally
18  agrees with Plaintiff's characterization of the issues pertaining to its Sixth Claim for
19  Relief.  Defendant notes, however, that Plaintiff's citations to authority omit pertinent
20  authorities.  Defendant Maricopa County also asserts that the question of whether it can
21  be held legally liable for the actions of the Sheriff and MCSO on the facts of this case as
22  they pertain to Plaintiff's Sixth Claim and, if so, whether the Plaintiff would be, on that
23  basis, entitled to any injunctive relief against the County, remain to be tried and
24  adjudicated.

25    F.    **STIPULATIONS AND UNDISPUTED FACTS**
26    The parties have conferred as to the stipulations and undisputed facts involved in
27  this litigation, and have agreed that they are as follows:

28

1.      The Maricopa County Sheriff's Office (MCSO) is a law enforcement agency in Maricopa County that provides law enforcement throughout the County and operates the County jail system.

2.      Defendant Joseph M. Arpaio (Arpaio) is the Sheriff of Maricopa County and is responsible for the operation of MCSO, both in its policing and jail operations.

3.      Defendants Maricopa County and Sheriff Arpaio received and continue to receive federal financial assistance for their programs and activities, including grants from the DOJ Office of Justice Programs from 2010 until the present.

4.      Representatives of Maricopa County signed contractual assurances, in effect from 2008 through the present, providing that the County "will comply (and will require any subgrantees or contractors to comply) with any applicable statutorily-imposed nondiscrimination requirements," including Title VI.

5.      Sheriff Arpaio is the final decision-maker at MCSO..

6.      Sheriff Arpaio has the final say on policy decisions at MCSO.

7.      In early 2007, MCSO entered into an agreement with the United States Immigration and Customs Enforcement (ICE) under § 287(g) of the Immigration and Nationality Act (INA) to enforce federal immigration laws in certain circumstances.  The agreement permitted up to 160 certified MCSO officers to enforce administrative aspects of federal immigration law under the 287(g) program.  Both detention officers working in MCSO jails and MCSO deputies operating in the field obtained 287(g) certification.  The agreement authorized certified MCSO officers to arrest individuals suspected of being in the United States in violation of the law.

14

8.      ICE revoked MCSO's 287(g) authority in October 2009.  At the time of the revocation, MCSO had approximately 100 field deputies certified under 287(g).

9.      Sheriff Arpaio believes that most illegal immigrants in Maricopa County come from Mexico and Central America.

10.     On December 23, 2011, the United States District Court for the District of Arizona issued an order in the action of *Melendres v. Arpaio* providing:  "MCSO and all of its officers are hereby enjoined from detaining any person based only on knowledge or reasonable belief, without more, that the person is unlawfully present within the United States, because as a matter of law such knowledge does not amount to a reasonable belief that the person either violated or conspired to violate the Arizona human smuggling statute, or any other state or federal criminal law."  Ortega-Melendres v. Arpaio, 836 F. Supp. 2d 959, 994 (D. Ariz. 2011), aff'd sub nom. Melendres v. Arpaio, 695 F.3d 990 (9th Cir. 2012).

11.     The worksite raids were carried out by a unit within MCSO initially called the Employer Sanctions Unit, then known as the Criminal Employment Squad and later as the Criminal Employment Unit (CEU).

12.     MCSO disbanded this unit in early 2015.

13.     In its original incarnation as the Employer Sanctions Unit, the unit operated under a grant from the Maricopa County Attorney's Office to investigate employers who hired undocumented immigrants.  Later, this unit was funded through state grants designed to sanction employers who hired undocumented workers.

14.     The following MCSO personnel were assigned to the CEU during part of the unit's existence: Cesar Brockman, Dimitri Whelan, Gabriel Almanza, Douglas Beeks, Darrin Frei, Jesus Jerez, Hector Martinez, Susan Monroe, and Wade Voeltz.

15

15.     Joseph Sousa and Brian Jakowinicz each served as Lieutenant over the Criminal Employment Squad or Unit.

16.     MCSO operates the following seven jail facilities:  the Fourth Avenue Jail; the Central Intake Division; the Durango Jail; the Estrella Jail; the Lower Buckeye Jail; the Tent City Jail; and the Towers Jail.

17.     The Estrella Jail houses approximately 1,000, predominantly female, inmates.

18.     The Durango Jail is a minimum and medium security facility which houses approximately 1,500 male inmates.

19.     The Maricopa County Jail system accepts arrestees from law enforcement agencies throughout Maricopa County.

20.     The MCSO jail facilities have an inmate population of over 10,000 people, making it the largest jail system in the state and the third largest jail system in the United States.

21.     In June 2010, MCSO estimated that, of the over 10,000 people composing the MCSO jail inmate population, 41 percent were Hispanic, 39 percent were Caucasian, 15 percent were African American, four percent were Native American, and one percent was other or mixed ethnicities.

22.     According to data in MCSO documents, for the time period between December 2013 through May 2014, approximately 31.2 percent of the total inmate population in all MCSO jail facilities was Hispanic.

23.     Grievance forms  a means by which inmates can report misconduct by a detention officer.

16

24.     By a letter dated November 30, 2009, Chief Deputy David Hendershott lodged a complaint against Judge Kenneth Fields with the State of Arizona Commission on Judicial Conduct.  Ex. 320.

25.     The Commission on Judicial Conduct dismissed the complaint against Judge Fields on June 18, 2010 without taking any action against Judge Fields.  Ex. 318

26.     By a letter dated November 30, 2009, Chief Deputy Hendershott lodged a complaint against Judge Gary Donahoe with the State of Arizona Commission on Judicial Conduct.  Ex. 310.

27.     The Commission on Judicial Conduct dismissed the complaint against Judge Donahoe on June 18, 2010 without taking any action against Judge Donahoe.  Ex. 309.

28.     By a letter dated November 30, 2009, Chief Deputy Hendershott lodged a complaint against Judge Barbara Mundell with the State of Arizona Commission on Judicial Conduct.  Ex. 321.

29.     The Commission on Judicial Conduct dismissed the complaint against Judge Mundell on June 18, 2010 without taking any action against Judge Mundell.  Ex. 319.

30.     By a letter dated November 30, 2009, Chief Deputy Hendershott lodged a complaint against Judge Anna Baca with the State of Arizona Commission on Judicial Conduct.  Ex. 322.

31.     The Commission on Judicial Conduct dismissed the complaint against Judge Baca on June 18, 2010 without taking any action against Judge Baca.  Ex. 317.

32.     By a letter dated October 31, 2007, Chief Deputy Hendershott lodged a bar complaint against Richard M. Romley.  Ex. 296.

33.     The State Bar of Arizona closed its consideration of the complaint against Mr. Romley on December 27, 2007 without taking any action against Mr. Romley.  Ex. 295.

4368187.1
7/15/15

34.     By a letter dated November 16, 2009, Chief Deputy Hendershott lodged a bar complaint against Julie Pace and David Selden.  Ex. 298.

35.     The State Bar of Arizona closed its consideration of the complaint against Ms. Pace and Mr. Selden on December 16, 2009 without taking any action against Ms. Pace or Mr. Selden.  Ex. 294.

36.     By a letter dated July 22, 2009, Chief Deputy Hendershott lodged a bar complaint against County Manager David Smith with the State Bar of Arizona.  Ex. 299.

37.     The State Bar of Arizona closed its consideration of the complaint against Mr. Smith on November 23, 2009, without taking any action against Mr. Smith.  Ex. 299.

38.     MCSO deputies arrested Michael Lacey and Jim Larkin on October 18, 2007 for publishing information relating to purported grand jury subpoenas in their newspaper, The Phoenix New Times.  Lacey v. Maricopa Cnty., 693 F.3d. 896, 910 (9th Cir. 2012).

39.     The subpoenas issued to Michael Lacey and Jim Larkin were not validly issued by a grand jury.

40.     The charges against Michael Lacey and Jim Larkin for disclosing grand jury information were dropped within days of their arrest.

41.     Salvador Reza was released from custody with the condition that he would be prohibited from initiating contact with his arresting officers.

42.     Sheriff Arpaio tweeted on July 30, 2010 at 3:56 p.m., "Looks like Raeza and his gang are out of my jail and just showed up to protest my operation."  Ex. 323.

43.     At 4:01 p.m. on July 30, 2010, Sheriff Arpaio tweeted, "And now they are blocking my deputies from pulling out, looks like they enjoy being in my jail."  Ex. 323.

44.     At 4:24 p.m. on July 30, 2010, Sheriff Arpaio tweeted, "And now Mr Raeza is under arrest again."  Ex. 323.

45.     On July 30, 2010, MCSO deputies arrested Salvador Reza for violating a court order and charged him with "interfering with judicial proc

18

46.     In a sworn, notarized letter dated September 26, 2008, then-Chairman of the Maricopa County Board of Supervisors, Andrew Kunasek, requested Chief Deputy David Hendershott of the Maricopa County Sheriff's Office to "provide sufficient Sheriff's personnel at all public meetings of the Board of Supervisors to oversee the conduct of the public in attendance." Ex. 302.

47.     Chairman Kunasek requested that MCSO deputies "take the necessary steps to remove anyone who is being disruptive or anyone who is directing or inciting others to be disruptive from the meeting.  Disruptive behavior includes such things as making statements or addressing the Board without first being recognized and obtaining permission to speak, or shouting, singing, chanting, or engaging in other behavior that disrupts the meeting or prevents the Board from carrying out its business." Ex. 302.

48.     Chairman Kunasek's letter did not specifically mention clapping or applauding as disruptive behavior during Board of Supervisors meetings.

49.     At the Board of Supervisors meeting on December 17, 2008, Raquel Teran spoke during the public comment portion of the meeting.

50.     Maricopa County Sheriff's Office ("MCSO") operates the Maricopa County Jail system which consists of six jails: 4th Avenue Jail, Durango Jail, Estrella Jail, Towers Jail, Lower Buckeye Jail and the In-Tents Jail facilities.

51.     Given the geographical location of Maricopa County and its Hispanic/Latino demographic, MCSO has had and will continue have the need to communicate with, assist and care for Limited English Proficient ("LEP") Spanish speaking inmates.

52.     In 2013, MCSO adopted a formal policy which sets forth MCSO's LEP program and its mandatory LEP policies, procedures and training.

53.     Religious services are also offered in English and Spanish.

54.     MCSO also has multiple forms available in the Spanish language which Spanish LEP inmates can use to access available programs and services, including legal,

19

religious, self-help, educational, canteen, medical, psychological, library, legal and grievance services.

55.     During this courts hearing on October 6, 2014, counsel for the United States admitted that none of the allegations in this case regarding retaliation have occurred since 2010:

> MR. MASTERSON: Well -- and this is a big assumption.
> Let's assume that they could prove that the Sheriff's Office
> retaliated against someone in the Maricopa County area
> because of their opinions or criticisms of Sheriff Arpaio. Let's
> assume that to be the case. What we don't have is that
> occurring or even an allegation of that occurring since 2010.
> Not a one.
>
> THE COURT: Okay. Let me stop you. Mr. Caspar, is that
> correct?
>
> MR. CASPAR: None of the allegations in this case have
> occurred since the Sheriff stopped this conduct in 2010.

56.     Pursuant to a Memorandum of Agreement ("MOA") entered into in early 2007 (US_675639-675654), MCSO agreed to provide officers to assist ICE in the enforcement of federal immigration laws in the 287(g) program entered into by representatives of ICE, Sheriff Arpaio, and the BOS.  MCSO officers who were to participate in the program were to be trained by ICE and were to perform functions of an immigration officer.  The MCSO officers who were to participate in the 287(g) program were to include officers involved in law enforcement.

57.     In October of 2009, the 287(g) authority for MCSO officers involved in law enforcement activities was withdrawn by the federal government.  Subsequently, in late 2011, the 287(g) authority for MCSO officers involved in jail administration activities was also withdrawn by the federal government.

## G.     PLAINTIFF'S CONTENTIONS OF DISPUTED FACTS

The United States anticipates that the disputed facts relating to each of its claims will include the following:

1.     <u>First Claim for Relief</u>

20

The disputed facts relating to this claim will concern the scope of the violation outside of the discriminatory traffic stops claims resolved on summary judgment.

2.     <u>Second Claim for Relief</u>

The disputed facts relating to this claim will include:  the manner in which MCSO conducted its worksite operations, the manner in which MCSO deputies searched, seized, arrested, and questioned individuals detained or arrested during MCSO worksite operations, and the manner in which MCSO deputies treated Hispanic individuals during MCSO worksite operations.

3.     <u>Third Claim for Relief</u>

The disputed facts relating to this claim will concern the scope of the violation outside of the discriminatory traffic stops claims resolved on summary judgment.

4.     <u>Fourth Claim for Relief</u>

The disputed facts relating to this claim will include:  the nature and extent of the Defendants' failures to provide meaningful Spanish-language services in MCSO jails, including the extent to which programs and services are available to LEP Hispanic jail inmates, the extent to which MCSO accurately and regularly identifies LEP inmates, and the extent to which MCSO provides translation and interpretation services to LEP jail inmates;  the extent to which MCSO's jail language access policies and practices have an adverse impact on Hispanic and LEP Hispanic jail inmates in MCSO jails; the manner in which MCSO detention officers and jail staff treat Hispanic and LEP Hispanic jail inmates; and the size and proportion of the Hispanic and LEP Hispanic inmate populations in MCSO jails.

5.     <u>Fifth Claim for Relief</u>

The disputed facts relating to this claim will concern the scope of the violation outside of the discriminatory traffic stops claims resolved on summary judgment.

6.     <u>Sixth Claim for Relief</u>

The disputed facts relating to this claim will include:  the nature and circumstances of the First Amendment protected activity engaged in by the targets of MCSO's alleged

21

retaliatory conduct, the nature and timing of the adverse actions taken against the individuals targeted for alleged retaliation by MCSO, the impact of MCSO's retaliatory conduct on the individuals targeted for alleged retaliation by MCSO, and direct and circumstantial evidence of MCSO's intent in taking adverse actions against individuals targeted for alleged retaliation by MCSO.

H.    **DEFENDANTS' CONTENTIONS OF DISPUTED FACTS**

    1.    **DEFENDANT ARPAIO'S CONTENTIONS OF DISPUTED FACTS**

1.    First Claim for Relief:

Defendant Arpaio contends that they are no remaining contentions of disputed fact involving Count I of Plaintiff's complaint.  It does not appear that Plaintiff intends to offer any testimony or other evidence on the merits of Count I of Plaintiff's complaint beyond what has already been determined by this Court in its Order granting Summary Judgment on June 15, 2015.

2.    Second Claim for Relief:

The disputed facts relating to this claim will include: the basis for MCSO's decision to enforce Arizona Criminal Laws, the impact of identity theft, forgery and other serious violations of Arizona Criminal Law on the community, and the manner in which MCSO enforced Arizona Criminal Law during worksite operations.

3.    Third Claim for Relief:

Defendant Arpaio contends that they are no remaining contentions of disputed fact involving Count III of Plaintiff's complaint.  It does not appear that Plaintiff intends to offer any testimony or other evidence on the merits of Count III of Plaintiff's complaint beyond what has already been determined by this Court in its Order granting Summary Judgment on June 15, 2015.

4.    Fourth Claim for Relief:

4368187.1
7/15/15

1    This disputed facts relating to this claim will include: Defendants complete

2    compliance with Federal and Arizona law including Department of Justice guidelines and

3    the implementation of its LEP policy; its reasonable measures to provide meaningful

4    Spanish language services in MCSO jails; the vast number of programs and services

5    available to LEP inmates; the reasonable manner in which MCSO identifies LEP inmates;

6    the reasonable provision of translation and interpretation services to LEP inmates; the

7    successful implementation of all jail language access policies and practices on LEP

8    inmates; the overall reasonable and fair treatment of LEP inmates by MCSO; emphasize

9    and proportion of LEP inmate populations in MCSO jails.

10        5.    Fifth Claim for Relief:

11        Defendant Arpaio contends that they are no remaining contentions of

12   disputed fact involving Count V of Plaintiff's complaint.  It does not appear that Plaintiff

13   intends to offer any testimony or other evidence on the merits of Count V of Plaintiff's

14   complaint beyond what has already been determined by this Court in its Order granting

15   Summary Judgment on June 15, 2015.

16        6.    Sixth Claim for Relief:

17        The disputed claims facts related to this claim will include: the nature and

18   circumstances of any MCSO investigation, complaint or charge based on unethical and/or

19   illegal conduct of persons investigated or charged, or behaviors otherwise questioned by

20   MCSO and the existence of reasonable suspicion and/or probable cause for such

21   complaints, investigations, or charges, and whether such complaints, investigations,

22   and/or charges, or entitled to any immunity under Federal or State law.

23

24        1.    The following identity theft operations were conducted without a warrant
     because there was full cooperation by the business owner and/or manager:

25        • Native New Yorker
          • Yogi's Grill
26        • Sienna Park Apartments
          • La Fonda
27        • Operations involving the use of the name Maria Flores

28

2.      The following identity theft operations were conducted pursuant to a Grand Jury Subpoena:

- Alliance Refuse Trucks
- Desert Star Plastics
- Integrity Cleaners
- Operations involving the use of the name Ivan Lopez
- 3 Palms Resort

3.      With the exception of identity theft operations listed in Paragraphs 1 and 2, all other identity theft operations subject to this litigation (and identified in Plaintiff's trial exhibit 264) were performed pursuant to a search warrant.

4.      The Maricopa County Jails are designed to hold, in the aggregate and at full capacity, 10,872 inmates.  On average, approximately over the past two years, 32% of all inmates in the jails have been Hispanic with 6.3% of those inmates being documented as LEP.

5.      At all steps during inmate intake, Defendants have put into place redundancies to ensure that LEP inmates are properly identified and cared for.

6.      The first step during inmate intake at either Central Intake at the 4th Avenue Jail or Lower Buckeye Jail is for inmates to go through a medical assessment to determine if they are medically stable to be in the jail system.

7.      During the medical assessment, an information officer meets and greets all incoming inmates and answers any questions about the intake process.  This officer also determines if an inmate should be designated as LEP.

8.      Additionally, the information officer gives each inmate a bilingual information sheet which explains the intake procedure.

9.      Finally, the information officer is one step in the LEP identification process as every officer that comes into contact with the inmate during the intake procedure gathers information on whether the inmate is LEP (based on their interactions with the inmate and his or her ability to communicate with MCSO officers).

10.      Once an inmate has been identified as LEP, that LEP designation appears in the inmate's records and on the inmate roster for the particular jail in which they are housed.

11.      MCSO has taken reasonable steps to ensure that the needs of LEP inmates were addressed, including Spanish speaking LEP inmates, to ensure that they have access to programs and services offered in the jails, and that they receive necessary care while they are in MCSO custody.

12.      Although MCSO has always attended to the needs of LEP inmates, in 2010, MCSO embarked on a mission to adopt a formal LEP program that consists of policy, training and procedures which address the needs of LEP inmates, starting with the release of its LEP Position Statement in June 2010.

13.      MCSO LEP policy DI-6 reflects the MCSO's approach to LEP inmate assistance which is beyond what is reasonably required under DOJ guidelines.

14.     MCSO's DI-6 Policy States as follows:

(1) **Inmate Access to Programs**: Inmates, including hearing-impaired inmates, shall not be denied access to any programs or services based solely on their limited ability to speak, read, or understand the English language.

(2) **Rights and Protections**: LEP inmates shall be afforded the same rights and protections mandated by the Prison Rape Elimination Act (PREA) and all other associated and applicable federal, state, and local laws and ordinances.

(3) **Identification and Records**:  LEP inmates are identified, and recorded as such, during the intake and classification process at Central Intake or the Self-Surrender Center located at the Lower Buckeye Jail (LBJ).  Once identified as a LEP inmate, a comment shall be placed in the Jail Management System (JMS).  The comment will then print on the housing unit rosters.

A. If, at any time during an inmate's incarceration, an officer discovers a LEP inmate that has not been previously identified as such, the officer shall notify a Classification Section supervisor.

B. The Classification Section supervisor shall ensure the JMS is updated to reflect the LEP status of the inmate.

C. If the officer is unable to contact a Classification Section supervisor, the officer shall notify his supervisor who shall ensure the Classification Section is notified so the necessary change can be made to the JMS.

D. The officer shall document the notifications made to the Classification Section or to his supervisor, in the Operations Journal (OJ), at his assigned duty post. The entry shall include the inmate's name, primary language, who was notified, and the time and date of the notification.

(4) **Language Identification Signs**: Language identification signs shall be posted in Central Intake, the Self-Surrender Center at LBJ, and all inmate housing units to assist staff members in identifying the language of a LEP inmate.

(5) **Inmate Informational Postings**:  All inmate informational postings in the jail housing units shall be in English and Spanish, at a minimum.

(6) **Booklets and Forms**: Booklets and forms issued for inmate use, including, but not limited to, the Rules and

Regulations for Inmates booklet; the Inmate Request Form (Tank Orders); the Inmate Grievance Form, including all levels of appeals; the Inmate Legal Services Request (ILS) form; and Health Needs Request Form (HNR) shall be available in English and Spanish. Additional forms shall be made available, as needed.

A. LEP inmates shall be permitted to complete and submit all inmate forms in their primary language. Officers shall accept these forms and forward them to the appropriate areas for processing.

B. HNR forms shall only be accepted by appropriate Correctional Health Services (CHS) personnel.

(7) **Training**: The Training Division shall provide a LEP training course during the Basic Academy, as well as continuing training for detention staff. This course shall include information regarding available resources to assist staff members in communicating with LEP inmates.

(8) **Detention Language Roster**: The Training Division shall be responsible for maintaining a Detention Language Roster.

A. The Detention Language Roster shall contain the names and current assignments of all bilingual and multilingual officers, including the languages they can speak, read, write, or understand. The roster shall be available to all staff members on the U:\Drive at U:\Training\Detention Language Roster. A direct link to this folder is also located on the LANDesk Desktop Manager.

B. An officer's use of their bilingual or multilingual skills shall be voluntary. Officers shall not receive additional salary based on foreign language knowledge or use.

(9) **LEP Manager**: The Custody Business Operations/Special Projects Division shall be responsible for assigning a LEP Manager to each jail facility.

A. The LEP Manager shall be an active Field Training Officer (FTO).

B. The LEP Manager for a specialty unit, such as the Special Response Team (SRT), or a civilian division which provides detention-related services, shall be assigned at the discretion of the appropriate commander  or supervisor, and shall not be required to be an active  detention FTO.

C. The duties of the LEP Manager include, but are not

26

limited to:

1. Maintaining a LEP Manager Manual which includes, but is not limited to, current resources available to all detention staff that shall assist them in communicating with LEP inmates.

2. Maintaining and updating all LEP or inmate informational postings in the intake areas and housing units.

3. Ensuring the jail facility maintains text telephone (TTY) machines in good working order and all detention personnel are aware of how to properly operate the machines.

4. Ensuring all detention personnel are kept up to date on all LEP-related information.

5. Detention LEP Managers assigned to jail facilities will conduct random monthlyinterviews with two LEP inmates and one officer regarding their LEP-related experiences and concerns. The LEP Manager shall conduct any appropriate follow-up to address issues or deficiencies discovered during the interviews. Follow-up may include, but is not limited to:

    a. Conducting a follow-up interview with the officer or inmate.

    b. Notifying a supervisor of alleged issues or deficiencies.

    c. Notifying the Custody Business Operations/Special Projects Division Commander of alleged issues or deficiencies.

6. Compiling weekly statistics regarding the number of LEP inmates housed at the facility and the languages they speak. This information shall be captured in a JMS report, "Language Code by Facility" each Monday, and made available on the Sheriff's Office Intranet.

7. If, due to exigent circumstances, the assigned LEP Manager is unable to complete these duties in a given month, the duties may be delegated to other personnel by a member of the affected division's command staff; or the command staff of the Custody Business Operations/Special

27

Projects Division.

(10) **Available Resources**: Resources available to communicate with LEP inmates include, but are not limited to, the following:

    A. Voiance Language Services (1-866-533-4998, Access Code 985692). Detention Officers in assignments with regular inmate contact shall be required to carry a "wallet card" listing the contact information for Voiance Language Services.

    B. Detention Language Roster.

    C. During an emergency situation when the security of a facility or the safety or health of an officer, staff member, or inmate may be at risk, an officer may request another inmate to provide interpretation for a LEP inmate. Officers shall use discretion when considering this option.

(11) **Reasonable Accommodations**: Accommodations shall be considered if a LEP inmate requires special attention. Every reasonable effort shall be made to provide a LEP inmate with meaningful access to information, programs, and services.

(12) **Assisting the Public**: The Sheriff's Information Management Services (SIMS) shall request bilingual and multilingual personnel, as well as Voiance Language Services, to assist members of the public who are LEP individuals when providing non-confidential information on the public jail information telephone line or, in the Bonds and Fines lobby at the 4th Avenue Jail.

(13) **Visitation**: Detention personnel assigned to the Visitation area of each jail facility shall take all reasonable steps to assist LEP members of the public when requesting to visit an inmate or requesting jail-related information, including utilizing bilingual and multilingual detention personnel and Voiance Language Services.

(14) **Language Services**: All Office language services, as required or applicable when conducting detention-related Office business, shall be provided free of charge to inmates, their family members, or members of the general public.

15.    MCSO Policy DI-6, Limited English Proficiency (LEP) Inmates is calculated to serve the LEP inmate, as well as LEP individuals associated with an inmate to access available programs and services, and to be in compliance with Title VI of the Civil Rights Act of 1964 as Amended, and all other applicable laws.

28

16.     To begin with, MCSO's jails offer bilingual classes for LEP inmates including Anger Management, 12-Steps, Parenting, Cognitive, and AA.  [November 7, 2013 Deposition of Mary Brazel at 23:14-23]

17.     Furthermore, an inmate requesting to take an English only class would never be refused entry due to their LEP designation.  [Id. at 46:14-22]

18.     DI-6, MCSO outlines its commitment to enhancing overall communications and building language competencies with inmates and the public who have a limited ability to read, write, speak, or understand the English language.  Under Policy DI-6, MCSO's policy is to provide for effective communication with inmates and the public with a limited English Language Proficiency, regarding detention-related office business, and to be in compliance with Title VI of the Civil Rights Act of 1964, as amended and all other applicable laws.

19.     In accordance with this policy, the following bilingual forms of communication are provided in MCSO's jails: (1) language identification signs, (2) inmate informational postings, (3) booklets and forms issued for inmate use including Rules And Regulations For Inmates, (4) inmate request form (tank orders), (5) the inmate grievance form (including all levels of appeals), (6) the inmate legal services request (ILS) form, (7) health needs request form (HNR) and (8) that additional forms shall be made available, as needed.

20.     Since 2007, MCSO has posted extensive bilingual (English and Spanish) signage throughout the Maricopa County jails.  These signs inform Spanish LEP inmates of their rights, as well as the protections, services and programs available to them.  There are currently over 1850 signs and number and types of bilingual signage continues to increase.

21.     In addition, under Policy DI-6, MCSO requires that each facility have an LEP manager.  The LEP managers' duties include maintaining an LEP Manager Manual which includes resources available to all detention staff to assist staff in communicating with LEP inmates.  The LEP manager is also responsible for maintaining and updating all LEP or inmate informational postings in the intake areas and housing units.  In addition, the LEP manager ensures that the jail facility maintains text telephone machines, and that all detention personnel are kept up to date on LEP related information.

22.     LEP managers also conduct random monthly interviews with two LEP inmates and one detention officer regarding the LEP/related experiences and concerns.  The LEP manager is also tasked with conducting any appropriate follow up to address any issue or deficiency revealed during those interviews.  As a result, the LEP manager may conduct follow up interviews with the officer or inmates, notify his or her supervisor or the Custody Business Operations/Special Project Division Commander of alleged deficiencies or issues.  The LEP manager also compiles weekly statistics regarding the number of LEP inmates housed at the facility and the languages they speak, and provides this information in a jail management systems report each Monday.

23.     MCSO mandates under DI-6 that reasonable accommodations shall be made to provide a LEP inmate with meaningful access to information, programs and services.

24.     For the past two decades, MCSO has also had 24 hour, 7 day a week telephonic language interpretation services.

29

25.    This telephonic language interpretation service provides interpretation services for a great number of languages, including but not limited to Mandarin, Romanian, and Vietnamese and, of course, Spanish, as well as a whole host of other languages.

26.    As a reflection of Maricopa County's demographics and, thus, Maricopa County jail population, MCSO personnel and inmates in the Maricopa County Jails use Spanish language interpretative services, including telephonic interpretative services, above all other languages.

27.    Under MCSO's current language interpretation services, Voiance, Spanish continues to be the language most accessed to assist LEP inmates in the Maricopa County jails.

28.    Spanish interpretation is consistently at approximately 90% or more of all access telephonic, language services.

29.    As a result, telephonic Spanish language interpretation can and does exceed over 4,300 minutes each month.  The cost of Voiance can easily approach $2199.48 monthly.

30.    In addition, MCSO's Policy DI-6 also requires language assistance from their bilingual and multilingual personnel to assist members of the public to communicate with jail personnel in the provision of non-confidential information, as well as ensuring that detention personnel take reasonable steps to assist LEP members of the public when requesting to visit an inmate or requesting jail related information, including utilizing bilingual and multilingual detention personnel and Voiance language services.

31.    MCSO through Policy DI-6, LEP Inmates ensures that all office language services required when conducting detention related office business, shall be provided free of charge to inmates, their family members or members of the general public.

32.    In addition to the telephonic language interpretation services, MCSO also has a diverse detention staff which speaks approximately 52 languages, including but not limited to Spanish, French, Tagalog, Vietnamese, Polish, German, Swahili, Twi, Navajo, Mandarin and Pigeon English, to name a few.

33.    The majority of bilingual detention officers, however, speak Spanish. In fact, as of August 8, 2014, the Detention Language Roster contains over 240 names of voluntary bilingual or multilingual officers; those detention officers who have formally disclosed that they speak Spanish numbered approximately 172.  This number does not reflect all Spanish speaking detention employees, however.  Rather, it reflects the number of Spanish speaking employees have voluntarily placed their names on the Detention Language Roster.  Nevertheless, officers not listed on the roster still provide language services to inmates including Spanish speaking inmates.

34.    The language skills roster referenced above, lists 241 officers who are available to provide language services to Maricopa County jail inmates.  This roster is intended to ensure that LEP inmates can communicate effectively with MCSO staff and have access to available programs and services in the Maricopa County jails.

35.    The detention language roster mentioned above, also referred to as a language skills roster, is also a part of MCSO LEP Policy DI-6.

36.     MCSO has on staff an American Council on the Teaching of Foreign Languages ("ACTFL") certified interpreter/translator, Lourdes Hernandez.

37.     In addition to the MCSO's LEP policy, training and procedures, MCSO has embarked on a multi-million dollar project to make bilingual (English and Spanish) jail announcements automatically with a mere selection and touch of computer monitors in all jails – the Sierra Detention Systems complete overhaul of the MCSO's Jail Security System.

38.     This Sierra intercom and recording system is already up and running in the 4th Avenue Jail.  Installation of the Sierra System is underway in the Lower Buckeye, Durango and Tents facilities, and will commence in the Towers jail and Estrella Jail in the near future.  It is projected that in approximately 11 months, the entire Maricopa County Jail System will be up and running with a state of the art, expandable, automatic announcement system which will ensure uniformity of announcements for such things as medical, medication, lock down, opposite gender presence in housing unit, meal service, and more.  Bilingual announcements will sound not only in the day rooms of each jail, but throughout the jails and within cells where available.

39.     This two year Sierra project to overhaul the camera's and recording devices, along with the announcement system in the Maricopa County jails was originally expected to cost $26 million to create and install.   However, the cost of the Sierra System is now approaching approximately $30 million.  Sierra has also informed MCSO that this project is the largest project of its kind ever attempted in the detention industry.

40.     There has not been a single inmate grievance or complaint from a former inmates' family or friends produced by Plaintiff complaining of LEP issues in the Maricopa County jails.  [*See* August 28, 2014 Deposition of Walter L. Kautzky at pp. 110-112, 124-26.]

41.     The Department of Justice condones the use of family members, friends, other inmates, or other detainees as interpreters.  [Department of Justice's 2002 LEP Guidance Report at p. 41462].

42.     Reasonable suspicion and/or probable cause existed for investigation and/or arrest in all instances of retaliation alleged by the United States.

43.     MCSO requires an arresting MCSO deputy to fill out a "Form 4" on which the deputy summarizes the factual basis which establishes probable cause for a suspect's arrest.  Of course, for warrant arrests a deputy presents to a neutral Judge or Magistrate, the probable cause basis for a prospective arrest, upon which the Judge or Magistrate decides whether probable cause exists to issue the arrest warrant.

44.     None of the allegations in this case regarding retaliation have occurred since 2010.

## 2.      DEFENDANTS MARICOPA COUNTY'S CONTENTIONS OF DISPUTED FACTS

4368187.1
7/15/15

Defendants anticipate that additional disputed facts relating to each of Plaintiff's claims will include the following:

1.     First Claim for Relief

Whether Plaintiff can show, by a preponderance of the evidence, that Defendants Arpaio and MCSO have engaged in any conduct, other than the traffic stops conducted in the context of immigration enforcement found to have been unlawful in Melendres, that is unlawful as alleged in Plaintiff's First Claim for Relief.  If Plaintiff can make such a showing, whether the facts warrant a conclusion that Defendant Maricopa County has any culpability for such conduct sufficient to support a finding that it has any legal liability for any portion or all of the conduct.  If Plaintiff succeeds in demonstrating unlawful conduct beyond that found to have been unlawful in Melendres, whether the origins and nature of such conduct, seen in the light of current circumstances, warrant the imposition of  extraordinary relief in the form of an injunction against either or both Defendants.

2.     Second Claim for Relief

If Plaintiff can demonstrate by a preponderance of the evidence that any aspect of worksite operations was conducted in an unlawful manner as alleged in its Second Claim for Relief, whether the facts warrant a conclusion that Defendant Maricopa County has any culpability for such conduct sufficient to support a finding that it has any legal liability for any portion or all of the conduct.  If Plaintiff succeeds in demonstrating any unlawful conduct as alleged in its Second Claim for Relief, whether the origins and

32

nature of such conduct, seen in the light of current circumstances, warrant the imposition of extraordinary relief in the form of an injunction against either or both Defendants.

3.     Third Claim for Relief

Whether Plaintiff can show, by a preponderance of the evidence, that Defendants Arpaio and MCSO have engaged in any conduct, other than the traffic stops conducted in the context of immigration enforcement found to have been unlawful in Melendres, that is unlawful as alleged in Plaintiff's Third Claim for Relief.  If Plaintiff can make such a showing, whether the facts warrant a conclusion that Defendant Maricopa County has any culpability for such conduct sufficient to support a finding that it has any legal liability for any portion or all of the conduct.  If Plaintiff succeeds in demonstrating unlawful conduct beyond that found to have been unlawful in Melendres, whether the origins and nature of such conduct, seen in the light of current circumstances, warrant the imposition of  extraordinary relief in the form of an injunction against either or both Defendants.

4.     Fourth Claim for Relief

Whether the measures taken by Defendant Arpaio and MCSO to provide Spanish-speaking LEP inmates in the Maricopa County jails constitute "reasonable steps to provide meaningful access to information and services" available to other inmates.  If Plaintiff can demonstrate by a preponderance of the evidence that such measures were not reasonable under the circumstances and that MCSO's treatment of Spanish-speaking LEP inmates was unlawful as alleged in its Fourth Claim for Relief, whether the facts warrant a conclusion that Defendant Maricopa County has any culpability for such

33

conduct sufficient to support a finding that it has any legal liability for any portion or all of the conduct.  If Plaintiff succeeds in demonstrating any unlawful conduct as alleged in its Fourth Claim for Relief, whether the origins and nature of such conduct, seen in the light of current circumstances, warrant the imposition of  extraordinary relief in the form of an injunction against either or both Defendants.

     5.    <u>Fifth Claim for Relief</u>

Whether Plaintiff can show, by a preponderance of the evidence, that Defendants Arpaio and MCSO have engaged in any conduct, other than the traffic stops conducted in the context of immigration enforcement found to have been unlawful in Melendres, that is unlawful as alleged in Plaintiff's Fifth Claim for Relief.  If Plaintiff can make such a showing, whether the facts warrant a conclusion that Defendant Maricopa County has any culpability for such conduct sufficient to support a finding that it has any legal liability for any portion or all of the conduct.  If Plaintiff succeeds in demonstrating unlawful conduct beyond that found to have been unlawful in Melendres, whether the origins and nature of such conduct, seen in the light of current circumstances, warrant the imposition of  extraordinary relief in the form of an injunction against either or both Defendants.

     6.    <u>Sixth Claim for Relief</u>

       Whether Plaintiff can show by a preponderance of the evidence that the actions alleged in its Sixth Claim for Relief in fact sprang from retaliatory motives and, if so, were not nevertheless legally justified by other factors. If Plaintiff can make such a demonstration, whether the facts warrant a conclusion that Defendant Maricopa

County has any culpability for such conduct sufficient to support a finding that it has any legal liability for any portion or all of the conduct.  If Plaintiff succeeds in demonstrating any unlawful conduct as alleged in its Sixth Claim for Relief, whether the nature of such conduct, seen in the light of current circumstances, warrant the imposition of extraordinary relief in the form of an injunction against either or both Defendants.

1.      Prior to Arizona's admission to the union, it was required to submit its Constitution to the President of the United States and the U.S. Congress for approval.  *See* Enabling Act of June 20, 1910, c. 310, 36 U.S. Stat. 557, 568-579 (§ 22), 1 A.R.S. 67 (2010); Joint Resolution No. 8, August 21, 1911, 37 Stat. 39, 1 A.R.S. 95-96 (2010); Proclamation of Admission, February 14, 1912, 37 Stat. 1728, 1 A.R.S. 97-98 (2010); *see also* JOHN D. LESHY, THE ARIZONA STATE CONSTITUTION 6, 22-23 (2d ed. 2013) ("LESHY").

2.      During the debates at Arizona's Constitutional Convention in 1910 regarding the structure of government at the county level, a proposal to have the county assessor appointed by the board of supervisors, rather than elected directly by those exercising the franchise, was rejected out of concern that an assessor appointed by the board would be subject to board control and, accordingly, less able to perform the duties of the position independently and free from political influence.  *See* John S. Goff, The Records of the Arizona Constitutional Convention of 1910, 503-505.

3.      As adopted and approved by the United States, the Arizona Constitution provided for certain county-level officers "who shall be elected by the qualified electors" of the county, and among these specified "Constitutional Officers" were a sheriff, an assessor, and members of the board of supervisors.  *See id*. at 1426;  *see also* Az. Const. art. XII, § 3 (current provision reflects some interim amendments, but continues to specify Constitutional Officers including sheriff, assessor, and supervisors).

4.      In practice during the period pertinent to this action, Sheriff Arpaio, the Maricopa County Sheriff's Office ("MCSO"), and the Maricopa County Board of Supervisors ("BOS") have conducted themselves in a manner reflecting their understanding that the BOS has no authority or control over the Sheriff in the performance of his duties related to law enforcement and jail administration, other than with respect to matters of fiscal management.

5.      Under applicable provisions of the Arizona Constitution and statutes, the BOS is not a body with adjudicatory or judicial powers.

6.      In 1992, the Arizona Constitution was amended to make it possible for counties with a population greater than 500,000 to adopt the charter form of government and, thereby, acquire the right to operate under "home rule," in the sense that they would be less dependent upon the Arizona Legislature as the source of their authority.   See Leshy at 324-329.  One of the provisions of this amendment directed that a county charter created pursuant to it create an "elective governing body," that would have the power to, inter alia, define the "powers, duties and responsibilities" of all other county officers. See Az. Const. art. XII, § 8; LESHY at 329.

7.      In 1996, the electorate of Maricopa County rejected a proposal to implement the charter form of government in the County.  LESHY at 328.

8.      There is no provision, in either the Arizona Constitution or the Arizona statutes, allocating to county boards of supervisors any authority over law enforcement or jail administration matters.

9.      There is a history of litigation brought against Arizona boards of supervisors by other Constitutional Officers when the latter believe that the BOS, through exercising authority over the County-wide budget or otherwise, has exceeded its powers and infringed upon authority allocated to such Constitutional Officers under the Arizona Constitution and statutes.  *See, e.g.*, *Romley v. Daughton*, 225 Ariz. 521, 241 P.3d 518 (App. 2010); *Hounshell v. White*, 220 Ariz. 1, 202 P.3d 466 (App. 2009); *Arpaio v. Board of Supervisors*, 225 Ariz. 358, 238 P.3d 589 (App. 2010).

10.     The BOS was informed, in 2006, that representatives of U.S. Immigration and Customs Enforcement ("ICE") had approached Sheriff Arpaio and asked that MCSO join ICE and assist in the enforcement of federal immigration laws in Maricopa County through the program authorized under Section 287(g) of the Immigration and Nationality Act, 8 U.S.C. § 1387(g).

11.     Another MOA was entered into by representatives of ICE, Sheriff Arpaio, and the BOS in the Fall of 2009 (MC-BOS/CM00003643-00003662), with terms essentially identical terms to those in the 2007 MOA, except that it was to cover officers involved in administration of the Maricopa County jails, who were to be trained by ICE and perform functions as an immigration officer.

12.     MCSO officers who participated in the 287(g) program were, in fact, given five weeks of training by ICE in, inter alia, federal constitutional and statutory law

36

applicable to their execution of duties pursuant to the program.   Once they had successfully completed the training provided by ICE, they were certified and performed functions of an immigration officer in the program under the supervision and direction of ICE officers.

13.     At no time has any representative of ICE or U.S. Customs and Border Patrol ("CBP") ever reported to the BOS or to the Maricopa County Manager that ICE or CBP believed Sheriff Arpaio or MCSO employees, in carrying out their duties as 287(g) certified officers, had done anything in violation of the U.S. Constitution or federal law.

14.     Shortly after 287(g) authority was withdrawn from MCSO officers performing law enforcement duties, Sheriff Arpaio announced publicly that MCSO was implementing a training program that would provide all MCSO sworn deputies with training similar that received by those MCSO officers who had participated in the ICE training in the 287(g) training.

15.     There is no evidence that the BOS, the County Manager, or any employee working under their direction and control instigated, affirmatively encouraged, or expressed approval of any conduct by Sheriff Arpaio and/or MCSO employees alleged by the United States in this action to have violated the United States Constitution or federal law.

I.     **ISSUES OF LAW IN CONTROVERSY**

**PLAINTIFF'S POSITION:** In addition to the legal issues described in Section R ("Miscellaneous"), _infra_, which will be in controversy to the extent these are contested by the Defendants, the United States anticipates that the issues of law in controversy relating to each of its claims will include the following:

1.     First Claim for Relief

The issues of law in controversy relating to this claim will concern the appropriate remedy to be ordered by the Court.

2.     Second Claim for Relief

The issues of law in controversy relating to this claim will include:  whether the searches, arrests, or detentions of individuals involved in MCSO worksite operations

were unreasonable, whether the questioning by MCSO deputies of individuals detained or arrested during MCSO worksite operations was compulsory, whether Hispanic individuals were subject to discriminatory treatment by MCSO deputies during MCSO worksite operations, and whether the MCSO worksite operations were part of a pattern or practice of discriminatory law enforcement conduct by MCSO.

       3.       Third Claim for Relief

       The issues of law in controversy relating to this claim will concern the appropriate remedy to be ordered by the Court.

       4.       Fourth Claim for Relief

       The issues of law in controversy relating to this claim will include:  whether the MCSO jail language access policies and practices have a significantly adverse or disproportionate impact on LEP Hispanic jail inmates, whether MCSO has intentionally discriminated against LEP Hispanic jail inmates on the basis of their race, color, or national origin, whether the MCSO jail language access policies and practices have a substantial legitimate justification, and whether the MCSO jail language access policies and practices were part of a pattern or practice of discriminatory law enforcement conduct by MCSO.

       5.       Fifth Claim for Relief

       The issues of law in controversy relating to this claim will concern the appropriate remedy to be ordered by the Court.

       6.       Sixth Claim for Relief

       The issues of law in controversy relating to this claim will include:  whether the incidents of alleged retaliation presented by the United States constitute a pattern or practice by law enforcement officers of retaliatory conduct, whether the victims of the alleged retaliation engaged in activity protected by the First Amendment, whether Defendants intended to inhibit future activity protected by the First Amendment, and whether the alleged retaliatory actions would chill a person of ordinary firmness from continuing in the protected activity.

4368187.1
7/15/15

**DEFENDANT ARPAIO'S POSITION:**

1. <u>First Claim for Relief</u>

Any issues of law and controversy relating to Count I of Plaintiff's complaint will solely be the relief to be afforded to Plaintiff based upon the Court's ruling on the Motion for Summary Judgment of June 15, 2015.

2. <u>Second Claim for Relief</u>

Issues of law and controversy relating to this claim will include: the reasonable and appropriate basis for MCSO executions of search warrants, arrests or detentions based upon reasonable suspicion and/or probable cause be reasonable and appropriate under Federal law and whether Plaintiff can prove any such action or a pattern and practice of discriminatory law enforcement conduct.

3. <u>Third Claim for Relief</u>

Any issues of law and controversy relating to Count III of Plaintiff's complaint will solely be the relief to be afforded to Plaintiff based upon the Court's ruling on the Motion for Summary Judgment of June 15, 2015

4. <u>Fourth Claim for Relief</u>

Issues of law and controversy relating to this claim will include: whether MCSO jail language access policies and practices comply with Arizona law, Federal law, The Department of Justice guidelines, and are a reasonable effort to provide access to LEP inmates in MCSO jails, and whether Plaintiff can prove MCSO LEP policies exhibit a pattern or practice of discriminatory law enforcement conduct in MCSO jail operations.

5. <u>Fifth Claim for Relief</u>

Any issues of law and controversy relating to Count V of Plaintiff's complaint will solely be the relief to be afforded to Plaintiff based upon the Court's ruling on the Motion for Summary Judgment of June 15, 2015

6. <u>Sixth Claim for Relief</u>

4368187.1
7/15/15

The issues of law and controversy relating to this claim will include: the reasonable and appropriate basis for MCSO executions of search warrants, arrests or detentions based upon reasonable suspicion and/or probable cause be reasonable and appropriate under Federal law and whether Plaintiff can prove any such action or a pattern and practice of discriminatory law enforcement conduct.

DEFENDANT MARICOPA COUNTY'S POSITION: Additional legal issues that Defendant Maricopa County understands to be in controversy relating to each of Plaintiff's claims will include the following:

1.    First Claim for Relief

Whether any conduct on the part of Sheriff Arpaio and/or MCSO, other than the traffic stops conducted in the context of immigration enforcement found to have been unlawful in *Melendres*, constitutes conduct unlawful under any legal theory asserted in Plaintiff's First Claim for Relief.  If Plaintiff can succeed in showing by a preponderance of the evidence that any such further conduct was unlawful, whether there is any legal basis, given the applicable facts, for assigning any legal liability for such conduct, or for the conduct found to have been unlawful in *Melendres*, to the County.  Whether under the law governing the circumstances under which a court can exercise its equitable powers to grant extraordinary relief in the form of an injunction, any such injunctive relief against either or both Defendants can be justified in the circumstances of this case.

2.    Second Claim for Relief

If Plaintiff can succeed in showing by a preponderance of the evidence that any aspect of worksite operations conducted by MCSO was unlawful as alleged in

40

Plaintiff's Second Claim for Relief, whether there is any legal basis, given the applicable facts, for assigning any legal liability for such conduct to the County. Whether under the law governing the circumstances under which a court can exercise its equitable powers to grant extraordinary relief in the form of an injunction, any such injunctive relief against either or both Defendants can be justified in the circumstances of this case.

      3.    <u>Third Claim for Relief</u>

      Whether any conduct on the part of Sheriff Arpaio and/or MCSO, other than the traffic stops conducted in the context of immigration enforcement found to have been unlawful in Melendres, constitutes conduct unlawful under any legal theory asserted in Plaintiff's Third Claim for Relief. If Plaintiff can succeed in showing by a preponderance of the evidence that any such further conduct was unlawful, whether there is any legal basis, given the applicable facts, for assigning any legal liability for such conduct, or for the conduct found to have been unlawful in *Melendres,* to the County. Whether under the law governing the circumstances under which a court can exercise its equitable powers to grant extraordinary relief in the form of an injunction, any such injunctive relief against either or both Defendants can be justified in the circumstances of this case.

      4.    <u>Fourth Claim for Relief</u>

      If Plaintiff can succeed in showing by a preponderance of the evidence that any aspect of MCSO's treatment of Spanish-speaking LEP inmates was unlawful as alleged in Plaintiff's Fourth Claim for Relief, whether there is any legal basis, given the applicable facts, for assigning any legal liability for such conduct to the County. Whether

41

under the law governing the circumstances under which a court can exercise its equitable

powers to grant extraordinary relief in the form of an injunction, any such injunctive

relief against either or both Defendants can be justied in the circumstances of this case.

     5.    <u>Fifth Claim for Relief</u>

        Whether any conduct on the part of Sheriff Arpaio and/or MCSO, other

than the traffic stops conducted in the context of immigration enforcement found to have

been unlawful in *Melendres*, constitutes conduct unlawful under any legal theory asserted

in Plaintiff's Fifth Claim for Relief.  If Plaintiff can succeed in showing by a

preponderance of the evidence that any such further conduct was unlawful, whether there

is any legal basis, given the applicable facts, for assigning any legal liability for such

conduct, or for the conduct found to have been unlawful in *Melendres*, to the County.

Whether under the law governing the circumstances under which a court can exercise its

equitable powers to grant extraordinary relief in the form of an injunction, any such

injunctive relief against either or both Defendants can be justied in the circumstances of

this case.

     6.    <u>Sixth Claim for Relief</u>

        If Plaintiff can succeed in showing by a preponderance of the evidence that

any unlawful retaliatory conduct occurred as alleged in Plaintiff's  Sixth Claim for Relief,

whether there is any legal basis, given the applicable facts, for assigning any legal

liability for such conduct to the County.   Whether under the law governing the

circumstances under which a court can exercise its equitable powers to grant

42

extraordinary relief in the form of an injunction, any such injunctive relief against either or both Defendants can be justified in the circumstances of this case.


### J.   SEPARATE TRIAL OF ISSUES

**PLAINTIFF'S POSITION**

The United States submits that it is advisable and feasible to hold a separate trial, following the trial on the merits, to determine the appropriate scope of injunctive relief or other court-ordered remedial measures.

**DEFENDANT ARPAIO'S POSITION**

Defendant Arpaio contends that no separate trial or evidentiary hearing is necessary for the Court to determine any injunctive relief after trial.  The Court should base injunctive relief on appropriate legal briefing by the parties after trial.

### K.   WITNESSES

A list of all witnesses that Plaintiff the United States will call or may call in person or through deposition is attached hereto as Appendix A.

A complete list of all witnesses that Defendants Maricopa County Sheriff's Office and Joseph M. Arpaio will call or may call in person or through deposition is attached hereto as Appendix C.

A complete list of all witnesses that Defendant Maricopa County will call or may call in person or through deposition is attached hereto as Appendix E

### L.   EXPERTS

Expert Witnesses for Plaintiff the United States:

1.   Frank Fernandez

Frank Fernandez's testimony will address his expert opinion as to MCSO's policies, practices, and procedures relating to training, policies, and lesson plans, immigration-related law enforcement, accountability, and racial profiling and biased policing.  Mr. Fernandez is a law enforcement expert.  His qualifications as an expert

43

witness include his 25 years of experience as a law enforcement officer with the City of Miami Police Department, including serving as the Deputy Chief of Police and Chief of Operations between 2003 and 2010; his experience conducting reviews and bench-marking assessments of law enforcement agencies throughout the United States and abroad; and his experience as a consulting expert in pattern and practice investigations in both large and small police departments.

2.      Margo Frasier

Margo Frasier's testimony will address her expert opinion as to the language access policies, practices, and procedures relating to LEP inmates in the MCSO jail facilities.  Ms. Frasier is a criminal justice expert, with specific expertise in the areas of law enforcement and jail operations.  Her qualifications as an expert witness in this litigation include her past experience as the Sheriff of Travis County, Texas, where she oversaw a law enforcement agency with over 1300 employees and a jail system housing over 3000 inmates; her experience as the Police Monitor for the City of Austin, Texas; and her significant experience working as a criminal justice consultant for law enforcement agencies, corrections agencies, local governments, and private parties.

3.      Paul Ong

Paul Ong's testimony will address his expert assessment as to the proportion of Hispanic and LEP inmates in the MCSO jail facilities.  Mr. Ong is an expert in economics and statistical analysis.  His qualifications as an expert witness in this litigation include his academic credentials and experience as a university professor in economics and statistical analysis; his extensive experience applying statistical analysis to measure problems of discrimination affecting ethnic minorities; and his extensive familiarity using publicly available information and information available from the U.S. Census Bureau to measure and assess the size and proportion of ethnic minorities in specific jurisdictions, including within the jail and prison populations of specific jurisdictions.

4.      Manuel Romero

44

Manuel Romero's testimony will address his expert opinion as to the language access policies, practices, and procedures relating to LEP inmates in the MCSO jail facilities.  Mr. Romero is a criminal justice expert, with specific expertise in the area of corrections.  His qualifications as an expert witness in this litigation include his over 30 years of experience working in the criminal justice field, including substantial hands-on experience as a correctional administrator, jail and prison auditor, court-appointed monitor in large-scale cases involving conditions of confinement, and a corrections consultant in large-scale cases involving conditions of confinement, language access policies, practices, and procedures, and protection from harm in jails and prisons.

Expert Witnesses for Defendants:

1.     Walter Kautzky

Mr. Kautzky is an expert witness previously disclosed in this action and deposed on August 28 2014. Mr. Kautzky is expected to testify consistent with his deposition testimony and to provide expert witness testimony on the subject matter of his opinions at trial consistent with his initial and supplemental report(s), as well as on the opinions and testimony of Plaintiff's opposing experts.

2.     Randy Means

Randy Means is a law enforcement training instructor whom the MCSO retained to insure appropriate and effective implementation of the initiatives set forth in the document entitled "Integrity, Accountability, Community."  Mr. Means will testify regarding the training he provided MCSO personnel, including his meetings with various Chiefs and command staff, the three-day leadership seminars he provided to MCSO command staff (Lieutenants and above) to ensure all command staff were consistent in their supervision and monitoring of MCSO line staff, as well as training provided to front-line supervisors (Sergeants and below) with regard to the same. In addition, he is expected to testify regarding his work with MCSO, the ACLU and the Monitor appointed by Judge Snow regarding revisions and updates to MCSO training

policies and procedures pursuant to Judge Snow's order in the Melendres matter.  Mr. Means is an expert witness previously disclosed in this action and deposed on August 21 2014. Mr. Means is expected to testify consistent with his deposition testimony and to provide expert witness testimony on the subject matter of his opinions at trial consistent with his initial and supplemental report(s) if applicable, as well as on the opinions and testimony of Plaintiff's opposing experts.

### 3.    Dr. Anthony Hayter

Mr. Hayter is an expert witness previously disclosed in this action and deposed on August 26 2014. Mr. Hayter is expected to testify consistent with his deposition testimony and to provide expert witness testimony on the subject matter of his opinions at trial consistent with his initial and supplemental report(s), as well as on the opinions and testimony of Plaintiff's opposing experts.

### 4.    Frank Fernandez

Frank Fernandez is an expert witness. He was deposed on 8/12/2014 and is expected to testify about, and consistently with, the questions, topics, etc. addressed in his deposition.

### M.    EXHIBITS

A list of the United States' exhibits, including the information required by the Order Setting Bench Trial entered June 10, 2015, is attached hereto as Appendix B.

A complete list of all exhibits, including the information required by the Order Setting Bench Trial entered June 10, 2015, that Defendants Maricopa County Sheriff's Office and Joseph M. Arpaio will present or may present at trial is attached hereto as Appendix D.

A complete list of all exhibits, including the information required by the Order Setting Bench Trial entered June 10, 2015, that Defendant Maricopa County will present or may present at trial is attached hereto as Appendix F.

N.   **MOTIONS IN LIMINE AND REQUESTED EVIDENTIARY RULINGS**

The United States intends to separately file, on the Court-ordered due date of July 10, 2015, motions in limine as to the following requests:

1.   Motion in limine to exclude any exhibit not adequately identified pursuant to the Court's Fourth Amended Rule 16 Scheduling Order, dated May 27, 2014, directing each party to make its FRCP 26(a)(3) pretrial disclosures of exhibits and witnesses on or before September 15, 2014; and

2.   Motion in limine to exclude from evidence certain video recordings of MCSO worksite operations not produced to Plaintiff by Defendants either in their entirety or in a sufficiently timely manner.

Defendants Maricopa County Sheriff's Office and Joseph M. Arpaio intend to separately file, on the Court-ordered due date of July 10, 2015, motions in limine as to the following requests:

1.   Defendant Joseph M. Arpaio intends to file a Motion in Limine to preclude the United States from calling witnesses to testify beyond those topics it has timely disclosed to Defendant Arpaio.  Moreover, Defendant Arpaio also requests this Court to preclude the United States from presenting testimony from late disclosed witnesses pursuant to this Court's Fourth Amended Scheduling Order:

Defendant Maricopa County intends to separately file, on the Court-ordered due date of July 10, 2015, a motion in limine as to the following requests:

1.   Motion in Limine to preclude Plaintiff from calling as witnesses in its case-in-chief certain individuals as to whom Plaintiff failed make disclosure, made

47

untimely disclosure, and/or made inadequate disclosure and, therefore, failed to comply with its obligations under Rule 26(a)(1)(A)(i) and (iii)(A)(i).

O.   **PROBABLE LENGTH OF TRIAL**

**PLAINTIFF'S CONTENTION:**

The Court has set trial for 15 days, to be held Monday (1-5 PM) and Tuesday through Friday (9-5 PM), between Monday, August 10, and Friday, August 27, 2015.

The United States submits that a just determination of the issues involved in this multiple pattern-or-practice case likely will require more than 15 days. Among other issues, trial will be held on the United States' claims that defendants engaged in a pattern or practice of carrying out workplace raids in violation of the Fourth and Fourteenth Amendments. In a similar case involving allegations that the "Immigration and Naturalization Service (INS) has engaged in a pattern and practice of carrying out workplace raids in violation of the Fourth Amendment," the court noted that trial took "four calendar months." <u>Pearl Meadows Mushroom Farm, Inc. v. Nelson</u>, 723 F. Supp. 432, 435 (N.D. Cal. 1989). The United States estimates that approximately six weeks will be required to complete the testimony of witnesses in the United States' case in chief.

[

**DEFENDANTS' CONTENTION:**

Defendant Arpaio and Defendant Maricopa County concur with Plaintiff's statement that the issues involved in this case will definitely require more than 15 trial days. Defendant Arpaio estimates that approximately 10 weeks will be required to complete the testimony of witnesses and introduction of all relevant exhibits in both United States' and Defendant Arpaio's cases in chief.

P.   **TRIAL DATE**

The Court has set trial for 15 days, to be held Monday (1-5 PM) and Tuesday through Friday (9-5 PM), between Monday, August 10, and Friday, August 27, 2015.

4368187.1
7/15/15

Should the Court agree to set trial for more than 15 days, the parties will confer and amend this order to provide additional potential trial dates for all trial counsel and witnesses.

Q-1.  **PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

The United States will file its proposed findings of fact and conclusions of law on July 17, 2015, as directed by the Court's June 10, 2015 Order Setting Bench Trial (Doc. 377).

Defendant Arpaio will file its proposed Findings of Fact and Conclusions of Law on July 17, 2015 as directed by the Court's June 10, 2015 Order Setting Bench Trial.

Defendant Maricopa County will file its proposed Findings of Fact and Conclusinos of Law as directed by the Court's June 10, 2015 Order Setting Bench Trial.

R.  **MISCELLANEOUS**

The United States submits that resolution of the following legal issues will aid in the effective presentation or disposition of the instant action:

1.  Admissibility as substantive evidence of MCSO deputies' prior
    statements, including in deposition testimony

The Court should permit the statements of MCSO deputies in deposition testimony and in police reports to be admitted as substantive evidence, pursuant to Rule 801(d)(2)(D).   See, e.g., 6 Handbook of Fed. Evid. § 801:15 (7th ed.) (the question of whether the requirements of Rule 801(d)(2)(D) have been met is determined by the court).  This issue is likely to arise in the context of the United States' examination of MCSO deputies if the deputies contradict their prior statements or their memories falter, for example.  The substance of deputies' prior statements would come in not just for impeachment but as substantive evidence.  Because these statements were made by MCSO employees, and concern a matter within the scope of the deputies' employment, the statements qualify as nonhearsay under Rule 801(d)(2)(D), and thus may be offered into evidence to prove the truth of the matter asserted in the statement.  See, e.g., 5 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence, § 801.33[2][c], at

49

801–69 (2d ed.2001) (footnotes omitted). Plaintiff further notes that there is no requirement that the person making the statement at issue have been authorized by the employer to make a statement on a particular subject; rather, the statement need only "concern a matter within the scope of [the] agency or employment." 6 Handbook of Fed. Evid. § 801:23 (7th ed.). For example, courts have allowed statements by employees that were directly adverse to the interest of the employer to be admitted as substantive evidence. See, e.g., White v. Honeywell, Inc., 141 F.3d 1270, 1276 (8th Cir.1998) (supervisor's racial slur against employee admissible against employer as statement "concerning a matter within the scope of the employment" under Fed.R.Evid. 801(d)(2)(D)); Larch v. Mansfield Mun. Elec. Dept., 272 F.3d 63, 72-73 (1st Cir. 2001) (finding that statements of deceased former employee were properly admitted as nonhearsay under Rule 801(d)(2)(D)) ("While Mahana's job description obviously did not include making life miserable for the Electric Department, the statements were related to a matter within the scope of his employment: oversight of the Department."); U.S. v. Rioux, 97 F.3d 648, 660 (2d Cir. 1996) (finding that court did not abuse its discretion in admitting employees' statements against their supervisors).

2. Judicial determination of whether questioning of detained individuals was compulsory

The Court will need to make a determination as to whether the questioning of individuals detained during MCSO worksite operations was compulsory. This issue is likely to arise in the context of the Court's consideration of evidence of individuals' detention and questioning by MCSO deputies during MCSO worksite operations; such evidence will be presented by Plaintiff in support of its Second Claim for Relief.

Under Michigan v. Summers, 452 U.S. 692 (1981), the police's authority to detain to protect the integrity of the search carries with it some power to question detainees. See, e.g., Muehler v. Mena, 544 U.S. 93, 94 (2005) (officers' questioning of Mena about her immigration status during legitimate detention was not a Fourth Amendment violation). However, there are limits to the police's authority to question incident to their

search.  See, e.g., Terry v. Ohio, 392 U.S. 1, 20 (1968) (explaining that the seizure must be "reasonably related in scope to the circumstances which justified the interference in the first place").  For example, compulsory questioning in the course of an otherwise authorized detention during a search warrant operation is unreasonable and thus violates the Fourth Amendment.  Ganwich v. Knapp, 319 F. 3d 1115, 1122 (9th Cir. 2003) (detention may violate the Fourth Amendment if the detention is unreasonable or is carried out in an unreasonable manner).

To determine whether questioning was compulsory or coerced, some courts, including the District of Arizona, will weigh the same factors courts consider in determining whether an investigative stop or questioning has turned into a custodial interrogation.  See Maryland v. Shatzer, 59 U.S. 98, 99 (2010) (custodial interrogation carries "inherently compelling pressures"); Berkemer v. McCarty, 468 U.S. 420, 421 (1984) (same); Bettin v. Maricopa Cnty., 2007 WL 1713319, *10-11 (D. Ariz. 2007) (holding that police authority to question pursuant to a legitimate detention "evaporated" when "Defendants removed Plaintiff from her home and took her to the sheriff's office for questioning without placing Plaintiff under arrest and without having a reasonable belief that Plaintiff was suspected of criminal activity"); U.S. v. Hamilton, 2012 WL 1029450, *4 (W.D. Ky. 2012) (considering cases that examine whether police have "overreach[ed] in their interrogation of Summers-detainees").  Those factors include:

- the number of law enforcement personnel and whether they were armed (see U.S. v. Craighead, 539 F.3d 1073, 1084 (9th Cir. 2008));

- whether the suspect was at any point restrained, either by physical force or by threats (Id.);

- whether the questioned individual is "isolated" or segregated from others (Id.; see also U.S. v. Kim, 292 F.3d 969, 974 (9th Cir. 2002));

- the duration of the detention (see Kim, 292 F.3d at 974);

51

- the duration and character of the interrogation (see U.S. v. Daubmann, 474 F. Supp. 2d 228, 233 (D.Mass. 2007) (citing United States v. Fornia–Castillo, 408 F.3d 52, 63 (1st Cir.2005)); and

- whether the individual was subject to an overbearing police presence, including being kept under constant guard by agents (Daubmann, 474 F. Supp. 2d at 234).

### 3.  Judicial determination of sufficiency of MCSO warrants

The Court will need to make a determination as to whether the search warrants relied on by MCSO in its worksite operations presented sufficient probable cause to support the searches for the individuals listed on the warrants.  This issue is likely to arise in the context of the Court's consideration of evidence of the searches and detentions conducted during MCSO worksite operations; such evidence will be presented by the United States in support of its Second Claim for Relief.

The United States will argue that the search warrants relied on by MCSO in its worksite operations lacked sufficient probable cause to support searches of the individuals listed on the warrants because, among other reasons, the warrants listed multiple individuals to be searched without specific information as to each individual and relied on stale information to justify the searches for the individuals.  "'A search warrant designating more than one person or place to be searched must contain sufficient probable cause to justify its issuance as to each person or place named therein.'" Greenstreet v. County of San Bernardino, 41 F.3d 1306, 1309 (9th Cir. 1994) (internal citations omitted); see also Marks v. Clarke, 102 F.3d 1012, 1029 (9th Cir. 1996) ("a warrant to search 'all persons present' for evidence of crime may only be obtained when there is reason to believe that all those present will be participants in the suspected criminal activity," which "not the case here, and would not be the case with respect to a raid on any family home, where innocent family members or friends might be residing or visiting"); State v. Reid, 319 Or. 65, 71, 872 P.2d 416, 419 (1994) (search illegal, as "affidavit did not demonstrate probable cause to believe that *all* 'persons present' on the

premises would be associated with the criminal activity taking place there"). In addition, search warrants based on stale information generally will not establish probable cause for a search. See, e.g., People v. Hulland, 110 Cal. App. 4th 1646, 1652 (52-day delay between controlled drug buy and issuance of search warrant was deemed too long to support probable cause; "delays of more than four weeks are generally considered insufficient to demonstrate probable cause"); Hemler v. Superior Court, 44 Cal. App. 3d 430, 432–33 (1975) (delay of 34 days between a controlled sale of cocaine and the officer's affidavit for a search warrant was insufficient to support probable cause). Even more so than illegal drugs, people frequently move from place to place; thus stale information that a person worked at a particular business, particularly where such information is unsupported by recent surveillance or even evidence of the person's work schedule, cannot provide probable cause that a person will be present at a place to be searched.

### 4. Leading questions on direct examination of MCSO deputies

The Court should permit the United States to ask leading questions during direct examination of MCSO deputies. Courts have "broad discretion" as to whether to permit leading questions on direct examination, and the court's determination of this question will be reversed "only if 'the judge's action … amounted to, or contributed to, the denial of a fair trial.'" Miller v. Fairchild Indus., Inc., 885 F.2d 498, 514 (9th Cir. 1989) (internal citations omitted). Rule 611 provides that, although leading questions typically are not permitted on direct examination, they may be used "[w]hen a party calls a hostile witness, an adverse party, or a witness identified with an adverse party." Fed.R.Evid. 611(c). By virtue of their employment relationship with defendant MCSO, MCSO deputies are witnesses identified with an adverse party; thus, Plaintiff should be permitted to ask MCSO deputies leading questions during the course of direct examination. See, e.g., Ellis v. City of Chicago, 667 F.2d 606, 612-13 (7th Cir. 1981) (in action by dog owners to recover against city and its police officer under section 1983 of Title 42 and Fourteenth Amendment after officer killed dog, officer's fellow policemen, who were

4368187.1
7/15/15

employed by the defendant City of Chicago and who had worked closely with the defendant police officer, "clearly qualified as witnesses identified with an adverse party" for purposes of Fed.R.Evid. 611(c)); Ratliff v. City of Chicago, No. 10 C 739, 2012 WL 7993412, at *1 (N.D. Ill. Nov. 20, 2012) (in action against the City of Chicago, non-defendant police officers, "by virtue of their employment with Defendant City of Chicago, by their involvement (even if tangential or limited) with the case, and by their relationship with the Defendant Officers as their co-workers, clearly qualify as 'witness(es) identified with an adverse party' for purposes of Rule 611(c)"). See also U.S. v. Duncan, 712 F.Supp 124 (S.D. Ohio 1998) (under Fed.R.Evid. 611(c), law enforcement official may qualify as an "witness identified with an adverse party" in action brought by Government against criminal defendants, absent positive showing that witness is not hostile, biased or so identified with Government that presumption of hostility should not be indulged). Furthermore, leading questions should be permitted during direct examination of MCSO deputies whether those deputies are current or former employees of MCSO. See, e.g., Stahl v. Sun Microsystems, Inc., 775 F.Supp. 1397 (D.Colo. 1991) (finding it appropriate to permit plaintiff in employment discrimination action to use leading questions on direct examination of former employee of defendant, who remained clearly identified with defendant, both through her previous employment and her ongoing relationship with key witness who attended trial on behalf of defendant).

### 5. Relevance of certain evidence of MCSO discriminatory intent

The Court will need to make a determination as to the relevance of certain evidence of MCSO's discriminatory intent. This issue is likely to arise in the context of the Court's evaluation of evidence to be presented by the United States in support of its First Claim for Relief, and which will also be relevant to Plaintiff's presentation of its Third, Fourth, and Fifth Claims for Relief. As articulated in Vill. of Arlington Heights v. Metro. Housing Dev. Corp., 429 U.S. 252 (1977), courts must consider the totality of circumstances in deciding whether defendants have acted with discriminatory intent in

54

perpetuating a course of conduct challenged as racially discriminatory and, thus, in violation of the Equal Protection Clause.   Proving discriminatory purpose requires evidence that the resulting adverse effect on persons of a particular race or national origin was a "motivating factor," but not necessarily the sole or primary motivation, for the challenged conduct.   Arlington Heights, 429 U.S. at 265-68; see also Rosenbaum v. City and Cnty. of San Francisco, 484 F.3d 1142, 1152-53 (9th Cir. 2007).   Rather, in evaluating discriminatory intent, courts will consider factors including, but not limited to, the "sequence of events leading up to the challenged decision," "the legislative or administrative history," including "contemporary statements by members of the decisionmaking body," "departures from the normal procedural sequence," and defendants' statements about the "purpose of the official action." Arlington Heights, 429 U.S. at 267-78; see also Rogers v. Lodge, 458 U.S. 613, 626 (1982).   Therefore, in evaluating whether Defendants' challenged law enforcement policies and practices were motivated by discriminatory intent, it is appropriate for the Court to consider a broad range of evidence, including, but not limited to: Defendants' statements, such as may be contained in MCSO news releases, e-mail messages between MCSO deputies, public statements by Sheriff Arpaio, and correspondence between MCSO officials and private citizens; MCSO's departures from normal protocol, including evidence of normal law enforcement protocols for executing search warrants, issuing press releases relating to the execution of search warrants, and the selection of geographic locations for law enforcement operations; the sequence of events leading up to MCSO's law enforcement decisions, including evidence of MCSO's lack of attempts to contact crime victims, lack of action to learn whether individuals named in MCSO search warrants were current employees, or would be present at the worksite, at the time of MCSO worksite operations; the historical background of MCSO law enforcement decisions, including evidence of the development of MCSO's Human Smuggling Unit and application of the employer sanctions law; and the adverse impact of MCSO law enforcement operations on

Hispanic individuals, including evidence of the adverse impact on Hispanics of MCSO worksite operations, traffic stops, and jail policies and procedures.  Id.

S.    **MODIFICATION OF ORDER**

The Court may, in order to prevent manifest injustice or for good cause shown, at the trial of the action or prior thereto upon application of counsel for either party, made in good faith, or upon the motion of the court, modify the Final Pretrial Order upon such conditions as the court may deem just and proper.


APPROVED AS TO FORM AND CONTENT:

/s/ Jennifer L. Mondino
Jennifer L. Mondino (NY Bar No. 4141636)
ATTORNEY FOR PLAINTIFF THE UNITED STATES


/s/ John Masterson
John Masterson
ATTORNEY FOR DEFENDANTS MARICOPA COUNTY SHERIFF'S OFFICE AND JOSEPH M. ARPAIO


/s/ Richard Walker
Richard Walker
ATTORNEY FOR DEFENDANT MARICOPA COUNTY, ARIZONA


**THIS JOINT PRETRIAL ORDER IS HEREBY APPROVED ON THIS ___ DAY OF _____, 2015.**


_____
Roslyn O. Silver
United States District Judge


Copies to all counsel of record

4368187.1
7/15/15