1
2
3
4
5
6
7
8
9
10

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF ARIZONA

11
12

United States of America,

13

     Plaintiff,

14

     v.

15
16

Maricopa County, Arizona; and Joseph M.
Arpaio, in his official capacity as Sheriff of
Maricopa County, Arizona,

17
18

     Defendants.

No. 2:12-cv-00981-ROS

**SETTLEMENT AGREEMENT**

19
20

     The parties to this Agreement, the United States of America, Joseph M. Arpaio,

21 Sheriff of Maricopa County, and Maricopa County (collectively the "Parties"), enter into

22 this Settlement Agreement ("Agreement") to resolve all claims related to worksite

23 identity theft operations ("Worksite Operations") and claims relating to alleged retaliation

24 ("Retaliation Claims") as set forth in, *inter alia*, the Second and Sixth Claims of the

25 United States' Complaint in this action. The parties have reached a separate agreement

26 that resolves the United States' Fourth Claim and that portion of any other claim

27 addressing discrimination in MCSO jails. *See* Attachment A.

28

The Parties agree that this Agreement is in the best interests of the people of Maricopa County and the United States.

## I. **DEFINITIONS**

The following terms and definitions shall apply to this Agreement:

1.  "Agreement" means this Agreement.

2.  "Business," as used in Paragraph 9, below, means any business, organization, or other enterprise that employs people, is engaged in business activities or charitable services, and is involved in the provision of goods or services, or both.

3.  "Complaint" means the Complaint filed in <u>United States v. Maricopa County and Joseph M. Arpaio, in his official capacity as Sheriff of Maricopa County, Arizona</u>, No. 2:12-cv-00981-ROS.

4.  "Defendants" means Joseph M. Arpaio, Sheriff of Maricopa County, named in his official capacity; and Maricopa County.

5.  "Effective Date of this Agreement" means the date on which this Agreement becomes effective pursuant to Paragraph 23, below.

6.  "Identity theft," as used in Paragraph 9, below, means the crime of "taking identity of another person," as defined currently or prospectively by Arizona law, and as currently defined:

> A person commits taking the identity of another person or entity if the person knowingly takes, purchases, manufactures, records, possesses or uses any personal identifying information or entity identifying information of another person or entity, including a real or fictitious person or entity, without the consent of that other person or entity, with the intent to obtain or use the other person's or entity's identity for any unlawful purpose or to cause loss to a person or entity whether or not the person or entity actually suffers any economic loss as a result of the offense, or with the intent to obtain or continue employment.

Ariz. Rev. Stat. § 13-2008(A).

7.  "MCSO" means the Maricopa County Sheriff's Office.

8.     "United States" means the United States of America as represented by the United States Department of Justice's Civil Rights Division and its agents, employees, and consultants.

9.     "Worksite Identity Theft Operation" means any pre-planned MCSO law enforcement operation at a place of business to execute a search warrant for evidence of, or for persons suspected of committing, identity theft or crimes incident thereto, such as forgery.

## II. SECOND CLAIM OF THE UNITED STATES' COMPLAINT AND ALLEGATIONS RE: WORKSITE OPERATIONS

10.     On December 18, 2014, the MCSO announced that it would no longer enforce State identity theft laws relating to obtaining or continuing employment, namely A.R.S. sections 13-2008(A) (employment provision) and 13-2009(A)(3), and that it would disband its Criminal Employment Unit.

11.     On January 5, 2015, in the case of Puente Arizona v. Arpaio, No. 14-cv-01356 (D. Ariz.), the United States District Court for the District of Arizona entered a preliminary injunction enjoining the Maricopa County Sheriff from enforcing those statutory provisions that address actions committed with the intent to obtain or continue employment.

12.     On January 19, 2015, the MCSO disbanded its Criminal Employment Unit, which was responsible for investigating cases of identity theft relating to obtaining or continuing employment, and for planning and carrying out Worksite Identity Theft Operations.

13.     MCSO is not now engaged, currently planning to engage, or currently intending to engage in any Worksite Identity Theft Operations.

14.     Before any Worksite Identity Theft Operation targeting three or more suspects may occur after the Effective Date of this Agreement:

> a.  Defendant Arpaio shall cause the MCSO to first establish a set of
> written policies or protocols to ensure that subsequent Worksite Identity

3

Theft Operations are conducted in compliance with all applicable laws and the United States Constitution; and

b. Defendant Arpaio will provide Plaintiff United States with draft policies and protocols regarding Worksite Identity Theft Operations, as described above, before MCSO finalizes them, and MCSO will consider in good faith any comments, suggestions, objections, and recommendations from the United States regarding those policies and protocols. Once MCSO finalizes policies and protocols regarding Worksite Identity Theft Operations, as described above, the MCSO shall ensure that all personnel participating in any subsequent Worksite Identity Theft Operations are advised of the applicable policies and protocols and MCSO will take reasonable measures designed to ensure that all MCSO personnel comply with such policies, and protocols in carrying out any Worksite Identity Theft Operations.

15.   If a Worksite Identity Theft Operation occurs after the Effective Date of this Agreement, it must comply with all applicable laws, and the United States Constitution.

16.   If a Worksite Identity Theft Operation occurs after the Effective Date of this Settlement Agreement, MCSO shall timely grant reasonable requests by the United States for information related to any such operation so that the United States may determine whether such operation was conducted consistent with Federal law and the United States Constitution.  Such information shall include documents, data, and records, including any investigative reports and supplemental reports and any video or audio recordings relating to such operation.

17.   The United States may bring a new civil action within two (2) years of the Effective Date of this Agreement seeking relief for alleged violations of federal law relating to any Worksite Identity Theft Operations that occurred prior to the Effective Date of this Agreement, but the United States may bring such a civil action only if:  (a) a

4

1  Worksite Identity Theft Operation, as defined in Paragraph 9 of this Agreement, occurs
2  after the Effective Date of this Agreement; (b) the United States first notifies the
3  Defendants that the information it has obtained indicates that the Worksite Identity Theft
4  Operation involves Fourth and Fourteenth Amendment violations that are consistent with
5  the pattern or practice of Fourth or Fourteenth Amendment violations alleged in this case;
6  (c) the United States attempts to confer with the Defendants to seek an agreement on
7  specific actions MCSO can take to guard against constitutional violations in any future
8  Worksite Identity Theft Operations; and (d) the Parties are unable, within 60 days of the
9  United States' notification, to agree on such action or a Defendant fails to implement any
10 such actions it has agreed to take.  The United States may not bring such a civil action—
11 an action seeking relief for alleged violations of Federal law relating to Worksite Identity
12 Theft Operations that occurred prior to the Effective Date of this Agreement—after two
13 (2) years of the Effective Date of this Agreement.

14      18.      This Settlement Agreement does not affect the United States' authority to
15 bring a civil action seeking relief for violations of federal law relating to Worksite
16 Identity Theft Operations that occur after the Effective Date of this Agreement.

17 **III.     SIXTH CLAIM OF THE UNITED STATES' COMPLAINT AND**
18 **         ALLEGATIONS RE: RETALIATION**

19      19.      Within 30 days after the effective date of this Agreement, the Maricopa
20 County Sheriff's Office (MCSO) will establish an official policy prohibiting retaliation
21 against any individual for any individual's lawful expression of ideas in the exercise of
22 the First Amendment right to the freedom of speech.

23      20.      The Parties have agreed that the policy will read as follows:

24

25          It is the policy of the Maricopa County Sheriff's Office to
            respect the First Amendment rights of all individuals.  MCSO
26          personnel will not take action against any individual in
            retaliation for any individual's lawful expression of opinions
27          in the exercise of the First Amendment right to the freedom of
28          speech.

5

21.   MCSO will notify all MSCO personnel of this policy through the issuance of a briefing board and in any other way MCSO determines to be appropriate.  MCSO will take reasonable steps to ensure all future MCSO personnel are advised of this policy, consistent with MCSO practices to advise new personnel of existing MCSO policies.

22.   Through counsel, within 45 days after the Effective Date of this Agreement, Defendant Arpaio will provide the United States with an affidavit or sworn declaration by an MCSO employee with authority to speak on behalf of MCSO and Sheriff Arpaio confirming that MCSO has issued the policy and briefing board, and will provide copies of same to the United States.

**IV.EFFECTIVE DATE AND JURISDICTION**

23.   This Agreement shall become effective upon the signing of this Agreement by duly authorized representatives of Plaintiff United States, Defendant Sheriff Joseph Arpaio, Defendant Maricopa County, and by the Court.  The Court will retain jurisdiction over this action for the purpose of enforcing compliance with the terms of this Agreement.

**V. SCOPE, IMPLEMENTATION AND ENFORCEMENT**

24.   The United States shall notify Defendants if it determines that a Defendant is not in compliance with the Agreement in any respect.  The Parties shall first attempt to resolve any dispute informally by notification and conferral.  If the Parties are unable to agree on a resolution of the dispute concerning the Defendant's compliance within 60 days after initial conferral, the United States may, without further notice to Defendants, seek enforcement of this Agreement with the United States District Court for the District of Arizona (the "Court"), through any appropriate form of relief.  Any motion to enforce this Agreement shall be brought within one year of the occurrence of any alleged violations.

25.   The Parties shall notify each other of any court or administrative challenge to this Agreement.  In the event any provision of this Agreement is challenged in any

6

local or state court, removal to a federal court shall be sought by the Parties and transfer of venue to the United States District Court for the District of Arizona will be sought.

26.     In response to requests for documents or data as provided herein, either Defendant may withhold from the United States any documents or data protected by the attorney-client privilege or the work product doctrine.  Should a Defendant decline to provide the United States access to such documents or data based on attorney-client privilege and/or the work product doctrine, the Defendant shall inform the United States that it is withholding documents or data on this basis and shall provide the United States with a log describing the documents or data.

27.     The Parties may make use of protective orders or agreements to ensure the confidentiality of any non-public information as appropriate and necessary. Other than as expressly provided herein, this Agreement shall not be deemed a waiver of any privilege or right a Defendant may assert, including the attorney-client communication privilege, attorney work product protections, and any other privilege, right, or protection recognized at common law or created by statute, rule or regulation, against any other person or entity with respect to the disclosure of any document.

## VI. ENTIRE AGREEMENT, SEVERABILITY, COSTS

28.     This Agreement constitutes the entire agreement between the Parties with regard to the Second and Sixth Claims, and any portions of other claims arising out of or relating to Worksite Operations or Retaliation Claims of the Complaint in this action, and it supersedes any and all prior representations and agreements, whether oral or written, between the Parties with regard to those claims.  No such prior representations or agreements may be offered or considered to vary the terms of this Agreement, or to determine the meaning of any of its provisions.

29.     In the event that any provision in this Agreement is declared invalid for any reason by a court of competent jurisdiction, said finding shall not affect the remaining provisions of this Agreement.

7

30.    Each party shall bear its own costs, fees, and expenses associated with the litigation concerning this action, <u>United States v. Maricopa County, et al.</u>, No. 2:12-cv-981 (D. Ariz).

SIGNATURES OF THE PARTIES:

_____

Joseph M. Arpaio
Maricopa County Sheriff

_____

Steve Chucri
Chairman, Maricopa County
Board of Supervisors
ATTEST:

_____

Mark Kappelhoff, Deputy Assistant Attorney General
U.S. Department of Justice, Civil Rights Division

Clerk of the Board          DEPUTY

_____

CHIEF Deputy County Attorney

SO ORDERED this _____ day of _____ 2015.

_____

Honorable Roslyn O. Silver
Senior United States District Judge

8

# Attachment

# A

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>    Plaintiff,<br><br>    v.<br><br>Maricopa County, Arizona; and Joseph M.<br>Arpaio, in his official capacity as Sheriff of<br>Maricopa County, Arizona,<br><br>    Defendants. | No. 2:12-cv-00981-ROS<br><br>**SETTLEMENT AGREEMENT<br>RESOLVING THE FOURTH<br>CLAIM OF THE UNITED<br>STATES' COMPLAINT AND<br>RELATED ALLEGATIONS** |

    The parties to this Settlement Agreement, the United States of America, Joseph M. Arpaio, Sheriff of Maricopa County, and Maricopa County (collectively the "Parties"), enter into this Agreement to resolve the Fourth Claim, and that portion of any other claim addressing discrimination in MCSO jails, set forth in the United States' Complaint in this action. The Parties agree that this Agreement is in the best interests of the people of Maricopa County and the United States.

## I. BACKGROUND

    1.    The Maricopa County Sheriff's office ("MCSO") has established a formal language access program to benefit limited-English-proficient ("LEP") inmates. The

establishment of a formal Language Access Program signified MCSO's formal
acknowledgment of its duty to provide LEP inmates with reasonable and meaningful
access to programs and services in the Maricopa County jail system.

2.      Over the last five years, the evolution of MCSO's Language Access
Program illustrates MCSO's continued efforts to further meaningful access for LEP
inmates to jail programs, services and opportunities. This evolution has entailed not only
improvements and enhancements to existing policies and programs, but also the creation
of new policies and operations plans to further the:  (1) provision of language assistance
to LEP persons whom MCSO personnel encounter; (2) recognition and identification of
LEP individuals with whom MCSO personnel come into contact; (3) documentation of
each LEP inmate's language needs and the easy availability of such information to all jail
personnel; (4) assessment of the competency of jail personnel to provide language
assistance; (5) limitation of the use of other inmates to translate and interpret for LEP
inmates; (6) production and distribution of written translations in Spanish of Vital
Documents; (7) facilitation of oral language assistance for communications with LEP
inmates; (8) reasonable availability of inmate classes, programs, opportunities and other
services to LEP inmates; (9) bias-free treatment of inmates; (10) facilitation of the
communication of grievances by LEP inmates; (11) facilitation of effective
communication between LEP visitors and jail personnel; (12) availability of telephonic
interpretation services; (13) appropriate handling of complaints relating to language
access; and (14) provision of appropriate supervision and training relating to MCSO
personnel's language access responsibilities.  This Agreement is intended to ensure that
MCSO maintains such language access policies and practices.

## II. DEFINITIONS

The following terms and definitions shall apply to this Settlement Agreement:

3.      "Agreement" means this Settlement Agreement.

4.      "Defendants" means Joseph M. Arpaio, Sheriff of Maricopa County,
named in his official capacity; and Maricopa County.

5.     "Detention Language Roster" means a database listing the bilingual or multilingual language capabilities of detention officers who have volunteered to provide periodic language interpretation and translation services.

6.     "Direct 'In-Language' Communication" means monolingual communication in a language other than English between a bilingual employee and a limited English proficient ("LEP", as defined in paragraph 12) person (e.g., Spanish to Spanish).

7.     "Effective Date of this Agreement" means the date on which this Agreement becomes effective, which is the day it is signed by a representative of the United States, a representative of Sheriff Arpaio, and a representative of Maricopa County, provided that this Agreement does not become effective until each Party to this action also signs the separate Settlement Agreement resolving all claims related to worksite identity theft operations and claims relating to alleged retaliation as set forth in, *inter alia*, the Second and Sixth Claims of the United States' Complaint in this action.

8.     "Full Assessment" means a written complete review and appraisal of the Defendants' compliance with the terms of this Agreement.

9.     "Interpretation" means the act of listening to a communication in one language (source language) and orally converting it into another language (target language), while retaining essentially the same meaning.

10.     "Language Access Plan" means MCSO's DI-6 Policy regarding limited-English-proficient inmates, or any future MCSO policy intended to ensure that MCSO will provide continued, effective communication with inmates and the public who have limited English language proficiency, as well as MCSO detention-related operations with regard to LEP inmates.  The purpose of MCSO's Language Access Plan is to ensure compliance with Title VI and all other applicable laws.

11.     "Language Assistance" means the facilitation of communication with an LEP individual using one of five designated methods, namely, interpretation, translation, direct "in-language" communication, telephonic interpretation, or sight translation in

3

order to enable LEP individuals to communicate effectively with MCSO and to provide LEP individuals with meaningful access to, and an equal opportunity to participate fully in MCSO's services, activities, and other benefits and programs.

12. "LEP" means limited English proficient, and refers to a person who does not speak English as his/her Primary Language and has a limited ability to read, write, speak, or understand English. LEP individuals may be competent in certain types of communication (e.g., speaking or understanding), but still be LEP for other purposes (e.g., reading or writing). Similarly, LEP designations are context-specific: an individual may possess sufficient English language skills to function in one setting, but these skills may be insufficient in other situations.

13. "MCSO" means the Maricopa County Sheriff's Office.

14. "MCSO Bilingual Staff" means bilingual MCSO employees with primary duties unrelated to interpretation but who have reasonably been determined to be proficient in English and other language(s), and are authorized to both interpret for others and engage in direct "in-language" communication.

15. "Primary Language" means the language in which the individual most effectively communicates.

16. "Qualified Interpreters/Translator" means a bilingual MCSO employee or non-employee contractor who has demonstrated his or her competence to interpret or translate through a MCSO approved assessment and/or whose employer is on the State of Arizona list of approved contractors.

17. "Sight translation" means the oral rendering of written text or a document into spoken language by an interpreter while retaining essentially the same meaning based on a visual review of the original text or document.

18. "Telephonic Interpretation Services" means real-time language service that enables speakers of different languages to communicate by telephone with the assistance of a network of operators or bilingual individuals via the available MCSO telephone

4

1  system. Telephone interpreters may or may not have the qualifications of a professional
2  interpreter or one procured through a contract for in-person interpretation service.

3    19.   "Title VI" means Title VI of the Civil Rights Act of 1964, as amended.

4    20.   "Translation" means the replacement of written text from one language
5  (source language) with a written text in another language (target language) while
6  retaining essentially the same meaning.

7    21.   "United States" means the United States of America as represented by the
8  United States Department of Justice's Civil Rights Division and its agents, employees,
9  and consultants.

10    22.   "Vital Documents" means written documents that are essential to providing
11  meaningful access to programs and services to all jail inmates offered by MCSO.  Such
12  written materials include the following: (1) Inmate Rules and Regulations; (2)
13  Announcements of Classes and Programs; (3) Any additional rules and notices posted in
14  the MCSO Jails; (4) Inmate Request Forms ("Tank Orders"); (5) Inmate Medical Request
15  Forms ("Medical Tank Orders"); (6) Inmate Grievance Form; (7) Institutional Grievance
16  Appeal Form; (8) External Grievance Appeal Form; (9) Inmate Legal Services Request
17  Form; (10) Disciplinary Appeal Form; (11) Visitation Form; and (12) Canteen and
18  Commissary Forms.  Whether additional documents are "vital" may depend upon the
19  importance of the program, information, encounter, or service involved.

20    23.   "Vital Announcements" means announcements made in MCSO jails that
21  are essential to providing meaningful access to programs and services and basic safety to
22  all jail inmates offered by MCSO, including, at a minimum, announcements indicating
23  the following: "Medical Nurse", "Male or Female in the House", "Chow in the House",
24  "Lockdown", "Programs", or "Recreation."

25  **III.   COMMITMENTS**

26      A. Language Assistance

27    24.   MCSO jail personnel shall provide reasonable, effective, free, and timely
28  language assistance to LEP individuals whom they encounter, including LEP inmates and

5

members of the public, regardless of whether the LEP person requests language services in the jail setting concerning jail related matters. MCSO detention personnel assigned to the visitation area of each facility shall take all reasonable steps to assist LEP members of the public requesting to visit an inmate or requesting jail-related information regarding jail-related matters, including utilizing bilingual and multilingual detention personnel and telephonic language interpretation services. MCSO will require the Sheriff's Information Management Services (SIMS) to utilize bilingual and multilingual personnel, as well as the telephonic language interpretation services, to assist members of the public who are LEP individuals when providing information on the public jail information telephone line or in the Bonds and Fines Lobby at the 4th Avenue Jail.

25. MCSO shall continue to maintain a written language access policy consistent with Title VI and this Agreement.

26. MCSO shall continue to maintain designated personnel to handle all language access needs and oversee compliance with the MCSO language access policy and plan. The responsibilities of such personnel shall include, but need not be limited to, the following:

    a. addressing all interpretation and translation needs raised by supervisors from MCSO jail units and departments;

    b. providing input regarding the selection and performance of interpretation and translation companies;

    c. establishing and enforcing assessment and quality control standards for bilingual jail personnel who will interpret for LEP persons;

    d. identifying, and working with appropriate officials to obtain within reasonable cost parameters the technology and apparatus reasonably necessary to effectively execute the Language Access Plan;

    e. monitoring the demographics of jail population in Maricopa County jail facilities to ensure sufficient language capacity as prescribed by DOJ guidelines;

6

f. maintaining and updating training curricula and conduct training, in conjunction with MCSO training personnel;

g. maintaining and updating logging, data entry, record keeping, and identification systems as discussed in the Language Access Plan and herein; and

h. maintaining complaint processes to address complaints related to language services in the jail setting concerning jail-related matters.

27. MCSO shall continue to maintain a high-level supervisor who is responsible for the oversight of personnel with language access responsibilities. MCSO shall maintain a reporting structure whereby such personnel report to a MCSO Headquarters LEP Coordinator, through the established chain of command, responsible to report to the Chief of Custody.

28. MCSO shall continue to require that the LEP Coordinator or other MCSO personnel primarily responsible for implementation of MCSO's language access policies generate an annual report of any language-access-related complaints submitted to MCSO by an LEP inmate or visitor of an LEP inmate, and steps taken to resolve any such complaints. The report shall be provided to the Chief of Custody and to the United States for the duration of this Agreement.

B. Identification of LEP Individuals

29. MCSO shall continue to require jail personnel to make reasonable efforts to determine during the inmate intake process whether any incoming inmates are LEP and to record that LEP status so that other jail personnel having subsequent contact with the inmate can readily identify the inmate's LEP status. MCSO also shall adopt reasonable procedures to ensure that any inmates whose limited English proficiency is not noticed during intake may subsequently be identified by jail personnel as LEP and their LEP status recorded so that other jail personnel having subsequent contact with the inmate can readily identify the inmate's LEP status.

7

30.    In determining LEP status of an inmate, MCSO shall continue to ensure that MCSO personnel use means reasonably calculated to determine LEP status. The methods to determine LEP status may include one or more of the following:

    a. Self-identification by the LEP individual (i.e., if the individual is able to communicate the language that he or she speaks);

    b. Language identification posters, which invite LEP persons to identify their Primary Language. These posters shall be placed at all MCSO intake facilities, in the 4th Avenue Holding Tanks next to the Language Access Policy, in the Holding Tanks at each of the housing facilities, in the Self-Surrender facility, in all visitation waiting areas, and at visitation counters. The information from such posters may also be available through a telephonic interpretation service;

    c. Verification of language by MCSO bilingual jail personnel; and

    d. Through use of a telephonic interpretation service.

31.    If an inmate has been identified as LEP by an arresting agency, MCSO jail personnel at Central Intake will utilize its independent procedures to determine whether an inmate is LEP and the inmate's Primary Language is accurately identified.

C. Documenting Language Needs

32.    MCSO shall continue to enter each individual's Primary Language in the Jail Management System ("JMS") database under the Primary Language field. In the event that a language code is unavailable for a particular language in JMS, MCSO will take appropriate measures to record the Primary Language of the LEP inmate in JMS in such a way that other jail personnel having subsequent contact with the inmate can readily identify the inmate's LEP status.

33.    MCSO shall continue to ensure that all jail personnel have access to the daily inmate rosters for those inmates with whom they may interact (housing rosters, transportation rosters, etc), and that each inmate's Primary Language appears on such rosters.

8

34.    MCSO shall continue to require jail intake personnel to record each LEP inmate's Primary Language on his or her booking/door facility card.

D.  Assessment of Jail Personnel Competency to Perform Language Assistance

35.    MCSO shall continue to ensure that jail personnel who self-identify as bilingual and agree to serve as interpreters and/or translators demonstrate proficiency in and ability to communicate information accurately in the languages in which they will be interpreting or translating.

36.    MCSO shall continue to maintain a list of bilingual jail personnel who may be available to help other jail personnel communicate with LEP inmates.  The list shall be accessible throughout its facilities and include the name of the individual detention officer and the facilities to which the individual detention officer is assigned.  MCSO shall continue to keep the list updated to account for personnel changes and transfers.

E.  Use of Inmates to Translate or Interpret

37.    MCSO's Language Access Plan shall make clear that reliance on inmates to translate or interpret for fellow LEP inmates is generally not appropriate and should only be an option in unforeseeable emergency circumstances or if the topic of communication is not sensitive, confidential, important, or technical in nature and the inmate is competent in the skill of interpreting.  MCSO's Language Access Plan also shall make clear that special care must be taken to ensure that family, legal guardians, caretakers, fellow inmates, and other informal interpreters are appropriate in light of the circumstances and subject matter of the communication.  MCSO personnel shall refrain from encouraging inmates to use other inmates as translators.

F.  Written Translations

38.    The LEP Coordinator and/or other MCSO personnel primarily responsible for implementation of MCSO's language access policies shall be responsible for:

    a.  identifying Vital Documents;

    b.  identifying and determining languages into which Vital Documents should be translated;

9

     c.  procuring qualified translators to accomplish translation of Vital

          Documents;

     d.  monitoring quality of translated documents;

     e.  enforcing protocols for accurate translation of documents;

     f.  reviewing complaints related to quality of translations;

39.     MCSO shall ensure that each jail facility maintains an appropriate supply of documents that have been translated into languages other than English, considering the LEP inmate population at each facility.

40.     MCSO shall use MCSO bilingual jail personnel or qualified contract translators for the translation of Vital Documents into Spanish or any other language rising to the level of five percent (5%) of the overall inmate population in the Maricopa County jails. MCSO shall ensure that the LEP Coordinator and/or other MCSO personnel primarily responsible for implementation of MCSO's language access policies documents the names of the forms that have been translated (including the version that was translated), translators' names, date of translation, and language of translation.

41.     MCSO shall continue to translate all Vital Documents into Spanish.

42.     Any time a Vital Document is updated, MCSO shall issue that document simultaneously in English and Spanish.

43.     MCSO shall ensure that Vital Documents are available to LEP inmates in their Primary Language, if the Primary Language rises to the level of five percent (5%) of MCSO's overall inmate population.

44.     MCSO shall instruct jail personnel that forms, requests, or any other document may be submitted by an inmate in the inmate's designated language. MCSO shall require its jail personnel to accept forms and Vital Documents in the language in which they are submitted.

45.     MCSO shall handle and process all Vital Documents submitted by inmates in Spanish in a reasonably expedient manner and timeframe.

    G. Oral language assistance for inmates

10

46.     MCSO shall ensure by December 31, 2015, that all vital announcements in MCSO facilities are made in both English and Spanish.

47.     MCSO shall ensure that transportation detention officers and deputies have radio or telephonic access to MCSO bilingual personnel and/or a telephonic interpretation service while at MCSO jail facilities.

48.     MCSO shall maintain its Language Access Plan and procedures to facilitate oral language and other language assistance.  MCSO shall take reasonable steps to ensure that personnel are available to communicate effectively with LEP inmates at all times.

H. Contacts of a Medical Nature

49.     For any contacts with LEP individuals of a medical nature, MCSO shall take reasonable steps to ensure that Correctional Health Services staff are informed of language assistance needs to facilitate such staff's communication with the LEP individual.

I. Inmate Classes, Programs, Work Opportunities and Other Services

50.     MCSO shall take reasonable steps to ensure that inmate classes, services, and programs are reasonably available to LEP inmates. MCSO shall keep a record of all scheduled classes, services, and programs, and the language in which they were conducted, by having the housing officer document the event in the online journal system and by keeping attendance lists from all scheduled classes, services, and programs. A copy of attendance lists at non-English language offerings shall be available to the LEP Coordinator and/or other MCSO personnel primarily responsible for implementation of MCSO's language access policies upon request.  MCSO shall take reasonable steps to ensure that an inmate's LEP status will not hinder the inmate from benefiting from classes or programs that can reduce the inmate's length of stay or improve conditions of the inmate's confinement.

51.     MCSO shall take reasonable steps to ensure that work opportunities, particularly those that may be associated with benefits such as additional food, clothing, or recreation, are made reasonably available to LEP inmates.

11

J.  Bias-Free Treatment of Inmates

52.     MCSO shall continue to ensure that all MCSO jail personnel, including MCSO jail personnel hired after the initial implementation of this Agreement, receive training on the MCSO Code of Conduct (CP-2) and Employee Disciplinary Procedures (GC-17), including clear guidance that MCSO policy prohibits employees from demeaning inmates or acting disparagingly against any inmate regardless of age, nationality, religious beliefs, race, gender, culture, sexual orientation, veteran status, ancestry, or disability, as currently provided in paragraph 4.D. of MCSO's Code of conduct (CP-2) .

K.  Grievances

53.     MCSO shall continue to accept grievances and grievance appeals in any language, and ensure that they are addressed in a reasonably timely manner, regardless of the language in which the grievance was submitted in accordance with rules and procedures applicable to all other grievances and grievance appeals. MCSO shall conduct grievance hearings with LEP inmates using a MCSO bilingual officer, a qualified contract interpreter, or a telephonic language interpretation service. MCSO shall document the type of language assistance provided on all grievance-related reports, and make this documentation available to the LEP Coordinator and/or other MCSO personnel primarily responsible for implementation of MCSO's language access policies, upon request.

L.  Disciplinary Action

54.     MCSO shall prohibit the practice of imposing pod restrictions and inmate disciplinary measures solely because of a language access issue.

55.     MCSO shall ensure that jail personnel use a MCSO bilingual officer or telephonic interpretation for communications relating to disciplinary action regarding an LEP inmate. MCSO shall ensure that the method of language assistance provided is documented on all related reports.

12

M. Visitors

56.     MCSO shall provide all Spanish-speaking LEP visitors with language-appropriate visitation forms. MCSO shall ensure that jail personnel use a MCSO bilingual officer to translate non-English language information on a visitation request form.

57.     MCSO shall ensure that such translation occurs within a reasonable amount of time. MCSO will also ensure that no LEP visitor will be turned away from visitation solely due to a language issue.

58.     MCSO shall follow its Language Access Plan regarding the use of telephonic interpretation services for visitors who speak a language for which no language-appropriate forms and/or timely translation services are available on-site, and will permit the LEP visitor to orally convey the written information to the telephonic interpreter, who shall, in turn, interpret the visitor's statements to MCSO personnel.

59.     MCSO shall continue to post language identification posters in visitation waiting areas.

60.     MCSO shall translate into Spanish the portions of its website that provide information relevant to family, friends, and visitors of inmates.

N. Telephonic Interpretation Services

61.     MCSO shall continue to equip housing units, as well as other MCSO jail units and departments that interact with inmates, arrestees, and/or the public, with communication technology reasonably necessary to obtain timely telephonic interpretation assistance.

62.     MCSO shall continue to maintain procedures to permit personnel to timely access telephonic interpretation assistance.

63.     MCSO shall continue to provide training to MCSO jail personnel on accessing telephonic interpretation services and provide MCSO jail personnel with a telephonic language interpretation access card pursuant to MCSO policy.

13

64.     MCSO shall continue to ensure that interactions interpreted through use of telephonic interpretation are accorded the same degree of confidentiality as in-person interactions. As such, MCSO will ensure that communications of a confidential nature that are normally conducted outside the presence of other inmates or jail personnel, when conducted telephonically, shall involve the same degree of privacy (via dual handsets, a private room, or other methods).

O. Complaint Procedures

65.     MCSO shall continue to maintain a grievance policy for inmate complaints and describe the complaint process in the Inmate Rules and Regulations. Complaints regarding language access concerning jail related issues shall be made available to the LEP Coordinator and/or other MCSO personnel primarily responsible for implementation of MCSO's language access policies.

66.     The LEP Coordinator and/or other MCSO personnel primarily responsible for implementation of MCSO's language access policies shall share language access complaints concerning jail related issues with the supervisors who oversee any personnel implicated by such complaints.

P. Training

67.     MCSO shall continue to ensure that MCSO jail personnel receive reasonable and adequate training on the MCSO Language Access Plan, Title VI of the Civil Rights Act of 1964, and cultural sensitivity and the provision of bias-free detention services. MCSO shall ensure that all new detention officers shall receive this training as part of their Academy Training.  MCSO personnel shall require jail personnel to receive reasonable Language Access Plan training annually.

Q. Other General Provisions

68.     Any provision in this Agreement requiring translation, interpretation, or other language assistance in Spanish does not relieve MCSO of any obligation under Title VI or any other applicable law to provide translation, interpretation, or other language assistance in other languages.  This Agreement does not relieve MCSO of any

1 obligation it may have under Title VI to ensure meaningful access to programs or
2 activities by LEP individuals.

3     R. Assessing Compliance

4     69.     MCSO shall timely grant reasonable requests by the United States for
5 information necessary to confirm and assess Defendants' compliance with this
6 Agreement. Such information may include access to documents, data, records, and
7 facilities, and interviews with MCSO personnel and inmates. MCSO shall compile
8 quarterly reports during the one year period following the effective date of this
9 Agreement which will include: (1) telephonic language interpretation usage reports; (2)
10 LEP inmate related formal grievances; (3) LEP jail related written complaints received
11 from the public; (4) JMS Language Code by Facility Reports; (5) LEP inmate monthly
12 interview forms; and (6) detention officer monthly LEP interview forms. These quarterly
13 reports will be available to the United States upon request. In addition, upon reasonable
14 notice and the delivery of a desired itinerary from the DOJ, MCSO will grant the United
15 States reasonable access to Maricopa County jail facilities for a maximum of two visits in
16 connection with the DOJ's Full Assessments.

17     70.     The United States shall have the opportunity to make two Full Assessments
18 of the Defendants' compliance with this Agreement. The United States shall have the
19 opportunity to complete the first Full Assessment within 210 days of the Effective Date
20 of this Agreement, unless otherwise agreed by the Parties. The United States shall have
21 the opportunity to complete its second Full Assessment of Defendants' compliance with
22 this Agreement within 155 days after completing the first Full Assessment, unless
23 otherwise agreed by the Parties.

24     71.     In resolving any motion or action to enforce any provision of this
25 Agreement, evidence of a Defendant's conduct, practices, or procedures prior to the
26 Effective Date of this Agreement may be probative, but shall not be determinative on the
27 question of whether the Defendant is in compliance with this Agreement.

28

## IV. SCOPE, IMPLEMENTATION AND ENFORCEMENT

72.     On the Effective Date of this Agreement or the business day following, the United States shall file in this case a notice informing the Court that the parties to this case have stipulated under Rule 15(a)(2) to amend the Complaint to remove the United States' Fourth Claim and that portion of any other claim addressing discrimination in MCSO jails, that the Complaint is thereby so amended and any such claims will not be further prosecuted in this action.

73.     The United States shall notify Defendants if it determines that a Defendant is not in compliance with the Agreement in any respect. Any notification of alleged non-compliance shall be in writing and will identify the specific non-compliance and the factual basis for any alleged non-compliance. The Parties shall first attempt to resolve any dispute informally by notification and conferral. If the Parties are unable to agree on a resolution of the dispute concerning the Defendant's compliance within 60 days after initial conferral, the United States may, without further notice to Defendants, seek enforcement of this Agreement with the United States District Court for the District of Arizona (the "Court"), through any appropriate form of relief. Any motion or action to enforce this Agreement shall be brought within one year of the occurrence of any alleged violations.

74.     The Parties shall notify each other of any court or administrative challenge to this Agreement. In the event any provision of this Agreement is challenged in any local or state court, removal to a federal court shall be sought by the Parties and transfer of venue to the United States District of Arizona will be sought.

75.     Either Defendant may withhold from the United States any documents or data protected by the attorney-client privilege or the work product doctrine. Should a Defendant decline to provide the United States access to documents or data based on attorney-client privilege and/or the work product doctrine, the Defendant shall inform the United States that it is withholding documents or data on this basis and shall provide the United States with a log describing the documents or data.

16

76.   The Parties may make use of protective orders or agreements to ensure the confidentiality of any non-public information as appropriate and necessary. Other than as expressly provided herein, this Agreement shall not be deemed a waiver of any privilege or right a Defendant may assert, including the attorney-client communication privilege, attorney work product protections, and any other privilege, right, or protection recognized at common law or created by statute, rule or regulation, against any other person or entity with respect to the disclosure of any document.

## V. ENTIRE AGREEMENT, SEVERABILITY, COSTS

77.   This Agreement constitutes the entire agreement between the Parties with regard to the Fourth Claim of the Complaint in this action, and it supersedes any and all prior representations and agreements, whether oral or written, between the Parties with regard to that claim.  No such prior representations or agreements may be offered or considered to vary the terms of this Agreement, or to determine the meaning of any of its provisions.

78.   In the event that any provision in this Agreement is declared invalid for any reason by a court of competent jurisdiction, said finding shall not affect the remaining provisions of this Agreement.

79.   Each party shall bear its own costs, fees, and expenses associated with the litigation concerning this action, United States v. Maricopa County, et al., No. 2:12-cv-981 (D. Ariz).

SIGNATURES OF THE PARTIES:

Joseph M. Arpaio
Maricopa County Sheriff

Steve Chucri
Chairman, Maricopa County
Board of Supervisors
ATTEST:

Mark Kappelhoff, Deputy Assistant Attorney General
U.S. Department of Justice, Civil Rights Division

Clerk of the Board   DEPUTY

CHIEF   Deputy County Attorney

17